# EXHIBIT 6

FOURTH AMENDED AND RESTATED
LIMITED LIABILITY COMPANY AGREEMENT
OF
ESCOM, LLC

**THIS FOURTH AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT** (together with any Schedules and Exhibits attached hereto, the "*Agreement*"), is entered into as of this 21st day of March, 2008 (the "Effective Date") by and among **DOMAIN NAME ACQUISITION GROUP, LLC**, a Delaware limited liability company ("**DNAG**"), **WASHINGTON TECHNOLOGY ASSOCIATES, LLC**, a Maryland limited liability company ("**WTA**"), **DOM PARTNERS LLC**, a Delaware limited liability company ("**DP**"), and **NUTHIN' BUT NET, LLC**, a Delaware limited liability company ("**NBN**"). Each of WTA, DNAG and DP shall be referred to individually hereafter as a "*Founder*" and collectively as the "*Founders*".

**WHEREAS,** WTA and DNAG agreed to organize and operate a limited liability company under the Delaware Limited Liability Act (the "**Act**") in accordance with the terms of, and subject to the conditions set forth in, the Limited Liability Company Agreement of Escom, LLC dated January 5, 2006 (the "Initial Operating Agreement") by filing a Certificate of Formation with the Division of Corporations in the office of the Secretary of State of Delaware (the "Division of Corporations");

**WHEREAS,** WTA and DNAG in connection with admitting DP as an additional member of the Company amended and restated their respective rights, obligations and duties with respect to the Company and its business, management and operations by executing, along with DP, a second version of the Initial Operating Agreement dated January 12, 2006, which also was titled "Limited Liability Company Agreement of Escom, LLC" and which superseded the Initial Operating Agreement (the "First Amended and Restated Operating Agreement"),as set forth in the Initial Operating Agreement by executing this Agreement;

**WHEREAS,** the Founders further amended the First Amended and Restated Operating Agreement by executing the Second Amended and Restated Limited Liability Company Agreement of Escom, LLC dated February 3, 2006 (the "Second Amended and Restated Operating Agreement") and the Third Amended and Restated Operating Agreement dated August 1, 2007; and

**WHEREAS,** the Members wish to further amend and restate their respective rights, obligations and duties with respect to the Company and its business, management and operations by executing this Agreement.

**NOW, THEREFORE,** in consideration of the mutual covenants herein contained and for other good and valuable consideration. the receipt of and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

CONFIDENTIAL

Body of Agreement:
Page 1 of 43

Deleted: 43

Exhibit 6
Page 39

# ARTICLE I
## NAME, OFFICE, AGENT, ORGANIZATION, POWERS, MEMBERS AND MANAGER

1.01    <u>Defined Terms</u>.  Capitalized terms used herein shall have the respective meanings ascribed to them in Article XI or as defined elsewhere in the text of this Agreement.

1.02    <u>Name of the Limited Liability Company</u>.   The name of the Company shall be Escom, LLC.  The name of the Company may be changed at any time or from time to time by the Managers in accordance with this Agreement.

1.03    <u>Registered Agent and Registered Office</u>.  The name of the registered agent for the Company is Delaware Corporate Agents.  The address of the registered office of the Company is 4406 Tennyson Road, Wilmington, DE 19802. The Managers may establish places of business of the Company within and without the State of Delaware, as and when required by its business and in furtherance of its purposes set forth in Section 1.06, and may appoint agents for service of process in all jurisdictions in which the Company shall conduct business.

1.04    <u>Principal Office</u>.  The principal office of the Company shall be located at 21300 Victory Boulevard, Suite 265, Woodland Hills, CA  91367, or at such other place as the CEO may designate.

1.05    <u>Organization</u>.  The Managers have caused or contemporaneously herewith shall cause to be filed such certificates and documents as may be necessary or appropriate to comply with the Act and any other applicable requirements for the operation of a limited liability Company in accordance with the laws of the State of Delaware and any other jurisdictions in which the Company shall conduct business, and shall continue to do so for so long as the Company conducts business therein.

1.06    <u>Nature of Business</u>.  The general character of the business of the Company, as set forth in the Certificate, is to conduct any and all business activities authorized by the Act. Accordingly, the purposes of the Company shall be to acquire, own, improve, develop, subdivide, finance, manage, lease, rent, sell and otherwise deal with any and all assets of the Company, real or personal, tangible or intangible.   Subject to all other provisions of this Agreement, in furtherance of the conduct of its business, the Company is hereby authorized:

(a)    To enter into, execute, modify, amend, supplement, acknowledge, deliver, perform and carry out contracts of any kind, including operating agreements of limited liability companies (whether as a member or manager), joint venture, limited and general partnership agreements, contracts with Affiliates, and including guarantees and contracts establishing business arrangements or organizations, necessary to, in connection with, or incidental to the accomplishment of the purposes of the

Deleted: 43

CONFIDENTIAL

Body of Agreement
Page 2 of 43

Exhibit 6
Page 40

Company, and to secure the same by mortgages, pledges or other liens.

(b)    To borrow money and issue evidences of indebtedness in furtherance of any or all of the purposes of the Company, and to secure the same by mortgages, pledges, or other liens.

(c)    To the extent that funds of the Company are available therefore, to pay all expenses, debts and obligations of the Company.

(d)    To enter into or engage in any kind of activity necessary to, in connection with, or incidental to the accomplishment of the purposes of the Company, so long as said activities may be lawfully carried on or performed by a limited liability company under the laws of the State of Delaware and any other jurisdictions in which the Company shall conduct business.

(e)    To take any other action not prohibited under the Act or other applicable law.

1.07   <u>Members</u>.  In accordance with Section 18-302 of the Act, the Company shall issue two classes of Interests; Class A and Class B Interests.  Class A and Class B Interests shall have equivalent voting rights.  The sole distinction between Class A and Class B Interests shall be with respect to priority of distributions (both of normal Positive Cash Flow and upon liquidation of the Company), as set forth below. All Members of the Company and their respective Percentage Interests as of the date hereof are identified on **<u>Schedule A</u>** attached hereto and incorporated herein by reference.  Additional Members may be admitted to the Company pursuant to and in accordance with Article VII.  In connection with any such admission, this Agreement (including Schedule A) shall be amended to reflect each additional Member, his capital contribution, if any, his Percentage Interest and Class of Interest, and any other rights and obligations of the additional Member.  The rights and obligations associated with particular Classes of Interests may be modified, expanded or reduced upon the Approval of the Managers, and the Consent of the holders of the Class of Interest to be affected.

1.08   <u>Term</u>.  The term of the Company shall commence upon the filing of the Certificate with the Division of Corporations and shall continue in existence until its existence is terminated pursuant to Article VIII of this Agreement.

