present.

5.16   _Manner of Acting._   If a quorum is present at any meeting, the vote or written consent of Members in accordance with Section 5.10 above shall be the act of the Members.

5.17   _Action by Members Without a Meeting._   Whenever the Members of the Company are required or permitted to take any action by vote, such action may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken shall be signed by the Members who hold the voting Interests having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all of the Members entitled to vote therein were present and voted and shall be delivered to the President.   Delivery made to the office of the Company shall be by hand or by certified or registered mail, return receipt requested.   Prompt notice of the taking of the action without a meeting by less than unanimous written consent shall be given to each Member who have not consented in writing but who would have been entitled to vote thereon had such action been taken at a meeting.

5.18   _Waiver of Notice._   Notice of a meeting need not be given to any Member who submits a signed waiver of notice, in person or by proxy, whether before or after the meeting.   The attendance of any Member at a meeting, in person or by proxy, without protesting prior to the conclusion of the meeting the lack of notice of such meeting, shall constitute a waiver of notice by him or her.

### ARTICLE VI
### FISCAL MATTERS; TRADE SECRETS; RESTRICTIVE COVENANT

6.01   _Books and Records._   The Managers shall keep or cause a designated third party to keep, complete and accurate books and records of the Company on the income tax method of reporting and otherwise in accordance with generally accepted accounting principles consistently applied, which shall be maintained and be available, in addition to any documents and Certificate required to be furnished to the Members under the Act, at the office of the Company for examination and copying by any Member or Manager, or his duly authorized representative, at his reasonable request and at his expense during ordinary business hours.   A current list of the full name and last known address of each Member and Manager, a copy of this Agreement, any amendments thereto, the Certificate, including all certificates of amendment thereto, executed copies of all powers of attorney, if any, pursuant to which this Agreement, any amendment, the Certificate or any certificate of amendment has been executed, copies of the Company's financial statements and federal, state and local income tax returns and reports, if any, for the three most recent fiscal years, shall be maintained at the principal office of the Company.

The Company shall have no obligation to deliver or mail a copy of the Certificate or any amendment thereto to the Members.

Deleted: 43

CONFIDENTIAL

Body of Agreement
Page 23 of 25

**Exhibit 6**
**Page 61**

6.02   Reports. The Managers shall cause to be prepared and sent to all Members financial reports of the Company annually, and at such other intervals as the Managers may determine to be reasonable, and, upon the request of any Member, for any quarterly period or periods within 45 days of the end of the last such quarterly period. Within ninety (90) days after the end of each fiscal year, the Managers shall furnish (or cause to be furnished) to all Members such Certificate as may be needed to enable the Members to file their federal income tax returns and any required state income tax returns. The cost of all such reporting shall be paid by the Company as a Company expense.

6.03   Fiscal Year. The fiscal year of the Company shall end on December 31st of each year.

6.04   Tax Matters Partner. DNAG is hereby designated as the "Tax Matters Partner," and an officer or Manager of DNAG shall act on its behalf in this capacity. The Tax Matters Partner is hereby authorized to and shall perform all duties of a Tax Matters Partner under the Code and shall serve as Tax Matters Partner until his, her or its resignation or until the designation of his, her or its successor by the Managers, whichever occurs sooner.

6.05   Bank Accounts. Bank accounts and/or other accounts of the Company shall be maintained in such banking and/or financial institution(s) as shall be selected by the CEO and withdrawals shall be made and other activity conducted on such signature or signatures as shall be Approved by the Managers.

6.06   Trade Secrets.

(a)     The Members stipulate and agree that all information relating to the Company and its activities, including, but not limited to, identity of customers, lists or compilations of data concerning customers or prospective customers solicited or targeted for solicitation, contracts, technical and production know-how, developments, formulae, devices, inventions, processes, administrative procedure, business or marketing strategies, and financial information ("Trade Secrets") shall be the sole property of the Company.

(b)     The Members agree that they shall not, during the term of this Agreement and thereafter, use such Trade Secrets for the benefit of anyone other than the Company, or disclose Trade Secrets to any third party. Notwithstanding the foregoing, it is understood that it shall not be deemed a breach of this Agreement if a Member is compelled by judicial or administrative proceedings to disclose such Trade Secrets if that Member has diligently tried to avoid such disclosure and has afforded the Company the opportunity to obtain assurance that the compelled disclosure will be kept confidential.

(c)     None of the Members, Managers or Officers shall disclose the identity of the Founders (including its members, officers or directors) to any Person without the

| Deleted: 43 |
| --- |

Exhibit 6
Page 62

prior written consent of such Person, except as may be required by legal process and then only after as much written notice as is reasonably practicable is given to the relevant Person(s) so they may seek a protective order.  To the extent the identity of the Founders becomes generally known to the public through no fault of the Members, Managers or Officers (or any of their members, officers or directors), any subsequent disclosure shall not be deemed a breach hereunder, provided, however, that commercially reasonable efforts shall be used to avoid further disclosure which in any event shall be limited to the extent reasonably necessary to further the Company's goals and interests and then only if the relevant Person(s) is given as much advance notice as reasonably practicable.