1.09   <u>Affiliate Matters</u>.  Subject to the terms of, and except as otherwise authorized in accordance with, this Agreement, the Company may enter into any agreement, transaction or arrangement between the Company and any Affiliates as defined in Article XI.

<div align="center">

### ARTICLE II
### CAPITAL CONTRIBUTIONS AND LIABILITY OF MEMBERS

</div>

2.01   <u>Capital Accounts</u>.  A separate Capital Account shall be established and maintained

| Deleted: 43 |
| --- |

<div align="center">

CONFIDENTIAL

Body of Agreement
Page 3 of ‥

</div>

<div align="center">

**Exhibit 6**
**Page 41**

</div>

for each Member. If any Interest is transferred pursuant to the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent the Capital Account is attributable to the transferred Interest. If the book value of Company property is adjusted pursuant to Section 4.05(b), the Capital Account of each Interest Holder shall be adjusted to reflect the aggregate adjustment in the same manner as if the Company had recognized gain or loss equal to the amount of such aggregate adjustment. It is intended that the Capital Accounts of all Interest Holders shall be maintained in compliance with the provisions of Regulation Section 1.704-1(b), and all provisions of this Agreement relating to the maintenance of Capital Accounts shall be interpreted and applied in a manner consistent with that Regulation.

2.02    Capital Contributions.

(a)    Initial Capital Contributions. The Members have contributed to the Company the cash, obligations and Domain Name Rights identified on Schedule A attached hereto (the "Initial Capital Contributions"). The parties acknowledge that the Company exercised the Domain Name Rights after execution of the First Amended and Restated Operating Agreement by complying with the process identified therein for such exercise and that the Company now owns all right, title and interest in and to the Domain Name. The parties acknowledge that this process involved the Company completing the purchase of the Domain Name on DNAG's behalf in accordance with the terms of the Domain Name Purchase Agreement and simultaneously purchasing the Domain Name from DNAG in exchange for the sum of $11.4 million. To the extent necessary, DNAG shall continue to cooperate in any way necessary to give further legal effect to the above described transaction.

(b)    Additional Capital Contributions. Except as otherwise provided in this Article II, no Member shall be obligated to contribute any additional capital or make any additional contribution to the Company. If at any time or from time to time, the Managers determine that the Company requires additional Capital Contributions, then notice shall be given to each Member of (i) the total amount of additional Capital Contributions required, (ii) the reason the additional Capital Contribution is required, (iii) each Member's proportionate share of the total additional Capital Contribution (determined in accordance with this Section), (iv) the valuation associated with such Capital Contribution, (v) the class of Interest the Members will receive for such Capital Contribution (and the rights associated therewith) and (vi) the date each Member's additional Capital Contribution is due and payable. A Member's proportionate share of the total additional Capital Contribution shall be equal to the product obtained by multiplying each such Member's Percentage Interest by the total additional Capital Contribution required. Except as provided above, no Member shall be required to contribute any additional capital to the Company, and no Member shall have any personal liability for any obligation of the Company, or for his failure to make additional Capital Contributions. Failure to make additional Capital Contributions does not constitute a breach of this

Deleted: 43

CONFIDENTIAL

Body of Agreement
Page 4 of

Exhibit 6
Page 42

Agreement and the exclusive remedy for such failure is provided in paragraph (c) below.

(c)   <u>Failure to Make Additional Capital Contributions</u>.   If a Member fails to pay ("Defaulting Member") when due all or any portion of any Capital Contribution (the "Unpaid Contribution"), a non-defaulting Member may pay the Unpaid Contribution of the Defaulting Member.  In such case where multiple Members elect to pay the Unpaid Contribution, such Members shall pay the Unpaid Contribution pro rata in accordance with their Percentage Interest. To the extent the Unpaid Contribution is contributed by the other Member(s), the Defaulting Member shall have a period of thirty (30) days from the time the Unpaid Contribution is paid to reimburse the other Member(s) the amount of the Unpaid Contribution. If the Defaulting Member does not reimburse the other such Member(s) within the thirty (30) day period, then the Defaulting Member's Percentage Interest shall be reduced and the Percentage Interest(s) of the Member(s) who made up the Unpaid Contribution shall be increased accordingly after taking into effect such Capital Contribution. The President (as defined below) shall amend Schedule A accordingly. This remedy is the exclusive remedy for the failure to pay additional Capital Contributions hereunder.

2.03   <u>No Withdrawal of or Interest on Capital</u>.   No interest shall accrue on any contributions to the capital of the Company, and no Member shall have the right to withdraw or to be repaid any capital contributed by him or to receive any other payment in respect of his interest in the Company, including without limitation as a result of the withdrawal or resignation of such Member from the Company, except as specifically provided in this Agreement.

2.04   <u>Liability of Members</u>.   No Member, in his, her or its capacity as a member, shall have any liability to restore any negative balance in his, her or its Capital Account or to contribute to, or in respect of, the liabilities or obligations of the Company, or to restore any amounts distributed from the Company, except as may be required under the Act, this Agreement or other applicable law.  In no event shall any Member, in his, her or its capacity as a Member, be personally liable for any liabilities or obligations of the Company.

2.05   <u>Managers as Members</u>.   Managers may hold interest in the Company as Members.

<div align="center"><u>ARTICLE III</u>
<u>FUNDING</u></div>

3.01   <u>Third Party Funding</u>.  In the event that the Company requires additional funds to carry out its purposes, to conduct its business, to meet its obligations or to make any expenditure authorized by this Agreement, the Company may offer third party investors the opportunity to invest in the Company on such terms and conditions as may be

<div style="border:1px dashed">Deleted: 43</div>

<div align="center">CONFIDENTIAL

Body of Agreement
Page 5 of 55</div>

Exhibit 6
Page 43

authorized in accordance with Article V. In the event that such additional equity investment would result in a dilution of any Member's Interest, such Member shall be given the opportunity to retain their Percentage Interest by investing additional capital on the same terms as those proposed for the third party investment. The Company also may borrow funds from such third party lender(s) and on such terms and conditions as may be authorized in accordance with Article V.

3.02    Member Funding.    As an alternative or in addition to funds raised from third party investors, the Company may raise additional funds as needed or desired by securing (upon the required authorization set forth in Article V) a loan from any Member in the amount and on such terms as so approved. To the extent the Company seeks any such loan, other than pursuant to Section 3.03 below, all Members shall have the pro rata opportunity to participate in making such loan to the Company and to acquire any further equity Interests as the Company may offer in connection with such funding on a pro rata basis in accordance with this Agreement.