6.07    <u>Restrictive Covenant</u>.  During the term of this Agreement and for the relevant period set forth below, without prior written Approval of the Managers and Consent of the Members, which Approval and/or Consent may be withheld, conditioned or delayed in their sole and absolute discretion, no Founder, Manager or Officer, nor any of their respective officers, managers, members, directors or shareholders (collectively, "Covered Persons") shall, for a period of eighteen months after such Covered Person ceases to be associated with the Company as a Member, Manager or Officer, or as an officer, manager, member, director or shareholder thereof, (such cessation hereafter referred to as the "Separation Event", and the 18 month period thereafter as the "Restrictive Period") directly or indirectly be engaged in, employed by (as an employee or independent contractor), concerned with, or financially interested in, or participate in, invest in or assist, individually or as an owner, part owner, shareholder, manager, director, officer, partner, or joint venturer, any Person or business that directly or indirectly creates, provides, sells or makes available any Adult Oriented (as defined below) goods, publications, content, media, products and/or services, which shall include, but not be limited to, information services, software, and the operation of any Adult Oriented Internet site (collectively, "Adult Products and/or Services"), except for those Persons or businesses currently in existence as of the date hereof with which any Covered Person already has such a relationship as of the date hereof, including, without limitation, Love Tactics, LLC and iEntertainment, Inc., with which DNAG and WTA, respectively, are affiliated ("Excluded Businesses").  For the avoidance of doubt, any business, investment or other opportunity related to Adult Products and/or Services that may be presented, offered or proposed to or may be discovered or developed by any Covered Person at any time after the date hereof, shall immediately be disclosed to the Company and shall be deemed the sole and exclusive opportunity of the Company.  For purposes of this paragraph, the term "Adult Oriented" shall refer to being characterized by an emphasis on depicting, describing, or relating to sexuality, sexual activity or anatomical areas commonly associated with sexuality.  The restrictions contained in this Section 6.07 shall apply within the boundaries of the United States of America, but shall not prohibit any Covered Person from purchasing or holding passive investments in no more than five percent (5%) of the stock or other securities of any corporation (regardless of its business) which has securities listed upon any recognized

| Deleted: 43 |

Exhibit 6
Page 63

securities exchange or traded on a recognized market in the United States. Except as expressly provided in this Section 6.07, the Members and Managers, and any Affiliates of any of them, may engage in and possess interest in other business ventures and investment opportunities of every kind and description, independently or with others, including serving as directors, officers, stockholders, managers, members and general or limited partners of corporations, partnerships or other limited liability companies. Neither the Company nor any other Member or Manager shall have any rights in or to such ventures or opportunities or the income or profits therefrom solely by reason of their status hereunder.

6.08   Covenants Severable; Equitable Relief.

(a)   The provisions of Section 6.06 through this Section 6.08 shall be construed as agreements independent of any other provision of this Agreement, and the existence of any claim or cause of action of any Officer, Manager or Member against the Company or each other, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by the Company of any such provisions. The Company's rights of termination under this Agreement shall be in addition to and shall not affect its rights under these provisions, and such rights and remedies shall survive termination of this Agreement.

(b)   The Members acknowledge that the restrictions contained in the provisions of Sections 6.06 through this Section 6.08, in view of the nature of the business in which the Company is engaged, are reasonable and necessary in order to protect the legitimate interests of the Company, and that any violation thereof would result in irreparable and substantial harm to the Company for which it does not have an adequate remedy at law.

## ARTICLE VII
### TRANSFERS OF INTEREST; ADMISSION OR WITHDRAWAL OF MEMBERS

7.01   General Restrictions on Transfer.

(a)   No Member may Transfer all or any part of his, her or its Interest in the Company to a non-Member except as provided herein or with the Approval of the Managers.

(b)   Every Transfer of an Interest in the Company permitted by this Article VII, including without limitation, Transfers permitted by Sections 7.01(a) and 7.02, shall nevertheless be subject to the following:

(i)   No Transfer of any interest in the Company may be made if such Transfer would cause or result in a breach of any agreement binding upon the Company or of then applicable rules and regulations of any governmental authority having jurisdiction over such Transfer. The Managers, acting by Approval, may require as a condition of any Transfer that the transferor

Deleted: 43

CONFIDENTIAL

Body of Agreement
Page 26 of ☐

Exhibit 6
Page 64

assume all costs incurred by the Company in connection therewith and furnish an opinion of counsel, satisfactory to the Company both as to counsel and opinion, that the proposed Transfer complies with applicable law, including federal and state securities laws.

(ii)   The Managers shall require, as a condition to the admission to the Company as a Member of any transferee who is not otherwise a Member, that such transferee demonstrate to the reasonable satisfaction of the Managers that he, she or it either is a financially responsible person or has one or more financially responsible persons who have affirmatively assumed the financial obligations of the transferor under this Agreement, if any, on his, her or its behalf. In addition, a transferee of an Interest pursuant to Section 7.02, who is not otherwise a Member, shall not be admitted to the Company as a Member without the Approval of the Managers, which may be withheld for any reason or for no reason, and such a transferee who is not so admitted need not be recognized by the Company for any purpose and shall be entitled only to the rights which are required under the Act to be afforded to a transferee who does not become a Member.

(iii)   Notwithstanding anything contained herein to the contrary, no Interest in the Company shall be transferred if, by reason of such Transfer, the classification of the Company as a partnership for federal income tax purposes would be adversely affected or jeopardized, or if such transfer would have any other substantial adverse effect for federal income tax purposes or otherwise pursuant to the Code (e.g. Section 708). In addition, no Transfer shall be permitted if it requires registration of Interests under any federal or state securities laws or if it will result in the Company being subject to the Investment Company Act of 1940, as amended;

(iv)   In the event of any Transfer, there shall be filed with the Company a duly executed and acknowledged counterpart of the instrument effecting such Transfer. The transferee, if any, shall execute such additional instruments as shall be reasonably required by the Managers. If and for so long as such instruments are not so executed and filed, the Company need not recognize any such Transfer for any purpose, and the transferee shall be entitled only to the rights which are required under the Act to be so afforded to a transferee who does not become a Member to receive distributions otherwise payable to the transferor's Interest.

(v)   Upon the admission or Involuntary Withdrawal of a Member, this Agreement (including without limitation Schedule A hereto) and/or the Certificate shall be amended appropriately to reflect the then existing names and addresses of the Members and Managers and their respective Percentage Interests.

CONFIDENTIAL

Body of Agreement
Page 27 of 43

| Deleted: 43 |

**Exhibit 6**
**Page 65**

(c)    A transferor of an Interest in the Company shall, if the transferee is a Member hereunder or if the transferee becomes a Member pursuant to the provision of this Agreement, be relieved of liability under this Agreement with respect to the transferred Interest arising or occurring on or after the effective date of the Transfer (unless such transferor affirmatively assumes liability as provided in Section 7.01 (b)(ii)).