3.03    Initial and Additional Funding.    The initial funding of the Company shall consist of the Initial Capital Contributions which were made in exchange for Class A Membership Units and Class B Membership Units in the amounts designated on Schedule A hereto and the funds borrowed by the Company pursuant to the promissory notes and security agreements described below. As the Company is currently in need of additional funds in order to repay the borrowed funds and for working capital, the Members hereby authorize the Company to sell equity in the Company in the form of Class B Membership Units for an additional amount of $3,000,000, as further provided below:

(a)    The Company acknowledges the following currently outstanding Notes and Security Agreements (as defined below):

(i)    $5,000,000 Secured Promissory Note payable to WTA dated January 12, 2006 (the "WTA Note"), and corresponding Security Agreement of even date therewith (the "WTA Security Agreement").

(ii)    $3,000,000 Secured Promissory Note payable to DP dated January 12, 2006 (the "DP Note"), and corresponding Security Agreement of even date therewith (the "DP Security Agreement").

(iii)    $1,500,000 Convertible Promissory Note payable to NBN dated May 12, 2006 (the "NBN Note").

(iv)    $2,500,000 Secured Promissory Note payable to iEntertainment, Inc. dated August 1, 2007 (the "iEntertainment Note"), and corresponding Security Agreement of even date therewith (the "iEntertainment Security Agreement").

(v)    The notes and security agreements described above shall be referred to hereafter respectively as the "Notes" and the "Security Agreements" and

CONFIDENTIAL

Deleted: 43

Body of Agreement
Page 6 of 52

Exhibit 6
Page 44

collectively, as the ("Loan Documents").  The Notes referred to in subparagraphs (i) and (ii) above shall be referred to as the "Long Term Notes", the Note referred to in subparagraph (iii) above shall be referred to as the "Bridge Note". The security for the Long Term Notes shall include a first priority lien on all assets of the Company, including all of the Company's right, title and interest in and to the Domain Name, as more fully described in the Security Agreements. The security for the iEntertainment Note shall include a second priority lien on all assets of the Company, including all of the Company's right, title and interest in and to the Domain Name, as more fully described in the iEntertainment Security Agreement.

(vi)   Notwithstanding anything to the contrary in the Notes or Security Agreements, prior to either WTA or DP (each, a "Lender", and collectively, the "Lenders"), as the case may be, exercising any remedy(ies) for any default under any Note(s) or Security Agreement(s), including converting the Bridge Note to Membership Units, the other Lender shall have a first right of refusal to purchase all or any portion of the relevant Note(s) for the Purchase Price (as defined below). The other Lender shall have five (5) business days from receipt of written notice from the original Lender stating such original Lender's intention to pursue any such remedy(ies) (a "Default Notice") to pay the original Lender an amount equal to any unpaid principal and all accrued and unpaid interest outstanding on the relevant Note(s) as of the date of the Default Notice (the "Purchase Price").  The original Lender shall not pursue any remedy(ies) for any default under any Note(s) or Security Agreement(s) until a Default Notice has been served on the other Lender and the five (5) business day period required to be included therein has expired without payment by the other Lender of the Purchase Price.  In the event the other Lender timely pays the Purchase Price, such other Lender shall step into the shoes of the original Lender and succeed to all rights of such original Lender contained in the relevant Note(s) and Security Agreement(s).

(b)   The Company shall be authorized to raise up to $3,000,000 in equity financing (together with the capital contributions of WTA and DP set forth in Schedule A corresponding to their Class B Interests, the "Class B Contributions") by offering investors the opportunity to purchase Class B Membership Units on such terms and conditions as may be acceptable to the Founders.   Immediately upon completion of this equity fundraising, the Company shall satisfy and discharge the Bridge Note in full (including all unpaid principal and accrued interest thereon) or to the maximum extent possible if the amount raised is less than the amount required to satisfy the Bridge Note in full.

3.04   Non-Dilution.  Notwithstanding anything herein to the contrary (including but not limited to Section 2.02(c) above, the Class B Interests held by the Members shall not be subject to dilution until such time as the completion of the equity fundraising referred to in Section 3.03(b) above.

## ARTICLE IV

CONFIDENTIAL

Body of Agreement
Page 7 of 13

Deleted: 43

Exhibit 6
Page 45

### PROFITS, LOSSES AND DISTRIBUTIONS

4.01    Positive Cash Flow.    The term "Positive Cash Flow" as used in this Agreement shall mean the gross cash receipts generated from the operation of the business of the Company from all sources, including, without limitation, all revenue and income obtained from the sale of the assets or property of the Company as well as the proceeds from all refinancing of mortgages or replacements of existing mortgages encumbering the property of the Company available to the Company after (i) the payment or accrual for payment of all current operating expenditures in connection therewith, including, without limitation, interest and principal payments due on loans and other charges due pursuant to any mortgages encumbering the property of the Company and after (ii) making provisions for the reasonable working capital requirements of the Company and investments and reinvestments appropriate to enable the Company to carry out its purposes, but disregarding in determining Positive Cash Flow depreciation, amortization, other non-cash items and amounts to be distributed to the Members pursuant to the terms of this Agreement.    The Managers' determination with respect to provisions for reasonable working capital requirements and appropriate investments and reinvestments of the Company shall be conclusive.

4.02    Distribution of Positive Cash Flow.

(a)    Upon the Approval of the Managers and subject to the provisions hereof (including specifically Section 4.12 herein below) and any applicable agreements to which the Company or the Members are a party, distributions of Positive Cash Flow shall be made on an annual basis following the end of each fiscal year within ninety (90) days after the close of the fiscal year, and shall be made to the Members in accordance with the following order of priority:

(i)    First, to Class B Interest Holders until they receive total distributions of Positive Cash Flow in an aggregate amount equal to 125% of their initial Class B Contributions (the "Class B Priority Return"). Such distributions to the Class B Interest Holders shall be made to each Class B Interest Holder pro rata based on the ratio each Class B Interest Holder's Percentage Interest bears to the aggregate Percentage Interests of all Class B Members.    Any distributions made (or deemed to have been made) pursuant to Section 4.11 or Section 4.12 shall be included in calculating the priority distributions required under this paragraph; and

(ii)    Thereafter, to all Members on a pro rata basis in proportion to their Percentage Interest.

Notwithstanding the foregoing, however, no distributions of Positive Cash Flow (other than pursuant to Sections 4.12 or 5.9 below, and then only to the extent the Company is solvent and the Notes are not then due or in default) shall be made until such time as the Notes are paid in full (including repayment of the entire

Deleted: 43

CONFIDENTIAL

Body of Agreement
Page 8 of 25

Exhibit 6
Page 46

principal and payment of all accrued interest thereon).

(b)    Notwithstanding anything to the contrary set forth in this Section, any Positive Cash Flow that arises during the liquidation of the Company shall be distributed in accordance with Article IX below.