(d)    Any Person who acquires in any manner whatsoever an Interest (or any part thereof) in the Company, whether or not such Person has accepted and assumed in writing the terms and provisions of this Agreement or been admitted into the Company as a Member as provided in Section 7.01(b), shall be deemed by acceptance of the acquisition thereof, to have agreed to be subject to and bound by all of the obligations of this Agreement with respect to such Interest and shall be subject to the provisions of this Agreement with respect to any subsequent Transfer of such Interest.

(e)    Any Transfer in contravention of any of the provisions of this Agreement shall be null and void and ineffective to transfer any Interest in the Company, and shall not bind, or be recognized by, or on the books of, the Company, and any transferee or assignee in such transaction shall not be or be treated as or deemed to be a Member for any purpose. In the event any Member shall at any time Transfer an Interest in the Company in contravention of any of the provisions of this Agreement, then each other Member shall, in addition to all rights and remedies at law and equity, be entitled to a decree or order restraining and enjoining such transaction, and the offending Member shall not plead in defense thereto that there would be an adequate remedy at law; it being expressly hereby acknowledged and agreed that damages at law would be an inadequate remedy for a breach or threatened breach of the violation of the provisions concerning such transactions set forth in this Agreement.

7.02   Permitted Transfers for Involuntary Withdrawal. The following Transfers shall be permitted without the Approval of the Managers otherwise required under Section 7.01(a) above, but such permitted Transfers shall in any event be subject to Sections 7.01 (b)-(e) hereof:

(a)    The right to distributions and allocations of profits and losses of the Company, but no other aspect of a Member's Interest, may be transferred from time to time as part of any proceeding under the present or any future federal bankruptcy act or any other present or future applicable federal, state or other statute or law relating to bankruptcy, insolvency, or other relief for debtors and subject to the requirements and provisions thereof.

(b)    The right to distributions and allocations of profits and losses of the Company, but no other aspect of a Member's Interest, may be transferred from time to time to

Deleted: 43

Exhibit 6
Page 66

any Legal Representative(s) and/or member(s) of the Immediate Family of the transferring Member.

7.03    <u>Right of First Refusal</u>.    Subject to the terms of Section 7.01, if any Member proposes to sell, assign or transfer all or a portion of its Member's Interest (a "Transferor"), and has received a bona fide offer in writing to purchase any or all of such Member's Interest (other than a transfer to an Affiliate), the Transferor shall give written notice to the Company and each Member of the proposed transaction specifying (i) the aggregate amount of Interests to be offered in such transaction and the Percentage Interest thereof (the "Offered Interests"), (ii) the amount and type of consideration which the Transferor will receive for such Offered Interests, (iii) the identity of the offeror in such transaction, (iv) the place and date on which the transaction is to be consummated and (v) all other material terms of the proposed transaction.    Upon receipt of such notice, each Member shall have the right and option during the 10 business day period following receipt of such notice to elect to sell, at the price and on the same terms and conditions stated in the notice, such Member's pro rata portion of the Offered Interests (which shall be based on such Member's Percentage Interest).    If any participating Member sells less than its pro rata share of the Offered Interests, each other participating Member will be entitled to sell such additional Members Interests as shall equal such participating Member's unused allotment, on a pro rata basis.

7.04    <u>Voluntary Withdrawal</u>.    No Member shall have the right or power to Voluntarily Withdraw from being an Interest Holder of the Company or to have its Interest repurchased by the Company.

7.05    <u>Tag-Along Rights and Obligation</u>.    Subject to the terms of Section 7.01 hereof, in the event that holders of a majority of the Percentage Interests shall elect to sell all or substantially all of their Percentage Interests in a bona fide transaction pursuant to which they will receive cash and/or marketable securities, and so long as the gross proceeds which may result from such sale of Percentage Interests exceeds any remaining portion of the Class B Priority Return (or if the Class B Priority Return has previously been distributed in full), then all other Members shall have the right, and upon the request by a majority of the Percentage Interests, the obligation, to participate pro rata in such transaction on the same terms and conditions regarding such Members' Percentage Interests as apply to such majority holders, and shall provide and be bound by all representations, warranties, covenants and indemnities as apply to such majority holders such that all involved shall pro rata follow the fortunes of the majority holders.    In the event that the gross proceeds from such sale of Percentage Interests shall be equivalent to or less than the remaining portion of the Class B Priority Return, then the Class B Members, if any, must approve such transaction by the vote of Class B Members holding a majority of the Percentage Interests held by Class B Members.

7.06    <u>Section 754 Election</u>.    Upon (a) the death of a Member and/or (b) the sale of any portion of a Member's Interest pursuant to the provisions hereof, at the request of the Legal Representative of such deceased Member or of the purchaser of such Member's

CONFIDENTIAL

Body of Agreement
Page 29 of 41

**Deleted:** 43

**Exhibit 6**
**Page 67**

Interest, as applicable, the Company shall file an election under Section 754 of the Code, permitting an adjustment to basis under Section 743 and/or Section 734 of the Code, or any successor provisions thereto.

### ARTICLE VIII
### DISSOLUTION AND TERMINATION

8.01    Events Causing Dissolution.    The Company shall be dissolved and its affairs wound up upon the first to occur of the following events:

(a)    The sale or other disposition of all or substantially all of the assets of the Company, unless the disposition is a transfer of assets of the Company in return for consideration other than cash and the Managers elect not to distribute any such non-cash items to the Members and to continue the Company.

(b)    A Transfer by a Founder of all of its Interest in the Company, unless (i) at least one other Founder remains a Member, or (ii) in the event there will be no remaining Founders, the remaining Members, acting by Consent within ninety days thereafter, elect to continue the Company and the business of the Company in which case a new management structure shall be established as specified in Section 5.02.

(c)    The election to dissolve the Company made in writing by the Approval of the Managers with the Consent of Members in accordance with Section 5.10;

(d)    Any consolidation or merger of the Company with or into any entity following which the Company is not the resulting or surviving entity;

(e)    Upon the occurrence of an event specified under the laws of the State of Delaware as one resulting in dissolution of a limited liability company irrespective of the terms of a limited liability company agreement, except that where, under the terms of this Agreement the Company is not to terminate, then the Company shall immediately be reconstituted and reformed on all of the applicable terms, conditions and provisions of this Agreement. The Company shall not be dissolved upon the death, insanity, retirement, resignation, expulsion, bankruptcy, dissolution or occurrence of any other event which terminates the membership of a Member under the Act or the terms of this Agreement, except as provided in Section 8.01(b); or

(f)    The failure of the Company to complete and close the equity fundraising described in Section 3.03(b) by the maturity date set forth in the Bridge Note, unless the Managers Approve the continuation of the Company within five (5) business days thereafter.