4.03   <u>Determination of Net Profits and Net Losses</u>.  For purposes of computing the amount of any items of income, gain, loss or expense to be reflected in the Member's Capital Accounts (hereinafter the net of such items being referred to as the "Net Profits" or the "Net Losses" of the Company), the determination, recognition and classification of such items shall be the same as their determination, recognition and classification for Federal income tax purposes, with the following modifications:

(a)    Any item of income, gain, loss or expense attributable to the taxable disposition of any property with an adjusted tax basis which is different from the Book Value of such property shall be determined as if the adjusted tax basis of such property as of the date of such disposition were equal in amount to the Book Value of such property.

(b)    If the Company's adjusted tax basis in an item of depreciable property is adjusted pursuant to Code Section 48(q)(1) to reelect any investment tax credit available with respect to such asset, the amount of such adjustment shall be treated as an Company expense and shall be allocated in the ratio in which the investment tax credit (or qualified investment in Code Section 38 property) which gave rise to such basis adjustment is allocated.  Any restoration of such adjusted tax basis pursuant to Code Section 48(q)(1) occurring as a result of any recapture of previously allowed investment tax credit with respect to any Company property shall be treated as Company income and shall be allocated in the ratio in which the investment tax credit (or qualified investment in Code Section 38 property the disposition of which gave rise to such restoration of adjusted tax basis) was allowed.

(c)    All expenditures of the Company not deductible in computing its taxable income and not properly chargeable to a Capital Account, and any otherwise nondeductible organization and syndication expenses of the Company (as described in Code Section 709) shall be treated as Company expenses.

(d)    Revenue of the Company that is exempt from Federal income tax shall be included in the Net Profits or the Net Losses of the Company without regard to the fact that such revenue is not includable in gross income for Federal income tax purposes.

(e)    Payments made to any Member which are treated for Federal income tax purposes as guaranteed payments pursuant to Code Section 707 (c) shall be treated as Company expenses; provided that such payments shall be treated as capital expenditures of the Company to the extent such payments are required to

Deleted: 43

CONFIDENTIAL

Body of Agreement
Page 9 of 45

Exhibit 6
Page 47

be capitalized under the Code and any applicable Treasury Regulations thereunder.

(f)     In the event the Book Value of any Company asset is adjusted pursuant to the terms of this Agreement, the amount of such adjustment shall be treated as gain or loss (as appropriate) from a sale of such asset.

4.04    <u>Allocation of Net Profits and Net Losses</u>.  For purposes of maintaining the Capital Accounts of the Members and determining the rights of the Members among themselves with respect to the assets of the Company, the Net Profits or Net Losses of the Company for each applicable period shall be allocated among the Members' Capital Accounts in the order of priority set forth below. Each item of such income, gain, loss or expense giving rise to such Net Profits or Net Losses of the Company for such period shall be allocated among the Members' Capital Accounts in the same proportion that such Net Profits or Net Losses of the Company for such period are allocated among the Members' Capital Accounts.

(a)     <u>Allocation of Net Profits</u>.

(i) <u>First</u>, an aggregate amount of Net Profits equal to the aggregate Unrecouped Net Losses previously allocated to the Members' Capital Accounts shall be allocated to such Capital Accounts in proportion to the respective amounts of Unrecouped Net Losses allocated to each such Capital Account.  As used herein, "Unrecouped Net Losses" shall mean Net Losses allocated to a Capital Account against which no Net Profits have previously been allocated.

(ii) <u>Second</u>, an aggregate amount of Net Profits equal to twenty-five percent (25%) of the total Class B Contributions shall be allocated to the Capital Accounts of Class B Interest Holders pro rata based on the ratio each Class B Interest Holder's Percentage Interest bears to the aggregate Percentage Interests of all Class B Members.

(iii) <u>Third</u>, after taking into account (i) and (ii) above, any and all additional Net Profits for any period shall be allocated to the Members' Capital Accounts in proportion to the Members' respective Percentage Interests.

(b)     <u>Allocation of Net Losses</u>.

(i) First, Net Losses for any given period shall be allocated to the Members' Capital Accounts in proportion to the positive balances reflected in such Capital Accounts at the time such allocation is to be made.

(ii) Second, any remaining Net Losses for any given period shall be allocated to the Members' Capital Accounts in proportion to the Members'

CONFIDENTIAL

Body of Agreement
Page 10 of 55

Deleted: 43

Exhibit 6
Page 48

respective Percentage Interests.

4.05   <u>Allocations to Comply with applicable Treasury Regulations</u>.  In order to comply with the provision of applicable Treasury Regulations, including Treasury Regulation Sections 1.70-1 (b) and 1.704-2, the following special allocations of income, gain, loss and expense shall be made notwithstanding any other provision of this Agreement.

(a)   <u>Deficit Capital Account Allocations</u>.  Subject to the remaining provisions of this Section, in accordance with applicable Treasury Regulations, including Treasury Regulation Section 1.704-1 (b) (2)(ii)(d), no allocation of expenses or losses shall be made pursuant to the terms of this Agreement to the extent such allocation would cause or increase a net deficit balance in a Member's Capital Account as of the end of the period to which such allocation relates in excess of any dollar amount of such net deficit balance that such Member is obligated to restore under this Agreement.  Such expenses and losses shall instead be allocated among the other Members not subject to this limitation in accordance with their relative Percentage Interests. For purposes of this paragraph (a), the following rules shall apply:

(i)   each Member's net deficit balance in such Member's respective Capital Account shall be determined by adding to such Capital Account balance the amount of such Member's share (as determined pursuant to Treasury Regulation Section 1.704-2) of the Total Minimum Gain of the Company as of the end of the period with respect to which such determination is being made; and

(ii)   in determining whether an allocation of loss or expense would cause or increase a net deficit balance in a Member's respective Capital Account as of the end of the period to which such allocation relates, the initial balance in such Member's respective Capital Account shall be treated as if it reflected an amount equal to the excess of any distributions that, as of the end of such period, reasonably are expected to be made to such Member in any future period over the Net Profits reasonably expected to be allocated to such Member during (or prior to) the period in which such distributions are expected to be made.

(b)   <u>Qualified Income Offset Provision</u>.  If a Member unexpectedly receives an adjustment, allocation or distribution pursuant to this Agreement which causes or increases a net deficit balance in such Member's respective Capital Account as of the end of the period to which such adjustment, allocation or distribution relates in excess of any dollar amount of such net deficit balance that such Member is obligated to restore pursuant to this Agreement, such Member will be allocated items of gross income and gain in an amount and manner sufficient to eliminate such net deficit balance as quickly as possible.    The rules set forth in subparagraph (a) (i) and (a) (ii) of this Section shall apply for purposes of

Deleted: 43

CONFIDENTIAL

Body of Agreement
Page 11 of 43

Exhibit 6
Page 49

determining whether any adjustment, allocation or distribution would cause or increase a net deficit balance in any Member's Capital Account.