CONFIDENTIAL

Body of Agreement
Page 30 of :.:.

Deleted: 43

Exhibit 6
Page 68

8.02  Procedures on Dissolution.  Dissolution of the Company shall be effective on the day on which occurs the event which gave rise to the dissolution, but the Company shall not terminate until the Certificate shall have been canceled and the assets of the Company shall have been distributed as provided herein.  Notwithstanding the dissolution of the Company, prior to the termination of the Company, as aforesaid, the business of the Company and the affairs of the Members, as such, shall continue to be governed by this Agreement.  Upon dissolution of the Company, the Managers acting by Approval or, if there be none, a liquidator appointed with the Consent of the Members, shall liquidate the assets of the Company, apply and distribute the proceeds thereof as contemplated by this Agreement and cause the cancellation of the Certificate.

### ARTICLE IX
### DISTRIBUTIONS UPON LIQUIDATION

9.01  Distribution of Proceeds From the Liquidation of the Company.  The net proceeds of liquidation and any other funds or property of the Company shall be distributed and applied to the extent available in the following order of priority:

(a)  to the payment of secured debts and liabilities of the Company, including the Notes and any other debts and liabilities to any Member(s)

(b)  to the payment of unsecured debts and liabilities of the Company, including any other debts and liabilities to any Member(s);

(c)  to the setting up of any reserves which the Managers or the liquidating agent or committee, as the case may be, deems reasonably necessary for contingent or unforeseen liabilities or obligations of the Company;

(d)  to Class B Members up to the Class B Priority Return, but only to the extent that less than the total Class B Priority Return has been paid or distributed to Class B Members prior to the liquidation;

(d)  to the Members with net positive balances in their respective Capital Accounts in the proportion that each such positive balance bears to the aggregate sum of balances in the Capital Accounts of all Members with net positive balances in their respective Capital Accounts; and

(e)  to the Capital Accounts of Members in proportion to the respective Percentage Interests.

9.02  Capital Account Adjustments.  For purposes of the preceding Section, the respective balance in the Capital Account of each member shall be determined (i) after allocating all income, gain, loss and expense of the Company pursuant to the terms of this Agreement and (ii) after taking into account all prior distributions to the Members.  In addition, if property is distributed in kind to the Members, for purposes of the preceding

Deleted: 43

CONFIDENTIAL

Body of Agreement
Page 31 of 43

Exhibit 6
Page 69

Section, any unsold Company property shall be valued by the Managers or the liquidating agent or committee, as the case may be, to determine the gain or loss which would have resulted if the property were sold for its fair market value, and, to the extent not previously reflected in the Members' Capital Accounts, the respective balance of the Capital Account of each Member shall be adjusted to reflect such gain or loss that would have been allocated to such Member if such property had been sold at its then fair market value.

9.03    Compliance with Treasury Regulations.    In the event the Company or any Manager's interest in the Company is "liquidated" within the meaning of Treasury Regulation Section 1.704-1(b)(2)(ii)(g), the following action shall be taken by the later to occur of (i) the last day of the Company's taxable year in which such liquidation occurred or (ii) the 90th day following the date of such liquidation:

(a)    If the Company is actually liquidated, distributions shall be made to the Members who have positive Capital Account balances in compliance with Treasury Regulation Section 1.704-1(b)(2)(ii)(b)(2).

(c)    In the discretion of the Managers or the liquidating agent or committee, as the case may be, distributions pursuant to this Section 9.03 may be distributed to a trust of which the Managers or the liquidating agent or committee is the trustee (hereinafter referred to as the "Trustee") established for the benefit of the Members for the purposes of liquidating Company assets, collecting amounts owed to the Company, and paying any contingent or unforeseen liabilities or obligations of the Company so long as an opinion of counsel is obtained to the effect that such trust will not be taxed as an association taxable as a corporation.  The assets of any such trust shall be distributed to the Members from time to time, in the reasonable discretion of the Trustee, in the same proportions as the amount distributed to such trust by the Company would otherwise have been distributed to the Members pursuant to this Agreement; and a portion or all of such assets may be withheld by the Trustee to provide a reasonable reserve for liabilities.

### ARTICLE X
### GENERAL PROVISIONS

10.01  Notices.  Any and all notices under this Agreement shall be effective (a) when delivered or refused if sent by registered or certified mail, return receipt requested, postage prepaid; (b) on the first business day after being sent by express mail, or commercial overnight delivery service providing a receipt for delivery; (c) on the date of hand delivery; or (d) on the date actually received, if sent by any other method.  In order to be effective, all such notices shall be addressed, if to the Company at its principal office, if to a Member at the last address of record on the Company books, and copies of such notices shall also be sent to the last address for the recipient which is known to the sender, if different from the address so specified.

10.02  Word Meanings.    The words such as "herein", "hereinafter", "hereof" and

Deleted: 43

Exhibit 6
Page 70

"hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires. The singular shall include the plural and the masculine gender shall include the feminine and neuter, and vice versa, unless the context otherwise requires.

10.03 <u>Binding Provisions.</u> Subject to the restrictions on Transfers set forth herein, the covenants and agreements contained herein shall be binding upon, and inure to the benefit of, the parties hereto, their heirs, Legal Representative, successors and assigns. In addition, each of the Founders represents and warrants that any Officers or Managers designated by them for purposes of this Agreement shall be bound in writing to comply with the terms hereof and shall so comply.