(c) <u>Minimum Gain Chargeback Provision</u>.  If there is a net decrease in the Minimum Gain of the Company (as determined pursuant to applicable Treasury Regulations, including Treasury Regulation Section 1.704-2), during any period, then each Member shall be allocated items of gross income and gain in accordance with the provisions of applicable Treasury Regulations, including Treasury Regulation Section 1.704-2.

(d) <u>Special Allocations of Nonrecourse Deductions</u>.   Notwithstanding any other provision in this Agreement, in compliance with applicable Treasury Regulations, including Treasury Regulation Section 1.704-2, allocations of Member Nonrecourse Deductions shall be made among the Members in accordance with the ratios in which the Members (or the affiliates of any Members) share the economic risk of loss with respect to the Member Nonrecourse Liabilities to which such member Nonrecourse Deductions are attributable.

(e) <u>Nonrecourse Liability Minimum Gain Chargeback</u>.  If there is a net decrease in the Member Nonrecourse Liability Minimum Gain (as determined pursuant to applicable Treasury Regulations, including Treasury Regulation Section 1.704-2) during any period, then each Member shall be allocated items of income and gain in accordance with the provisions of applicable Treasury Regulations, including Treasury Regulation Section 1.704-2.

(f) <u>Subsequent Allocations</u>.  Any special allocations of items of income, gain, loss or expense made pursuant to this Section shall be taken into account in computing subsequent allocations of income, gain, loss and expense pursuant to this Agreement, so that the net amount of any item of income, gain, loss and expense allocated to each Member pursuant to this Agreement shall, to the extent possible, be equal to the amount of such items of income, gain, loss and expense that would have been allocated to such member pursuant to this Agreement if the special allocations of income, gain, loss or expense required by this Section had not been made.

(g) <u>Interpretation of these provisions</u>.  The provision of this Section are intended to comply with the provisions of applicable Treasury Regulations, including Treasury Regulation Section 1.704-1(b)(2) and 1.704-2, and shall be interpreted consistently therewith.

4.06  <u>Federal Income Tax Allocations</u>.  The allocations of income, gain, loss and expense made pursuant to the previous Sections are allocations of book income which are made for accounting purposes to determine the respective balances in the Capital Accounts of the Members and to establish the rights of the Members among themselves with respect to the assets of the Company.  These allocations may be different from the

| Deleted: 43 |
| --- |

CONFIDENTIAL

Exhibit 6
Page 50

allocations among the Members of the income, gain, loss, deduction, tax preference and tax credits of the Company for Federal income tax purposes. Allocations of income, gain, loss, deduction, tax preference and tax credits of the Company for Federal income tax purposes for each taxable year shall be made among the Members as follows:

(a)     General Rules Regarding Allocations of Income, Loss, Etc.  In general, for Federal income tax purposes, all items of income, gain, loss, deduction and tax preference of the Company for each taxable year shall be allocated among the Members in the same manner as the items of income, gain, loss and expense which gave rise to such items of income, gain, loss, deduction and tax preference for Federal income tax purposes are allocated among the Members pursuant to the terms of this Agreement.

(b)     Special Rules Where Tax Basis Differs from Book Value.  If the Company's adjusted tax basis for Federal income tax purposes of any of its property differs from the Book Value of such property at the beginning of any taxable year, in determining each Member's distributive share of the taxable income or loss (or items thereof) of the Company, each item of income, gain, loss or deduction with respect to such property shall be allocated among the Members in such manner as will take into account (as required by Code Section 704(c) and any applicable Treasury Regulation, including Section 1.704-1(b)(i)) the difference between the adjusted tax basis for Federal income tax purposes of such property and its Book Value, all as of the beginning of such taxable year.

4.07     Allocation of Taxable Income and Loss and Tax Credits on the Transfer of a Members' Interest.  The items of income, gain, loss expense, deduction, tax preference and/or tax credit allocable under the terms of this Agreement to any Interest in the Company which may have been transferred during any period shall be allocated among the persons who were the holders of such Interest during such period in a manner which takes into account the varying Interests of the Members in the Company during such period, all in accordance with any Treasury Regulations promulgated under Code Section 706 (d); provided, that the allocation of gain or loss on the disposition of any property in which the Company has a direct or indirect interest shall, to the extent not prohibited under such regulations, be allocated among the Members who are Members in the Company on the date the event giving rise to such gain or loss occurs in accordance with the provisions of this Agreement otherwise dealing with Federal income tax allocations.

4.08     Special Tax Audit Allocations.    Notwithstanding anything contained in this Agreement to the contrary, in the event that the taxable income of the Company for Federal income tax purposes (or any item thereof) is adjusted as the result of an audit by the Internal Revenue Service, the Members' Capital Accounts shall be adjusted in a manner which reflects such adjustments as though corresponding book adjustments had been originally reflected in the Net Profits or Net Losses of the Company determined pursuant to the terms of this Agreement.

CONFIDENTIAL

Deleted: 43

Exhibit 6
Page 51

4.09   Interest.  If, pursuant to applicable law, a portion of the amounts paid on any Member notes issued with respect to capital contributions to the Company shall be deemed to constitute interest rather than principal for Federal income tax purposes, the interest income attributable thereto shall be allocated to the Members who shall have made such deemed interest payments on such Member notes; and the amount of such interest income shall be taken into account in determining the amount of Capital Contributions made by such Member to the Company.

4.10   Credits.  Any investment tax credits, targeted job credits and other tax credits available to the Company shall, subject to applicable Treasury Regulations and provisions of the Code, be allocated among the Members as determined by the Managers in a manner which is designed to reflect the economic interests of the Members in the Company as otherwise described in this Agreement.

4.11   Tax Withholding.  If the Company incurs a withholding tax obligation with respect to the share of income allocated to any Member, (a) any amount which is (i) actually withheld from a distribution that would otherwise have been made to such Member and (ii) paid over in satisfaction of such withholding tax obligation shall be treated for all purposes under this Agreement as if such amount had been distributed to such Member, and (b) any amount which is so paid over by the Company, but which exceeds the amount, if any, actually withheld from a distribution which would otherwise have been made to such Member, shall be treated as an interest-free advance to such Member. Amounts treated as advanced to any Member pursuant to this Section shall be repaid by such Member to the Company within thirty (30) days after the Managers, acting by Approval, give notice to such Member making demand therefor.  Any amounts so advanced and not timely repaid by such Member shall bear interest, commencing on the expiration of said 30-day period, compounded monthly on unpaid balances, at an annual rate equal to the lowest Applicable Federal Rate as of such expiration date.   The Company shall collect any unpaid amounts so advanced from any Company distributions that would otherwise be made to such Member.