10.04 <u>Applicable Law.</u> This Agreement shall be governed by, construed and enforced in accordance with the laws of the State of Delaware, including the Act, without regard to the choice of law rules of such jurisdiction. Any dispute or controversy arising out of this Agreement shall be brought exclusively in the Federal or State courts located in Wilmington, Delaware. Each Member agrees not to commence any action, suit or other proceeding arising from, relating to, or in connection with this Agreement except in such a court and each Member irrevocably and unconditionally consents and submits to the personal and exclusive jurisdiction of such courts for the purposes of litigating any such action, and hereby grants jurisdiction to such courts and to any appellate courts having jurisdiction over appeals from such courts or review of such proceedings.

10.05 <u>Separability of Provisions and Validity under the Act.</u> Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law. However, if any provision of this Agreement shall be prohibited by or invalid under such law, it shall be deemed modified to conform to the minimum requirements of such law or, if for any reason it is not deemed so modified, it shall be prohibited or invalid only to the extent of such prohibition or invalidity without the remainder thereof or any other such provision being prohibited or invalid. To the extent that any provision of this Agreement is prohibited or ineffective under the Act, this Agreement shall be considered amended to the smallest degree possible in order to make the Agreement effective under the Act (and, if the Act is subsequently amended or interpreted in such manner as to make effective any provision of this Agreement that was formerly rendered invalid, such provision shall automatically be considered to be valid from the effective date of such amendment or interpretation).

10.06 <u>Section Titles and Headings.</u> Section titles and Headings are for descriptive purposes only and shall not control or alter the meaning of this Agreement as set forth in the text.

10.07 <u>Amendments.</u> Except as otherwise specifically provided in this Agreement, this Agreement may be amended or modified only with the Approval of the Managers and the Consent of the Members; provided, however, that (i) an amendment or restatement that would modify Section 2.02 in a way that is materially adverse to any non-Founder

CONFIDENTIAL

Body of Agreement
Page 33 of 43

| Deleted: 43 |

Exhibit 6
Page 71

Member or that would subject any non-Founder Member to liability for the debts or obligations of the Company shall require for its effectiveness the consent or approval of such non-Founder Member, (ii) an amendment or restatement that would materially modify the terms of Section 5.07 (Indemnification) shall require for its effectiveness the Approval of the Managers and the Consent of the non-Founder Members, and (iii) an amendment that would materially and adversely modify the rights or obligations of the non-Founder Members other than in the same fashion as those of the Founder Members shall require for its effectiveness the Consent of the non-Founder Members.

10.08  _Third Party Beneficiaries._  The provisions of this Agreement, including Article III, are not intended to be for the benefit of any creditor (other than a Member who is a creditor) or other Person (other than a Member or Manager in his capacity as such) to whom any debts, liabilities or obligations are owed by (or who otherwise have any claim against) the Company or any of the Members or Managers.  Moreover, notwithstanding anything contained in this Agreement, including without limitation Article III, no such creditor or other Person shall obtain any rights under this Agreement or shall, by reason of this Agreement, make any claim in respect of any debt, liability or obligation (or otherwise) against the Company or any Member or Manager.

10.09  _Entire Agreement._   This Agreement embodies the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings (whether express or implied, oral or written) related thereto, including (a) that certain Letter of Intent dated November 21, 2005, entered into by DNAG and the sole member of WTA, (b) the Initial Operating Agreement, (c) the First Amended and Restated Operating Agreement, and (d) the Second Amended and Restated Operating Agreement.

10.10  _Reliance._  The Members hereby agree that each Member and each Manager shall be entitled to rely on the provisions of this Agreement, and no Member or Manager shall be liable to the Company or any other Member or Manager for any action or refusal to act taken in good faith in reliance on the terms of this Agreement.  The Members hereby agree that the duties and obligations imposed on the Members and Managers as such shall be those set forth in this Agreement, which is intended to govern the relationship among the Company, the Members and the Managers, notwithstanding any provision of the Act or common law to the contrary.

10.11  _Waiver of Partition._  Each Member agrees that irreparable damage would be done to the Company if any Member brought an action in court to dissolve the Company. Accordingly, unless otherwise expressly authorized in this Agreement, each Member agrees that he shall not, either directly or indirectly, take any action to require partition or appraisal of the Company or of any of the assets or properties of the Company, and notwithstanding any provisions of this Agreement to the contrary, each Member (and his successors and assigns) accepts the provisions of the Agreement as his sole entitlement on termination, dissolution and/or liquidation of the Company and hereby irrevocably waives any and all right to maintain any action for partition or to compel any sale or other

CONFIDENTIAL

Body of Agreement
Page 34 of 45

Deleted: 43

Exhibit 6
Page 72

liquidation with respect to his interest, in or with respect to, any assets or properties of the Company; and each member agrees that he will not petition a court for the dissolution, termination or liquidation of the Company.

10.12 Survival of Certain Provisions. The Members acknowledge and agree that this Agreement contains certain terms and conditions which are intended to survive the dissolution and termination of the Company, including without limitation, the provisions of Section 2.04 and 5.06. The Members agree that any provisions of this Agreement which by their terms require, given their context, that they survive the dissolution and termination of the Company or the execution of any document terminating this Agreement, shall so survive unless such termination document specifically provides for non-survival by reference to this Section 10.12 and to specific non-surviving provisions.

10.13 No partnership Intended for Non-tax Purposes. The Members have formed the Company under the Act, and expressly do not intend hereby to form a partnership under either Chapter 15 or Chapter 17 of Title 6 of the Delaware Code or under any other provision of Delaware or other law. The Members do not intend to be partners one to another, or partners as to any third party. To the extent any Member, by word or action, represents to another party that any other Member is a partner or that the Company is a partnership, the Member making such wrongful representation shall be liable to any other Member who incurs personal liability by reason of such wrongful representation.

10.14 Intent of Agreement. This Agreement is made under and pursuant to the Act and shall be construed and interpreted in all respects to qualify the Company as a limited liability Company formed under the Act, to provide the Company with all the rights and privileges of a limited liability Company formed under the Act and to be taxed for federal income tax purposes as a partnership in all respects under the Code and Regulations.