4.12   Distributions to Cover Members' Tax Liabilities.  To the extent the Managers determine in good faith that the Company has sufficient cash on hand to meet current and reasonably anticipated operating requirements, the Managers shall distribute annually to each Member, prior to April 15 of each year, an amount intended to be sufficient to cover the federal, state and local tax obligations of such Member with respect to the fiscal year of the Company ended immediately preceding such April 15 on account of the cumulative allocation to such Member (pursuant to this Agreement) of net taxable income; provided, that such amount shall be reduced by the aggregate amount of all distributions of Positive Cash Flow made to such Member prior thereto in excess of the aggregate amount of all such tax obligations of such Member incurred with respect to cumulative allocations of net taxable income to such Member in all prior fiscal years of the Company. For purposes of the foregoing, such federal, state and local tax obligations of each Member shall be conclusively determined by the Managers to be either a fixed rate established by the Managers or the highest effective combined federal, state and local

Deleted: 45

**Exhibit 6**
**Page 52**

income tax rate applicable to any Member.

4.13   Dissolution.   Distribution to Members upon a liquidation and dissolution of the Company shall be determined pursuant to Article IX.

4.14   Distribution of Assets in Kind.   No Member shall have the right to require any distribution of any assets of the Company in kind.   If any assets of the Company are distributed in kind, such assets shall be distributed on the basis of their fair market value as determined by the Managers.   Any Member entitled to any interest in such assets shall, unless otherwise determined by the Managers, receive separate assets of the Company and not an interest as a tenant-in-common with other Members so entitled in any asset being distributed.

### ARTICLE V
### MANAGERS, MANAGEMENT, AND MEMBER MEETINGS

5.01   Management.   The overall business and affairs of the Company shall be managed by the Managers and the day to day operations of the Company shall be managed by the Officers (each as further described below).   All management and other responsibilities not specifically reserved for the Members and/or the Managers in this Agreement shall be reserved for the Officers.   The Members shall have no voting rights except as specifically provided in this Agreement.

5.02   Number and Appointment of Managers.   The Company shall be managed by three Managers.   Each of the Founders shall (a) be entitled to appoint one Manager, (b) ensure that the Manager it appoints complies with this Agreement and does all things required to give effect to this Agreement, and (c) have the right to dismiss at any time any Manager which it has designated and to replace him or her by another of its choice.   The Founders may appoint, remove and/or replace their designated Managers at their respective discretions at any time without the need for a meeting of or consent from the other Members.   A Manager may only be dismissed by the Founder who designated that Manager, except to the extent of any Manager's breach of this Agreement, gross negligence or material violation of applicable law, in which case said Manager may be removed by a majority vote of the Members' voting rights.   In the event of a vacancy in any (or all) of the Manager positions, the relevant Founder(s) shall endeavor to appoint a new Manager within five (5) business days of notice or actual knowledge of the vacancy, and, during any interim period, shall itself act as Manager.   The number of Managers of the Company and/or the right of the Founders to appoint, remove and replace the Managers may be amended (including the elimination of such rights) from time to time by Consent of the Members and the written Approval of the Founders.   In the event of any Transfer by one or more Founders of all of its/their Interest in the Company (in accordance with Article VII), the rights and obligations of the remaining Founder(s) (as described above) shall continue without need to appoint a second and/or third Manager (as the case may be) or to grant any other Member(s) the withdrawn Founder's(s') rights and obligations stated above, and the Manager(s) appointed by the Transferring

| Deleted: 43 |

Exhibit 6
Page 53

Founder(s) shall be deemed to be dismissed by the Transferring Founder(s), at which time the Company shall have only one (1) or two (2) Managers as the case may be. In the event all three of the Founders cease to be Members, the remaining Members shall hold a meeting as soon as practicable and shall approve by a majority of the voting rights of such remaining Members a new management structure for the Company.

5.03   Powers of Managers. When a decision, approval or consent of the Managers is required or authorized in this Agreement, a unanimous vote of all Managers shall be required. In the event that the Managers fail to reach unanimity with respect to a particular issue, such that if no action is taken regarding the issue at all, there would be a material adverse affect on the Company, each Manager shall submit a written report to the Members describing their view of the issue and recommended course of action. The other Members (who are not Managers or Founders) shall then decide on the appropriate course of action by written Consent or pursuant to a vote in a meeting called in accordance with this Article V. Except to the extent otherwise provided herein, the Managers shall have the responsibility and authority do such things that are reasonably necessary, proper, customary, advisable or incidental to carry out their responsibilities. The Managers shall have the authority to establish one or more committees to handle any matters generally designated as part of their duties. Except as otherwise set forth in this Agreement, the Managers shall have the exclusive power and authority, on behalf of the Company, to:

(a)   Acquire (by purchase, lease, exchange or otherwise), transfer, sell, finance, refinance, encumber or otherwise dispose of (by exchange, abandonment or otherwise), any asset with a book or fair market value greater than or equal to $25,000, unless covered by the Budget (as defined below);

(b)   Relocate the Company's principal office/headquarters outside the states of California, Massachusetts, or Maryland;

(c)   Commence business operations outside of the 50 United States (other than via the Internet), change the nature of the business to be conducted by the Company, or add a new line of business;

(d)   Change the legal name of the Company or adopt any trade name or DBA for the Company;

(e)   Approve the annual budget (the "Budget") and financial statements of the Company, and any material deviations therefrom;

(f)   Acquire any interest in securities issued by an entity other than a wholly owned subsidiary of the Company;

(g)   Borrow money, issue any evidence of indebtedness, provide any guaranty, indemnity or other assurance for the debt of another Person or with respect to the

CONFIDENTIAL

Body of Agreement
Page 16 of __

Deleted: 43

Exhibit 6
Page 54

financial condition of such Person, secure any of the same by mortgage, deed of trust, pledge or other lien on any assets or property of the Company, and/or prepay, extend, amend or otherwise modify the terms of any such indebtedness;

(h)   Adopt any benefit plan of the Company, provided, however, that the CEO is hereby authorized to establish a reasonable group health insurance plan for the Company's employees;

(i)   Establish the compensation, if any, to be paid to the Officers and/or Managers for their service to the Company, and alter the authorization and/or responsibilities of the Officers;