10.15 Waiver. No failure of a Member to exercise, and no delay by a Member in exercising, any right or remedy under this Agreement shall constitute a waiver of such right or remedy. No waiver by a Member of any such right or remedy under this Agreement shall be effective unless made in a writing duly executed by all Members and specifically referring to each such right or remedy being waived.

10.16 Counterparts. This Agreement may be executed in several counterparts, each of which shall be deemed an original and all of which taken together shall constitute one and the same instrument.

10.17 Specific Performance. The obligations of the parties hereunder are acknowledged to be unique and the parties consent that, in the event of its default in any obligations hereunder, the other parties may, in addition to all other remedies which may be available, also obtain injunctive relief to compel the specific performance by any breaching party of such parties obligations hereunder.

### ARTICLE XI

CONFIDENTIAL

Body of Agreement
Page 35 of 43

Deleted: 43

**Exhibit 6**
**Page 73**

## DEFINITIONS

The following capitalized terms used in this Agreement shall have the respective meanings ascribed to them below:

"Act" means the Delaware Limited Liability Company Act, 6 Del. C. Sec. 18_101 et seq., in effect at the time of the initial filing of the Certificate with the Office of the Secretary of the State of Delaware, and as thereafter amended from time to time.

"Affiliated Person" or "Affiliate" means, with respect to any Member, Manager and/or officer of the Company, any Person: (i) which owns or controls more than 10% of the voting interests in the Member; or (ii) in which the Member, or any member of such Member's Immediate Family, owns or controls more than 10% of the voting interests.

"Agreement" means this Limited Liability Company Agreement as it may be amended, supplemented, or restated from time to time.

"Approval" (or any capitalized derivative of such term) means the written consent or approval of all Managers.

"Bankruptcy" means the occurrence of any of the following events:

(1)    A Member makes an assignment for the benefit of creditors;

(2)    A Member files a voluntary petition in bankruptcy;

(3)    A Member is adjudged a bankrupt or insolvent, or has entered against him an order for relief, in any bankruptcy or insolvency proceeding;

(4)    A Member files a petition or answer seeking for himself any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation;

(5)    A Member files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against him in any proceeding of this nature;

(6)    A Member seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Member or of all or any substantial part of his properties; or

(7)    One hundred twenty (120) days after the commencement of any proceeding against a Member seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation, if the proceeding has not been dismissed, or if within ninety (90) days after the appointment without his consent or acquiescence of a trustee, receiver or

Deleted: 43

CONFIDENTIAL

Body of Agreement
Page 36 of 43

Exhibit 6
Page 74

liquidator of the Member or of all or any substantial part of his properties, the appointment is not vacated or stayed, or within ninety (90) days after the expiration of any such stay, the appointment is not vacated.

"Book Value" shall mean, with respect to any Company asset, the asset's book value as carried on the books and records of the Company, determined in compliance with the provisions of applicable Treasury Regulations, including Treasury Regulation Section 1.704-1(b)(2)(iv).

"Capital Account" means the account maintained by the Company for each Interest Holder in accordance with the following provisions:

(i)      an Interest Holder's Capital Account shall be credited with the Interest Holder's Capital Contributions, the amount of any Company liabilities assumed by the Interest Holder (or which are secured by Company property distributed to the Interest Holder), the Interest Holder's allocable share of Profit and any item in the nature of income or gain specially allocated to such Interest Holder pursuant to the provisions of Article IV (other than Section 4.05(b)); and

(ii)      an Interest Holder's Capital Account shall be debited with the amount of money and the fair market value of any Company property distributed to the Interest Holder, the Interest Holder's allocable share of Loss, and any item in the nature of expenses or losses specially allocated to the Interest Holder pursuant to the provisions of Article IV (other than Section 4.05(b)).

"Capital Contribution" means the total capital contribution of a Member including such Member's initial capital contribution as well as all additional capital contributions made pursuant to Section 2.02.

"Certificate" means the Certificate of Organization creating the Company, as it may, from time to time, be amended in accordance with the Act.

"Class A Member" means any Member who has been classified as holding a Class A Interest in the Company.

"Class B Member" means any Member who has been classified as holding a Class B Interest in the Company.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Company" means the limited liability company the Members will form in the State of Delaware pursuant to the Certificate and this Agreement under the name Escom, LLC.

"Consent" means the written consent or approval of Members entitled to participate in giving such Consent holding sufficient Interest in the Company to take the action specified

Deleted: 43

Exhibit 6
Page 75

therein (as required by this Agreement). Throughout this Agreement, where a specified percentage of Interests is required to take certain action, unless specifically stated otherwise in the Agreement, the required percentage shall refer to an aggregate across both Class A and Class B Interests. Wherever the Agreement is silent as to the required percentage of voting Interests to take a certain action, a majority of the Members' voting Interests shall be sufficient.

"Domain Name" means the Internet domain name registration for "sex.com" and certain intellectual property rights associated therewith, as further described in that certain Domain Name Purchase and Sale Agreement dated July 13, 2005, by and between DNAG and Grant Media, LLC, as amended (the "Domain Name Purchase Agreement")

"Domain Name Rights" means the exclusive right to acquire the Domain Name free and clear of all liens and encumbrances from DNAG, who currently holds an exclusive right to purchase the same pursuant to the Domain Name Purchase Agreement.

"Fair Market Value" means the fair market value of any non-cash property as reasonably determined by the Managers in good faith. If any Member disputes the Managers' determination of fair market value within 15 days after notification thereof, then a valuation appraisal shall be conducted by an independent appraiser mutually agreeable to the parties at the expense of the Company. The appraiser shall afford the Managers and the Member the right to submit evidence with respect to the fair market value and shall, as promptly as practicable, make its determination in writing and give notice thereof to the Managers and the Member. The fair market value so determined shall be controlling and shall be binding upon the Company, the Managers and the Members and shall be specifically enforceable in a court having jurisdiction.

"Gross Fair Market Value" shall mean the agreed fair market value of an asset determined without taking into account any liabilities which are secured by such asset or which are otherwise associated with such asset.