(j)   Encumber, abandon, transfer, sell, assign, license or otherwise dispose of, alter or modify any intellectual property right or interest of the Company, including, without limitation, the Domain Name, provided, however, that in the event the Company determines in good faith that it will be unable to pay any amounts next coming due under either or both of the Long Term Notes, and the Company has received a bona fide offer to purchase the Domain Name for at least US$16,000,000 in cash (the "Offer"), the Lenders shall meet (in person or via teleconference) and attempt to mutually agree on taking one or more of the following courses of action in an effort to avoid foreclosure on either of the Long Term Notes: (i) cause the Managers appointed by them to approve the Company's sale of the Domain Name pursuant to the Offer, which approval shall be conditioned upon the Company's agreement to satisfy the Notes in full with the proceeds therefrom immediately upon consummation of such sale, (ii) restructure or extend the payment terms of either or both Long Term Notes on terms no less favorable to the Company than those currently in such Notes, or on any other terms as agreed by all the Managers, or (iii) cause the Managers appointed by them to approve the sale of new equity in the Company on terms agreed by all the Managers in order to satisfy either or both Long Term Notes or to enable the Company to continue servicing them (the "New Equity"), (iv) purchase the Domain Name from the Company on the same payment terms as in the Offer (which right shall be exercised within thirty (30) days of receipt of written notice of the Offer and all relevant terms thereof) with all proceeds therefrom going to satisfy the Long Term Notes in full immediately upon consummation of the purchase, and/or (v) purchase all or a portion of any New Equity and/or convert any remaining amounts (or any portion thereof) due under either or both Long Term Notes to additional Interests in the Company at the same valuation (and same class) offered to third parties for the New Equity or, if no such offering has been made, at a valuation (and class) agreed by all the Managers. With respect to option (iv) above, the Lenders may agree to purchase the Domain Name jointly (equally or pursuant to any split they may choose) or to allow one of them to purchase it alone. With respect to any course of action described above and agreed on by the Lenders that does not expressly require agreement by all the Managers to certain relevant terms (e.g. extending the Long Term Notes on terms no less favorable than those currently

Deleted: 43

Exhibit 6
Page 55

contained therein), DNAG agrees to cause its Manager to approve the same without condition or delay. However, in the event the Lenders cannot agree on a course of action that will avoid foreclosure on either of the Long Term Notes, the Lenders agree to cause their Managers to abstain from any vote relating to the sale of the Domain Name, provided that the sale price shall not be less than US$16,000,000 in cash and the first funds from the proceeds of such sale are to be used to repay the Long Term Notes in full (including all remaining principal and any other amounts owed thereunder) to the satisfaction of the Lenders.

(k)   Hire or employ the Company's auditors;

(l)   Pay, extend, renew, modify, adjust, submit to arbitration, prosecute, defend and/or compromise, upon such terms as they may determine and upon such evidence as they may deem sufficient, any obligation, suit, liability, litigation or similar procedure, cause of action or claim, including related to taxes, either in favor of or against the Company involving matters greater than $25,000 in value, where the cost thereof is expected to exceed $25,000, or involving matters of strategic importance to the Company (which shall be deemed to include anything relating to or in connection with the Domain Name);

(m)   Determine the appropriate accounting method or methods to be used by the Company, and/or cause the Company to make or revoke any of the elections referred to in any section of the Code;

(n)   Establish and maintain reserves for such purposes and in such amounts as the Managers deem appropriate from time to time with advice from the CEO;

(o)   Incur liability of the Company in excess of $25,000 in a single item or aggregate of related items not covered by the relevant Budget;

(p)   Exercise all other powers and authority granted by the Act to Managers, except as otherwise provided in or limited by this Agreement;

(q)   Make, release or disseminate any public statements, promotions, press releases or announcements that reference (expressly or implicitly) any Member or Manager, provided, however, that the Managers first must obtain the prior written consent of any Managers and/or Members that will be mentioned or identified (directly or indirectly) therein; and

(r)   Return any Capital Contribution to an Interest Holder, or issue or grant additional Interests or other equity of the Company, provided however, that the authority to issue the Class B Interests referred to in Section 3.03(b) shall rest exclusively with the Founders.

5.04   No Management by other Members; Binding Authority.   Except as otherwise

| Deleted: 43 |

Exhibit 6
Page 56

expressly provided herein, no Member other than the Officers and Managers, shall take part in the day-to-day management, or the operation or capital of the business and affairs, of the Company. No Person shall have any power or authority to bind the Company other than the Managers and the Officers unless such Person has been authorized by the Managers to act on behalf of the Company.

5.05   Contracts with Affiliated Persons.  With the Approval of the Managers (excluding any interested Manager or any Manager appointed by an interested Member), the Company may enter into one or more agreements, leases, contracts or other arrangements for the furnishing to or by the Company of goods, services or space with any Member, Manager or Affiliated Person, and may pay compensation thereunder for such goods, services or space, provided in each case the amounts payable thereunder are reasonably comparable to those which would be payable to unaffiliated Persons under similar agreements, and if the determination of such amounts is made in good faith it shall be conclusive absent manifest error.  The Members acknowledge that the Founders previously authorized and directed the Company to enter into that certain Web Site Linking Agreement dated February 3, 2006 (the "Linking Agreement") and that certain Option Agreement of even date therewith (the "Option Agreement") with iEntertainment, Inc., a WTA Affiliate.  The Members further acknowledge that the Company entered into that certain Agreement to Waive Linking Rights dated August 1, 2007, in order to modify the parties' respective rights and obligations under the Linking and Option Agreements.

5.06   Limited Liability for Certain Acts.  A Manager shall not be personally liable to the Company or its Members for damages for any breach of duty as a Manager, except for any matter in respect to which such Manager shall be liable by reason that, in addition to any and all other requirements for such liability, there shall have been a judgment or other final adjudication adverse to such Manager that establishes that such Manager's acts or omissions were in bad faith or involved intentional misconduct or a knowing violation of law or that such Manager personally gained in fact a financial profit or other advantage to which such Manager was not legally entitled or that with respect to a distribution such Manager's acts were not performed in accordance with the Act or this Agreement. Neither the amendment or the repeal of this Section 5.06 shall eliminate or reduce the effect of this Section 5.06 in respect to any matter occurring, or any cause of action, suit or claim that, but for this Section 5.06, would accrue or arise, prior to such amendment, repeal or adoption of an inconsistent provision.

5.07   Indemnification.

(a)   In General.  Subject to Section 5.07(b), the Company shall indemnify and hold harmless the Managers, officers and each Member from and against all claims and demands to the maximum extent permitted under the Act.  The Company shall to the fullest extent permitted by law advance funds to indemnified individuals in respect of defending and/or fulfilling all such claims and demands.  In addition, subject to Section 5.07(b), no Manager, or his Affiliates, or officer, shall have any liability to the Company or

Deleted: 43

Exhibit 6
Page 57

to any Member for any loss suffered by the Company or any Member which arises out of any action or inaction of any Manager or his Affiliates or officer if such Manager or his Affiliates or officer, as the case may be, in good faith, determined that such course of conduct was in the best interests of the Company.