"Immediate Family" (i) with respect to any individual, means his ancestors, spouse, issue, spouses of issue, any trustee or trustees, including successor and additional trustees, principally for the benefit of any one or more of such individuals, and any entity or entities all of the beneficial owners of which are such trust and/or such individuals, but (ii) with respect to a Legal Representative, means the Immediate Family of the individual for whom such Legal Representative was appointed and (iii) with respect to a Trustee, means the Immediate Family of the individual with respect to whom the principal beneficiaries are members of the Immediate Family.

"Interest" means a Member's share of the Profits and Losses of, and the right to receive distributions from, the Company.

"Interest Holder" means any Person who holds an Interest, whether as a Class A or Class B Member, or as an unadmitted assignee or transferee of a Member.

| Deleted: 43 |
| --- |

Exhibit 6
Page 76

"Involuntary Withdrawal" means the death, incompetency, bankruptcy, liquidation, or dissolution of any Member (including as more specifically set forth in Section 18-304 of the Act).

"Legal Representative" means, with respect to any individual, a duly appointed executor, administrator, guardian, conservator, personal representative, or other legal representative appointed as a result of the death or incompetence of such individual.

"Manager" shall refer to any Person named as a Manager in this Agreement and any Person who becomes a Manager as permitted by this Agreement, in each such Person's capacity as (during the period during which such Person serves as) a Manager of the Company. "Managers" shall refer collectively to all of such Persons who hold the position of Manager at any given time.

"Member" shall refer to any Person named as Member in this Agreement and any Person who becomes an additional, substitute or replacement Member as permitted by this Agreement, in such Person's capacity as a Member of the Company. "Members" shall refer collectively to all such Persons in such capacity.

"Member Nonrecourse Deduction" shall mean an allocation of loss and/or expense (or item thereof) attributable to Member Nonrecourse Liabilities, determined in accordance with the provisions of applicable Treasury Regulations, including Treasury Regulation Section 1.704-2.

"Member Nonrecourse Liabilities" shall mean liabilities of the Company that are nonrecourse debt (as defined in applicable Treasury Regulations, including Treasury Regulation Section 1.704-2) but with respect to which one or more Members (or the affiliate of any Member) bears the economic risk of loss (as defined in applicable Treasury Regulations promulgated under Code Section 752).

"Member Nonrecourse Liability Minimum Gain" shall mean the aggregate amount of gain (of whatever character), computed with respect to each property of the Company which secures a Member Nonrecourse Liability of the Company, that would be recognized by the Partnership if, in a taxable transaction, the Company were to dispose of such property in full satisfaction of such Member Nonrecourse Liability. The amount of Member Nonrecourse Liability Minimum Gain and the amount of any Member's share of Member Nonrecourse Liability Minimum Gain shall be determined in accordance with the provisions of applicable Treasury Regulations, including Treasury Regulation Section 1.704-2.

"Membership Unit" shall mean any of the equal parts into which the ownership of the Company is divided.

"Minimum Gain" shall mean the aggregate amount of gain (of whatever character),

CONFIDENTIAL

Deleted: 43

Exhibit 6
Page 77

computed with respect to each property of the Company that secures a Third Party Nonrecourse Liability of the Company, that would be recognized by the Company if, in a taxable transaction, the Company were to dispose of such property in full satisfaction of such Third Party Nonrecourse Liability. The amount of Minimum Gain and the amount of any Member's share of Minimum Gain shall be determined in accordance with the provisions of applicable Treasury Regulations, including Treasury Regulation Section 1.704-2.

"Net Income" shall mean the Company's gross revenue for the relevant year minus the following amounts: (a) all operating expenses, including but not limited to salaries, office administration and equipment costs, professional fees, travel and entertainment, and contractual amounts due third-parties (including affiliates) and capital expenditures; (b) payment of all interest, principal and other amounts due in connection with any debt of the Company; and (c) any amount required to maintain a cash reserve held by the Company in the amount of not less than Two Hundred Fifty Thousand Dollars (US$250,000.00), or such other amount as the Managers may Approve from time to time.

"Net Losses and Net Profits" shall have the meanings ascribed to such terms in Section 4.03 hereof.

"Net Fair Market Value" shall mean, in connection with the contribution of an asset to the Company by a Member and/or in connection with the distribution of an asset by the Company to a Member, the Gross Fair Market Value of such asset reduced by any liabilities (i) assumed by such Member or the Company, or (ii) subject to which such Member or the Company takes such asset.

"Nonrecourse Deduction" shall mean an allocation of loss and/or expense (or item thereof) attributable to Third Party Nonrecourse Liabilities, determined in accordance with the provisions of applicable Treasury Regulations, including Treasury Regulation Section 1.704-2.

"Percentage Interest" shall mean, as to a Member, the Member's percentage of ownership in the Company as calculated below, and as to an Interest Holder who is not a Member, the Percentage of the Member whose Interest has been acquired by such Interest Holder, to the extent the Interest Holder has succeeded to that Member's Interest. A Member's percentage of ownership shall be calculated by dividing the number of Membership Units held by such Member, as set forth on Schedule A, by the total number of outstanding Membership Units held by all Members, also as set forth on Schedule A (as amended from time to time).

"Person" means any natural person, partnership (whether general or limited), limited liability company, trust, estate, association, corporation or any other legal entity.

"Positive Cash Flow" shall have the meaning ascribed to it in Section 4.01.

Deleted: 43

CONFIDENTIAL

Body of Agreement
Page 40 of 53

Exhibit 6
Page 78

"Tax Matters Partner" shall mean the Member designated in this Agreement as the Tax Matters Partner as defined in Code Section 6231(a)(7).

"Third Party Nonrecourse Liabilities" shall mean liabilities of the Company which are nonrecourse debt (as defined in applicable Treasury Regulations, including Treasure Regulation Section 1.704-2) and which are not Member Nonrecourse Liabilities.

"Total Minimum Gain" shall mean the aggregate of the Minimum Gain and the Member Nonrecourse Liability Minimum Gain.

"Transfer" and any grammatical variation thereof shall refer to any sale, exchange, issuance, redemption, assignment, distribution, encumbrance, hypothecation, gift, pledge, retirement, resignation, transfer or other disposition or alienation in any way as to any Interest. Transfer shall specifically, without limitation of the above, include assignments, transfers and distributions resulting from Involuntary Withdrawal. A Transfer will be deemed to occur upon a change in ownership of 20% or more of the equity of any Interest Holder.