(b)    Exception.  Notwithstanding Section 5.07(a), the Company shall not indemnify a Manager, officer or Member (or any of his, her or its Affiliates) from or against any claim or demand to the extent arising from his, her or its negligent or willful misconduct which was the basis for any conviction of, or plea of no contest to, a felony having a material adverse effect on the Company.  In addition, to the extent a Manager, officer or Member (or any of his, her or its Affiliates) is denied indemnification pursuant to the preceding sentence, the Company and its Members reserve all claims it and/or they may have against any such persons pursuant to applicable law arising from such conduct.

5.08    Officers.

(a)    Appointment.  The Managers may designate individuals (who may be but do not need to be Manager(s)) to serve as officers of the Company having such titles as the Managers may determine, including, but not limited to, Chief Executive Officer, President, and Vice President (each, an "Officer", and collectively, the "Officers"), provided, however, that the authority of any Officer to legally bind the Company shall be subject to the limitations imposed by Section 5.03 above.  Subject to the terms of any relevant employment contracts, such Officers may be dismissed by the Managers at any time, except to the extent of any Officer's breach of this Agreement, failure to follow the lawful directives of the Managers, gross negligence or material violation of applicable law, in which case said Officer may be removed by two Managers or the Consent of the Members.

(b)    Authority of CEO.  Subject to the limitations set forth in Section 5.03 above, the specific authority of the Chief Executive Officer ("CEO") shall include, but is not limited to, the following (with any delegation or further division of responsibility and/or authority amongst the other Officers determined by the CEO in his reasonable discretion):

- Directing and supervising the day-to-day operations of the Company;
- Relocating the Company's principal office/headquarters to the extent within the states of California, Massachusetts or Maryland;
- Establishing such charges for services and products of the Company as may be necessary to provide adequate income for the efficient operation of the Company;
- Retaining such accountants, attorneys, and other professionals (other than the Company's auditors) necessary or appropriate to carry out the business and operations of the Company;
- Making, releasing or disseminating any public statements, promotions, press releases or announcements relating to the Company or its business

Deleted: 43

CONFIDENTIAL

Body of Agreement
Page 20 of 44

Exhibit 6
Page 58

that do not expressly or implicitly reference any Manager or Member of the Company;

- Within the Budget established by the Managers, setting and adjusting wages and rates of pay for all personnel of the Company (other than any wages or compensation to be paid to any Officer or Manager, and as otherwise restricted by this Agreement), which the Managers hereby agree may include a profit share pursuant to which those employees deemed appropriate for such a benefit by the CEO are entitled to share in the Company's Net Income, provided that the aggregate share and amount, respectively, of the Company's annual Net Income paid to employees does not exceed, in the aggregate, 5% of Net Income or $100,000 per annum without Approval of the Managers, and appointing, hiring and dismissing all such personnel and regulating their hours of work;
- Obtaining and continuing in force all policies of insurance required by any mortgage, lease or other agreement relating to the Company's business or any party thereof, or determined by the Officers to be in the best interests of the Company;
- Causing to be paid any and all taxes, charges and assessments that may be levied, assessed or imposed upon any of the assets of the Company, unless the same are contested by the Company; and
- Keeping the Managers and Members advised in all matters pertaining to the operation of the Company, services rendered, operating income and expense, and financial position at times as may be directed by the Managers and/or the Members

5.09   [Intentionally Deleted]

5.10   <u>Member Matters</u>.  Notwithstanding anything herein to the contrary, the following matters shall require the Approval of the Managers and the Consent of the Members:

(a)   Entering an agreement (including a letter of intent or similar document) to sell (whether or not for cash, stock or any other asset or a combination thereof) all or substantially all of the assets or Interests in the Company or to merge the Company;

(b)   Terminating the business of, or voting to dissolve or liquidate, the Company, or taking any steps in furtherance thereof (including, the appointment of a liquidator);

(c)   Entering into an arrangement or incurring a liability that is not done at arm's length (e.g. with an Affiliate where the terms are not in accordance with Section 5.05);

(d)   Making distributions other than on a non-discriminatory basis to all Members in a particular Class; and

(e)   Causing or permitting the Company to take any steps to convert the Company to

**Deleted:** 43

CONFIDENTIAL

Body of Agreement
Page 21 of 43

**Exhibit 6**
**Page 59**

another form (e.g., to permit trading of the securities of the Company on a recognized exchange).

5.11   Meetings.  For purposes of any matters specified in Section 5.10 above, or for any other purpose, a meeting of the Members may be called by a Manager or any Member holding not less than ten percent (10%) of the Interests of the Company.

5.12   Place of Meetings.  Whenever the Members of the Company are required or permitted to take action by vote, a meeting of the Members may be held at any place reasonably convenient to the Members as designated in any notice of such meeting, within or outside the state in which the principal office of the Company is located.  If no such designation is made, the place of any such meeting shall be the principal office of the Company.  Meetings of the Members may be conducted by teleconference, provided all Members can hear and be heard.  Attendance by teleconference shall be deemed to be attendance in person.

5.13   Notice of Meeting.  Written notice stating the place, day and hour of the meeting indicating that it is being issued by or at the direction of the person or persons calling the meeting, stating the purpose or purposes for which the meeting is called shall be delivered no fewer than ten (10) nor more than sixty (60) days before the date of the meeting.  Notice given by facsimile (provided successful transmission is confirmed by the sending machine) or email shall be deemed to be written notice.

5.14   Record Date.  For the purpose of determining the Members entitled to notice of or to vote at any meeting of Members or any adjournment of such meeting, or Members entitled to receive payment of any distribution, or to make a determination of Members for any other purpose, the date on which notice of the meeting is mailed or the date on which the resolution declaring distribution is adopted, as the case may be, shall be the record date for making such a determination.  When a determination of Members entitled to vote at any meeting of Members has been made pursuant to this Section, the determination shall apply to any adjournment of the meeting.

5.15   Quorum.  Members holding not less than a majority of all Members' Interests, represented in person or by proxy, shall constitute a quorum at any meeting of Members; provided however that a quorum must include all Founders who are also Members.  In the absence of a quorum at any meeting of Members, a majority of the Members' Interests so represented may adjourn the meeting from time to time for a period not to exceed sixty (60) days without further notice.  However, if the adjournment is for more than sixty (60) days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each Member of record entitled to vote at such meeting.  At an adjourned meeting at which a quorum shall be present or represented, any business may be transacted that might have been transacted at the meeting as originally noticed.  The Members present at a meeting may continue to transact business until adjournment, notwithstanding the withdrawal during the meeting of Members Interests whose absence results in less than a quorum being

Deleted: 43

Exhibit 6
Page 60