"Treasury Regulations" shall mean any applicable regulations promulgated under the Code.

"Voluntary Withdrawal" means a dissociation from the Company by means other than a Transfer or an Involuntary Withdrawal. "Voluntarily Withdraw" means to effect a Voluntary Withdrawal.

The definitions set forth in the Act shall be applicable, to the extent not inconsistent herewith, to define terms not defined herein and to supplement definitions contained herein.

**[Remainder of this page is intentionally blank]**

CONFIDENTIAL

Deleted: 43

**Exhibit 6**
**Page 79**

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement under seal as of the day and year first above written.

**BY DNAG HOLDINGS, LLC, ON BEHALF AND AS MANAGER OF DOMAIN NAME ACQUISITION GROUP, LLC:**

By: _____

Name: <u>Andrew Miller</u>

Title:   <u>Manager of DNAG Holdings. LLC</u>

**BY BUILT TO LAST, LLC, ON BEHALF AND AS MANAGER OF DOMAIN NAME ACQUISITION GROUP, LLC:**

By: _____

Name: <u>Mike Zapolin</u>

Title:   <u>Manager of Built to Last, LLC</u>

**BY WASHINGTON TECHNOLOGY ASSOCIATES, LLC:**

By: _____

Name: _____

Title: _____

**BY DOM PARTNERS LLC:**

By: _____

Name: <u>Robert E. Seaman III</u>

Title: _____

[Signatures Continue on Next Page]

Deleted: 43

CONFIDENTIAL

Body of Agreement
Page 42 of 43

**Exhibit 6**
**Page 80**

**BY NUTHIN' BUT NET, LLC:**

By: _____

Name: _____

Title: _____

CONFIDENTIAL

Body of Agreement
Page 43 of __

Deleted: 43

**Exhibit 6**
**Page 81**

**SCHEDULE A**
**to the Limited Liability Company Agreement of**
**Escom, LLC**

| Members of the Company | Capital Contributions Pursuant to Section 2.02(a) | Membership Units | Class of Interest |
|---|---|---|---|
| Domain Name Acquisition Group, LLC | • $2,800.00<br>• The Domain Name Rights | 28 | A |
| Washington Technology Associates, LLC | • $2,200.00<br>• The WTA Loan Obligation | 22.0 | A |
| DOM Partners LLC | • $1,250.00<br>• The DP Loan Obligation<br>• The DP Bridge Obligation | 12.5 | A |
| Nuthin' But Net, LLC | • The NBN Loan Obligation | 1.0 | A |
| Washington Technology Associates, LLC | $1,000,000 | 7.5 | B |
| DOM Partners LLC | $1,000,000 | 7.5 | B |
| TOTAL | • $2,006,250.00<br>• The Domain Name Rights<br>• The WTA Loan Obligation<br>• The DP Loan Obligation<br>• The DP Bridge Obligation<br>• The NBN Loan Obligation | 78.5 | |

CONFIDENTIAL

Schedule A
Page 1 of 1

**Exhibit 6**
**Page 82**

IN WITNESS WHEREOF, the parties hereto have executed this Agreement under seal as of the day and year first above written.

BY DNAG HOLDINGS, LLC, ON BEHALF AND AS MANAGER OF DOMAIN NAME ACQUISITION GROUP, LLC:

By:

Name: Andrew Miller

Title:   Manager of DNAG Holdings, LLC

BY BUILT TO LAST, LLC, ON BEHALF AND AS MANAGER OF DOMAIN NAME ACQUISITION GROUP, LLC:

By:

Name: Mike Zapolin

Title:   Manager of Built to Last, LLC

BY WASHINGTON TECHNOLOGY ASSOCIATES, LLC:

By: _____

Name: _____

Title: _____

BY DOM PARTNERS LLC:

By: _____

Name: Robert E. Seaman III

Title: _____

[Signatures Continue on Next Page]

CONFIDENTIAL

Body of Agreement
Page 42 of 43

**Exhibit 6**
**Page 83**

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement under seal as of the day and year first above written.

**BY DNAG HOLDINGS, LLC, ON BEHALF AND AS MANAGER OF DOMAIN NAME ACQUISITION GROUP, LLC:**

By: _____

Name: Andrew Miller

Title: Manager of DNAG Holdings, LLC

**BY BUILT TO LAST, LLC, ON BEHALF AND AS MANAGER OF DOMAIN NAME ACQUISITION GROUP, LLC:**

By: _____

Name: Mike Zapolin

Title: Manager of Built to Last, LLC

**BY WASHINGTON TECHNOLOGY ASSOCIATES, LLC:**

By: _____*(signature)*_____

Name: _____Michael Mann_____

Title: _____sole member_____

**BY DOM PARTNERS LLC:**

By: _____

Name: Robert E. Seaman III

Title: _____

[Signatures Continue on Next Page]

CONFIDENTIAL

APR. 11. 2008  5:14PM                                        NO. 2866   P. 2

IN WITNESS WHEREOF, the parties hereto have executed this Agreement under seal as
of the day and year first above written.

BY DNAG HOLDINGS, LLC, ON BEHALF AND AS MANAGER OF DOMAIN NAME
ACQUISITION GROUP, LLC:

By:

Name: Andrew Miller

Title:  Manager of DNAG Holdings, LLC

BY BUILT TO LAST, LLC, ON BEHALF AND AS MANAGER OF DOMAIN NAME
ACQUISITION GROUP, LLC:

By:

Name: Mike Zapolin

Title:  Manager of Built to Last, LLC

BY WASHINGTON TECHNOLOGY ASSOCIATES, LLC:

By:  _____

Name:  _____

Title:  _____

BY DOM PARTNERS LLC:

By:

Name: Robert E. Seaman III

Title: AUTHORIZED SIGNATORY

[Signatures Continue on Next Page]

CONFIDENTIAL

Body of Agreement
Page 42 of 43

Exhibit 6
Page 85