1  Jeffrey W. Dulberg (CA Bar No. 181200)
   Gabrielle Albert Rohwer (CA Bar No. 190895)
2  PACHULSKI STANG ZIEHL & JONES LLP
   10100 Santa Monica Blvd., 11th Floor
3  Los Angeles, California 90067-4100
   Telephone: 310/277-6910
4  Facsimile: 310/201-0760

5  Proposed Attorneys for Alleged Debtor

6

7

8              UNITED STATES BANKRUPTCY COURT

9               CENTRAL DISTRICT OF CALIFORNIA

10              SAN FERNANDO VALLEY DIVISION

11  In re:                              Case No.: 1:10-bk-13001-GM

12  **ESCOM LLC,**                      Chapter 11

13                    Alleged Debtor.   **DECLARATION OF DEL ANTHONY
                                        POLIKRETIS IN SUPPORT OF
14                                      DEBTOR'S RESPONSE TO ORDER TO
                                        SHOW CAUSE WHY A CHAPTER 11
15                                      TRUSTEE SHOULD NOT BE
                                        APPOINTED IN THIS BANKRUPTCY
16                                      CASE**

17                                      Date:    April 27, 2010
                                        Time:    10:00 a.m.
18                                      Place:   Ctrm 303
                                                 21041 Burbank Blvd.
19                                               Woodland Hills, CA 91367
                                        Judge: Hon. Geraldine Mund
20

21       I, Del Anthony Polikretis, declare:

22       1.    I am the President and Chief Executive Officer of ESCOM LLC, the above captioned

23  alleged debtor (the "Debtor").  I have over ten years of experience in the internet/web

24  development/domain industry.  I have been employed by the Debtor since March 2007.  I received a

25  masters of business degree from a top-ten business school.

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    2.    I submit this Declaration in support of the Debtor's Response to Order to Show Cause

2    Why a Chapter 11 Trustee Should Not Be Appointed in this Bankruptcy Case (the "OSC

3    Response").[1]

4    3.    I run the Debtor's day-to-day operations, including management of the website and

5    all business functions.  All facts stated herein are known by me to be true through my own personal

6    knowledge and, therefore, I would and could competently testify thereto in a court of law if called

7    upon to do so.

8    4.    I received a Written Consent of Non-Founder Members of Escom, LLC attached to

9    the Declaration of Corey Bialow as Exhibit A.  According to the terms of the Forth Amended and

10    Restated Limited Liability Company Agreement of ESCOM, LLC (the "Operating Agreement"), a

11    copy of which is attached hereto as Exhibit A, I am now authorized to act for and on behalf of the

12    Debtor in this case.

13    5.    The Debtor was formed in 2006 to operate a website with the domain name

14    www.sex.com.  The Debtor is run by three managers pursuant to the terms of the Operating

15    Agreement.  Those managers are DOM Partners LLC ("DOM") (the Movant), Washington

16    Technology Associates, LLC ("WTA") (one of the petitioning creditors), and Domain Name

17    Acquisition Group ("DNAG" and, collectively with DOM and WTA, the "Managers").  According

18    to the terms of the Operating Agreement, the majority of actions taken outside the ordinary course of

19    business must be approved by a unanimous vote of the Managers.

20    6.    The Debtor has a revenue generating operation.  In fact, the Debtor's revenue

21    increased 194% between September 2009 and March 2010 and traffic on the website increased

22    155% during the same period.  As a result, the Debtor has approximately $200,000 of cash on hand.

23    While the Debtor does not presently generate adequate cash to fully service its debt, the Debtor does

24    generate sufficient revenue to fund operations.  I have been able to generate a positive cash flow

25    sufficient to fund operations and make debt payments.  I have also been working on ways to

26    maximize the value of the Domain Name.

27

28

[1] Capitalized terms not otherwise defined shall have the same meaning as ascribed to them in the OSC Response.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

7.    I have operated the Debtor for more than three years.  During that time, I have always operated the business for the benefit of all Managers.  I do not take direction from any single Manager unless authorized pursuant to the terms of the Operating Agreement.  I have not excluded any Manager from the operation of the business.

8.    It is my intention to execute upon a sale initiative if granted Court authority to do so.  In order to maximize the value of the Domain Name, the Debtor must continue to operate and generate revenue.  It is my opinion that the Debtor will benefit from my years of experience and knowledge of the intricacies of the Domain Name and business operations during the sales process.  While operating the Debtor as a debtor-in-possession, I will do so as a fiduciary for the Debtor's bankruptcy estate.

9.    A true and correct copy of the letter dated April 19, 2010, from Scott R. Matthews, counsel to DOM, addressed to me is attached hereto as Exhibit B.

10.    A true and correct copy of the e-mail dated April 16, 2010 from Brian Leventhal, counsel to WTA, addressed to me is attached hereto as Exhibit C.

11.    A true and correct copy of the e-mail from Robert Muzzy ("Muzzy"), counsel to DOM, to Anthony dated April 5, 2009 is attached hereto as Exhibit D.

12.    A true and correct copy of the e-mail from Robert Seaman to Anthony dated April 8, 2009 is attached hereto as Exhibit E.

13.    A true and correct copy of e-mails among Leventhal, counsel to WTA, Muzzy and Anthony dated May 13, 2009, is attached hereto as Exhibit F.

14.    A true and correct copy of the e-mail between Muzzy and Leventhal dated August 11, 2009, is attached hereto as Exhibit G.

15.    A true and correct copy of the e-mail dated February 2, 2010 from Muzzy to me is attached hereto as Exhibit H.

16.    A true and correct copy of the e-mail dated April 16, 2010 from Brian Leventhal, counsel to WTA, addressed to me is attached hereto as Exhibit I.

1        I declare under penalty of perjury that the forgoing is true and correct.

2    Dated: April 26, 2010

3

4                   By    _____

5                           Del Anthony Polikretis

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# EXHIBIT A

# EXHIBIT 6

**FOURTH AMENDED AND RESTATED**
**LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**ESCOM, LLC**

THIS FOURTH AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT (together with any Schedules and Exhibits attached hereto, the "**Agreement**"), is entered into as of this 21st day of March, 2008 (the "Effective Date") by and among **DOMAIN NAME ACQUISITION GROUP, LLC**, a Delaware limited liability company ("**DNAG**"), **WASHINGTON TECHNOLOGY ASSOCIATES, LLC**, a Maryland limited liability company ("**WTA**"), **DOM PARTNERS LLC**, a Delaware limited liability company ("**DP**"), and NUTHIN' BUT NET, LLC, a Delaware limited liability company ("**NBN**"). Each of WTA, DNAG and DP shall be referred to individually hereinafter as a "**Founder**" and collectively as the "**Founders**".

WHEREAS, WTA and DNAG agreed to organize and operate a limited liability company under the Delaware Limited Liability Act (the "**Act**") in accordance with the terms of, and subject to the conditions set forth in, the Limited Liability Company Agreement of Escom, LLC dated January 5, 2006 (the "Initial Operating Agreement") by filing a Certificate of Formation with the Division of Corporations in the office of the Secretary of State of Delaware (the "Division of Corporations");

WHEREAS, WTA and DNAG in connection with admitting DP as an additional member of the Company amended and restated their respective rights, obligations and duties with respect to the Company and its business, management and operations by executing, along with DP, a second version of the Initial Operating Agreement dated January 12, 2006, which also was titled "Limited Liability Company Agreement of Escom, LLC" and which superseded the Initial Operating Agreement (the "First Amended and Restated Operating Agreement"),as set forth in the Initial Operating Agreement by executing this Agreement;

WHEREAS, the Founders further amended the First Amended and Restated Operating Agreement by executing the Second Amended and Restated Limited Liability Company Agreement of Escom, LLC dated February 3, 2006 (the "Second Amended and Restated Operating Agreement") and the Third Amended and Restated Operating Agreement dated August 1, 2007; and

WHEREAS, the Members wish to further amend and restate their respective rights, obligations and duties with respect to the Company and its business, management and operations by executing this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants herein contained and for other good and valuable consideration, the receipt of and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

Deleted: 43

CONFIDENTIAL

Body of Agreement
Page 1 of 42

**Exhibit 6**
**Page 39**

## ARTICLE I
## NAME, OFFICE, AGENT, ORGANIZATION, POWERS, MEMBERS AND MANAGER

1.01    Defined Terms.  Capitalized terms used herein shall have the respective meanings ascribed to them in Article XI or as defined elsewhere in the text of this Agreement.

1.02    Name of the Limited Liability Company.   The name of the Company shall be Escom, LLC.  The name of the Company may be changed at any time or from time to time by the Managers in accordance with this Agreement.

1.03    Registered Agent and Registered Office.  The name of the registered agent for the Company is Delaware Corporate Agents.   The address of the registered office of the Company is 4406 Tennyson Road, Wilmington, DE 19802. The Managers may establish places of business of the Company within and without the State of Delaware, as and when required by its business and in furtherance of its purposes set forth in Section 1.06, and may appoint agents for service of process in all jurisdictions in which the Company shall conduct business.

1.04    Principal Office.  The principal office of the Company shall be located at 21300 Victory Boulevard, Suite 265, Woodland Hills, CA  91367, or at such other place as the CEO may designate.

1.05    Organization.  The Managers have caused or contemporaneously herewith shall cause to be filed such certificates and documents as may be necessary or appropriate to comply with the Act and any other applicable requirements for the operation of a limited liability Company in accordance with the laws of the State of Delaware and any other jurisdictions in which the Company shall conduct business, and shall continue to do so for so long as the Company conducts business therein.

1.06    Nature of Business.  The general character of the business of the Company, as set forth in the Certificate, is to conduct any and all business activities authorized by the Act.  Accordingly, the purposes of the Company shall be to acquire, own, improve, develop, subdivide, finance, manage, lease, rent, sell and otherwise deal with any and all assets of the Company, real or personal, tangible or intangible.  Subject to all other provisions of this Agreement, in furtherance of the conduct of its business, the Company is hereby authorized:

(a)    To enter into, execute, modify, amend, supplement, acknowledge, deliver, perform and carry out contracts of any kind, including operating agreements of limited liability companies (whether as a member or manager), joint venture, limited and general partnership agreements, contracts with Affiliates, and including guarantees and contracts establishing business arrangements or organizations, necessary to, in connection with, or incidental to the accomplishment of the purposes of the

Deleted: 43

CONFIDENTIAL

Body of Agreement
Page 2 of 43

Exhibit 6
Page 40

Company, and to secure the same by mortgages, pledges or other liens.

(b)    To borrow money and issue evidences of indebtedness in furtherance of any or all of the purposes of the Company, and to secure the same by mortgages, pledges, or other liens.

(c)    To the extent that funds of the Company are available therefore, to pay all expenses, debts and obligations of the Company.

(d)    To enter into or engage in any kind of activity necessary to, in connection with, or incidental to the accomplishment of the purposes of the Company, so long as said activities may be lawfully carried on or performed by a limited liability company under the laws of the State of Delaware and any other jurisdictions in which the Company shall conduct business.

(e)    To take any other action not prohibited under the Act or other applicable law.

1.07    <u>Members.</u>  In accordance with Section 18-302 of the Act, the Company shall issue two classes of Interests; Class A and Class B Interests.  Class A and Class B Interests shall have equivalent voting rights.  The sole distinction between Class A and Class B Interests shall be with respect to priority of distributions (both of normal Positive Cash Flow and upon liquidation of the Company), as set forth below. All Members of the Company and their respective Percentage Interests as of the date hereof are identified on <u>Schedule A</u> attached hereto and incorporated herein by reference.  Additional Members may be admitted to the Company pursuant to and in accordance with Article VII.  In connection with any such admission, this Agreement (including Schedule A) shall be amended to reflect each additional Member, his capital contribution, if any, his Percentage Interest and Class of Interest, and any other rights and obligations of the additional Member.  The rights and obligations associated with particular Classes of Interests may be modified, expanded or reduced upon the Approval of the Managers, and the Consent of the holders of the Class of Interest to be affected.

1.08    <u>Term.</u>  The term of the Company shall commence upon the filing of the Certificate with the Division of Corporations and shall continue in existence until its existence is terminated pursuant to Article VIII of this Agreement.

1.09    <u>Affiliate Matters.</u>  Subject to the terms of, and except as otherwise authorized in accordance with, this Agreement, the Company may enter into any agreement, transaction or arrangement between the Company and any Affiliates as defined in Article XI.

<div align="center">

**ARTICLE II**
**CAPITAL CONTRIBUTIONS AND LIABILITY OF MEMBERS**

</div>

2.01    <u>Capital Accounts.</u>  A separate Capital Account shall be established and maintained

Deleted: 43

<div align="center">

CONFIDENTIAL

Body of Agreement
Page 3 of 45

</div>

<div align="center">

**Exhibit 6**
**Page 41**

</div>

for each Member. If any Interest is transferred pursuant to the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent the Capital Account is attributable to the transferred Interest. If the book value of Company property is adjusted pursuant to Section 4.05(b), the Capital Account of each Interest Holder shall be adjusted to reflect the aggregate adjustment in the same manner as if the Company had recognized gain or loss equal to the amount of such aggregate adjustment. It is intended that the Capital Accounts of all Interest Holders shall be maintained in compliance with the provisions of Regulation Section 1.704-1(b), and all provisions of this Agreement relating to the maintenance of Capital Accounts shall be interpreted and applied in a manner consistent with that Regulation.

2.02    Capital Contributions.

(a)    Initial Capital Contributions. The Members have contributed to the Company the cash, obligations and Domain Name Rights identified on Schedule A attached hereto (the "Initial Capital Contributions"). The parties acknowledge that the Company exercised the Domain Name Rights after execution of the First Amended and Restated Operating Agreement by complying with the process identified therein for such exercise and that the Company now owns all right, title and interest in and to the Domain Name. The parties acknowledge that this process involved the Company completing the purchase of the Domain Name on DNAG's behalf in accordance with the terms of the Domain Name Purchase Agreement and simultaneously purchasing the Domain Name from DNAG in exchange for the sum of $11.4 million. To the extent necessary, DNAG shall continue to cooperate in any way necessary to give further legal effect to the above described transaction.

(b)    Additional Capital Contributions. Except as otherwise provided in this Article II, no Member shall be obligated to contribute any additional capital or make any additional contribution to the Company. If at any time or from time to time, the Managers determine that the Company requires additional Capital Contributions, then notice shall be given to each Member of (i) the total amount of additional Capital Contributions required, (ii) the reason the additional Capital Contribution is required, (iii) each Member's proportionate share of the total additional Capital Contribution (determined in accordance with this Section), (iv) the valuation associated with such Capital Contribution, (v) the class of Interest the Members will receive for such Capital Contribution (and the rights associated therewith) and (vi) the date each Member's additional Capital Contribution is due and payable. A Member's proportionate share of the total additional Capital Contribution shall be equal to the product obtained by multiplying each such Member's Percentage Interest by the total additional Capital Contribution required. Except as provided above, no Member shall be required to contribute any additional capital to the Company, and no Member shall have any personal liability for any obligation of the Company, or for his failure to make additional Capital Contributions. Failure to make additional Capital Contributions does not constitute a breach of this

<div style="border:1px solid">Deleted: 43</div>

Exhibit 6
Page 42

Agreement and the exclusive remedy for such failure is provided in paragraph (c) below.

(c)    Failure to Make Additional Capital Contributions.    If a Member fails to pay ("Defaulting Member") when due all or any portion of any Capital Contribution (the "Unpaid Contribution"), a non-defaulting Member may pay the Unpaid Contribution of the Defaulting Member. In such case where multiple Members elect to pay the Unpaid Contribution, such Members shall pay the Unpaid Contribution pro rata in accordance with their Percentage Interest. To the extent the Unpaid Contribution is contributed by the other Member(s), the Defaulting Member shall have a period of thirty (30) days from the time the Unpaid Contribution is paid to reimburse the other Member(s) the amount of the Unpaid Contribution. If the Defaulting Member does not reimburse the other such Member(s) within the thirty (30) day period, then the Defaulting Member's Percentage Interest shall be reduced and the Percentage Interest(s) of the Member(s) who made up the Unpaid Contribution shall be increased accordingly after taking into effect such Capital Contribution. The President (as defined below) shall amend Schedule A accordingly. This remedy is the exclusive remedy for the failure to pay additional Capital Contributions hereunder.

2.03    No Withdrawal of or Interest on Capital.    No interest shall accrue on any contributions to the capital of the Company, and no Member shall have the right to withdraw or to be repaid any capital contributed by him or to receive any other payment in respect of his interest in the Company, including without limitation as a result of the withdrawal or resignation of such Member from the Company, except as specifically provided in this Agreement.

2.04    Liability of Members.    No Member, in his, her or its capacity as a member, shall have any liability to restore any negative balance in his, her or its Capital Account or to contribute to, or in respect of, the liabilities or obligations of the Company, or to restore any amounts distributed from the Company, except as may be required under the Act, this Agreement or other applicable law. In no event shall any Member, in his, her or its capacity as a Member, be personally liable for any liabilities or obligations of the Company.

2.05    Managers as Members.    Managers may hold interest in the Company as Members.

### ARTICLE III
### FUNDING

3.01    Third Party Funding.    In the event the Company requires additional funds to carry out its purposes, to conduct its business, to meet its obligations or to make any expenditure authorized by this Agreement, the Company may offer third party investors the opportunity to invest in the Company on such terms and conditions as may be

| Deleted: 43 |
| --- |

CONFIDENTIAL

Body of Agreement
Page 5 of 45

Exhibit 6
Page 43

authorized in accordance with Article V. In the event that such additional equity
investment would result in a dilution of any Member's Interest, such Member shall be
given the opportunity to retain their Percentage Interest by investing additional capital on
the same terms as those proposed for the third party investment. The Company also
may borrow funds from such third party lender(s) and on such terms and conditions as
may be authorized in accordance with Article V.

3.02    <u>Member Funding.</u>    As an alternative or in addition to funds raised from third party
investors, the Company may raise additional funds as needed or desired by securing
(upon the required authorization set forth in Article V) a loan from any Member in the
amount and on such terms as so approved. To the extent the Company seeks any such
loan, other than pursuant to Section 3.03 below, all Members shall have the pro rata
opportunity to participate in making such loan to the Company and to acquire any further
equity Interests as the Company may offer in connection with such funding on a pro rata
basis in accordance with this Agreement.

3.03    <u>Initial and Additional Funding.</u>    The initial funding of the Company shall consist of
the Initial Capital Contributions which were made in exchange for Class A Membership
Units and Class B Membership Units in the amounts designated on Schedule A hereto
and the funds borrowed by the Company pursuant to the promissory notes and security
agreements described below. As the Company is currently in need of additional funds in
order to repay the borrowed funds and for working capital, the Members hereby authorize
the Company to sell equity in the Company in the form of Class B Membership Units for
an additional amount of $3,000,000, as further provided below:

(a)    The Company acknowledges the following currently outstanding Notes and
Security Agreements (as defined below):

(i)    $5,000,000 Secured Promissory Note payable to WTA dated January 12,
2006 (the "WTA Note"), and corresponding Security Agreement of even date
therewith (the "WTA Security Agreement").

(ii)    $3,000,000 Secured Promissory Note payable to DP dated January 12,
2006 (the "DP Note"), and corresponding Security Agreement of even date
therewith (the "DP Security Agreement").

(iii)    $1,500,000 Convertible Promissory Note payable to NBN dated May 12,
2006 (the "NBN Note").

(iv)    $2,500,000 Secured Promissory Note payable to iEntertainment, Inc. dated
August 1, 2007 (the "iEntertainment Note"), and corresponding Security
Agreement of even date therewith (the "iEntertainment Security Agreement").

(v)    The notes and security agreements described above shall be referred to
hereafter respectively as the "Notes" and the "Security Agreements" and

| Deleted: 43 |
| --- |

CONFIDENTIAL

Body of Agreement
Page 6 of 3

Exhibit 6
Page 44

collectively, as the ("Loan Documents"). The Notes referred to in subparagraphs (i) and (ii) above shall be referred to as the "Long Term Notes", the Note referred to in subparagraph (iii) above shall be referred to as the "Bridge Note". The security for the Long Term Notes shall include a first priority lien on all assets of the Company, including all of the Company's right, title and interest in and to the Domain Name, as more fully described in the Security Agreements. The security for the iEntertainment Note shall include a second priority lien on all assets of the Company, including all of the Company's right, title. and interest in and to the Domain Name, as more fully described in the iEntertainment Security Agreement.

(vi)    Notwithstanding anything to the contrary in the Notes or Security Agreements, prior to either WTA or DP (each, a "Lender", and collectively, the "Lenders"), as the case may be, exercising any remedy(ies) for any default under any Note(s) or Security Agreement(s), including converting the Bridge Note to Membership Units, the other Lender shall have a first right of refusal to purchase all or any portion of the relevant Note(s) for the Purchase Price (as defined below). The other Lender shall have five (5) business days from receipt of written notice from the original Lender stating such original Lender's intention to pursue any such remedy(ies) (a "Default Notice") to pay the original Lender an amount equal to any unpaid principal and all accrued and unpaid interest outstanding on the relevant Note(s) as of the date of the Default Notice (the "Purchase Price"). The original Lender shall not pursue any remedy(ies) for any default under any Note(s) or Security Agreement(s) until a Default Notice has been served on the other Lender and the five (5) business day period required to be included therein has expired without payment by the other Lender of the Purchase Price. In the event the other Lender timely pays the Purchase Price, such other Lender shall step into the shoes of the original Lender and succeed to all rights of such original Lender contained in the relevant Note(s) and Security Agreement(s).

(b)    The Company shall be authorized to raise up to $3,000,000 in equity financing (together with the capital contributions of WTA and DP set forth in Schedule A corresponding to their Class B Interests, the "Class B Contributions") by offering investors the opportunity to purchase Class B Membership Units on such terms and conditions as may be acceptable to the Founders. Immediately upon completion of this equity fundraising, the Company shall satisfy and discharge the Bridge Note in full (including all unpaid principal and accrued interest thereon) or to the maximum extent possible if the amount raised is less than the amount required to satisfy the Bridge Note in full.

3.04    Non-Dilution. Notwithstanding anything herein to the contrary (including but not limited to Section 2.02(c) above, the Class B Interests held by the Members shall not be subject to dilution until such time as the completion of the equity fundraising referred to in Section 3.03(b) above.

**ARTICLE IV**

CONFIDENTIAL

Body of Agreement
Page 7 of 13

Deleted: 43

**Exhibit 6**
**Page 45**

## PROFITS, LOSSES AND DISTRIBUTIONS

4.01  <u>Positive Cash Flow</u>.  The term "Positive Cash Flow" as used in this Agreement shall mean the gross cash receipts generated from the operation of the business of the Company from all sources, including, without limitation, all revenue and income obtained from the sale of the assets or property of the Company as well as the proceeds from all refinancing of mortgages or replacements of existing mortgages encumbering the property of the Company available to the Company after (i) the payment or accrual for payment of all current operating expenditures in connection therewith, including, without limitation, interest and principal payments due on loans and other charges due pursuant to any mortgages encumbering the property of the Company and after (ii) making provisions for the reasonable working capital requirements of the Company and investments and reinvestments appropriate to enable the Company to carry out its purposes, but disregarding in determining Positive Cash Flow depreciation, amortization, other non-cash items and amounts to be distributed to the Members pursuant to the terms of this Agreement.  The Managers' determination with respect to provisions for reasonable working capital requirements and appropriate investments and reinvestments of the Company shall be conclusive.

4.02  <u>Distribution of Positive Cash Flow</u>.

(a)    Upon the Approval of the Managers and subject to the provisions hereof (including specifically Section 4.12 herein below) and any applicable agreements to which the Company or the Members are a party, distributions of Positive Cash Flow shall be made on an annual basis following the end of each fiscal year within ninety (90) days after the close of the fiscal year, and shall be made to the Members in accordance with the following order of priority:

(i)    First, to Class B Interest Holders until they receive total distributions of Positive Cash Flow in an aggregate amount equal to 125% of their initial Class B Contributions (the "Class B Priority Return").  Such distributions to the Class B Interest Holders shall be made to each Class B Interest Holder pro rata based on the ratio each Class B Interest Holder's Percentage Interest bears to the aggregate Percentage Interests of all Class B Members.  Any distributions made (or deemed to have been made) pursuant to Section 4.11 or Section 4.12 shall be included in calculating the priority distributions required under this paragraph; and

(ii)    Thereafter, to all Members on a pro rata basis in proportion to their Percentage Interest.

Notwithstanding the foregoing, however, no distributions of Positive Cash Flow (other than pursuant to Sections 4.12 or 5.9 below, and then only to the extent the Company is solvent and the Notes are not then due or in default) shall be made until such time as the Notes are paid in full (including repayment of the entire

<div style="float:right; border:1px solid black;">Deleted: 43</div>

CONFIDENTIAL

Body of Agreement
Page 8 of 23

Exhibit 6
Page 46

principal and payment of all accrued interest thereon).

(b)   Notwithstanding anything to the contrary set forth in this Section, any Positive Cash Flow that arises during the liquidation of the Company shall be distributed in accordance with Article IX below.

4.03   <u>Determination of Net Profits and Net Losses</u>.  For purposes of computing the amount of any items of income, gain, loss or expense to be reflected in the Member's Capital Accounts (hereinafter the net of such items being referred to as the "Net Profits" or the "Net Losses" of the Company), the determination, recognition and classification of such items shall be the same as their determination, recognition and classification for Federal income tax purposes, with the following modifications:

(a)   Any item of income, gain, loss or expense attributable to the taxable disposition of any property with an adjusted tax basis which is different from the Book Value of such property shall be determined as if the adjusted tax basis of such property as of the date of such disposition were equal in amount to the Book Value of such property.

(b)   If the Company's adjusted tax basis in an item of depreciable property is adjusted pursuant to Code Section 48(q)(1) to reelect any investment tax credit available with respect to such asset, the amount of such adjustment shall be treated as an Company expense and shall be allocated in the ratio in which the investment tax credit (or qualified investment in Code Section 38 property) which gave rise to such basis adjustment is allocated.  Any restoration of such adjusted tax basis pursuant to Code Section 48(q)(1) occurring as a result of any recapture of previously allowed investment tax credit with respect to any Company property shall be treated as Company income and shall be allocated in the ratio in which the investment tax credit (or qualified investment in Code Section 38 property the disposition of which gave rise to such restoration of adjusted tax basis) was allowed.

(c)   All expenditures of the Company not deductible in computing its taxable income and not properly chargeable to a Capital Account, and any otherwise nondeductible organization and syndication expenses of the Company (as described in Code Section 709) shall be treated as Company expenses.

(d)   Revenue of the Company that is exempt from Federal income tax shall be included in the Net Profits or the Net Losses of the Company without regard to the fact that such revenue is not includable in gross income for Federal income tax purposes.

(e)   Payments made to any Member which are treated for Federal income tax purposes as guaranteed payments pursuant to Code Section 707 (c) shall be treated as Company expenses; provided that such payments shall be treated as capital expenditures of the Company to the extent such payments are required to

| Deleted: 43 |
| --- |

**Exhibit 6**
**Page 47**

be capitalized under the Code and any applicable Treasury Regulations thereunder.

(f)    In the event the Book Value of any Company asset is adjusted pursuant to the terms of this Agreement, the amount of such adjustment shall be treated as gain or loss (as appropriate) from a sale of such asset.

4.04    Allocation of Net Profits and Net Losses.  For purposes of maintaining the Capital Accounts of the Members and determining the rights of the Members among themselves with respect to the assets of the Company, the Net Profits or Net Losses of the Company for each applicable period shall be allocated among the Members' Capital Accounts in the order of priority set forth below. Each item of such income, gain, loss or expense giving rise to such Net Profits or Net Losses of the Company for such period shall be allocated among the Members' Capital Accounts in the same proportion that such Net Profits or Net Losses of the Company for such period are allocated among the Members' Capital Accounts.

(a)    Allocation of Net Profits.

(i) First, an aggregate amount of Net Profits equal to the aggregate Unrecouped Net Losses previously allocated to the Members' Capital Accounts shall be allocated to such Capital Accounts in proportion to the respective amounts of Unrecouped Net Losses allocated to each such Capital Account.  As used herein, "Unrecouped Net Losses" shall mean Net Losses allocated to a Capital Account against which no Net Profits have previously been allocated.

(ii) Second, an aggregate amount of Net Profits equal to twenty-five percent (25%) of the total Class B Contributions shall be allocated to the Capital Accounts of Class B Interest Holders pro rata based on the ratio each Class B Interest Holder's Percentage Interest bears to the aggregate Percentage Interests of all Class B Members.

(iii) Third, after taking into account (i) and (ii) above, any and all additional Net Profits for any period shall be allocated to the Members' Capital Accounts in proportion to the Members' respective Percentage Interests.

(b)    Allocation of Net Losses.

(i) First, Net Losses for any given period shall be allocated to the Members' Capital Accounts in proportion to the positive balances reflected in such Capital Accounts at the time such allocation is to be made.

(ii) Second, any remaining Net Losses for any given period shall be allocated to the Members' Capital Accounts in proportion to the Members'

Deleted: 43

CONFIDENTIAL

Body of Agreement
Page 10 of 41.

Exhibit 6
Page 48

respective Percentage Interests.

4.05    Allocations to Comply with applicable Treasury Regulations.    In order to comply with the provision of applicable Treasury Regulations, including Treasury Regulation Sections 1.70-1 (b) and 1.704-2, the following special allocations of income, gain, loss and expense shall be made notwithstanding any other provision of this Agreement.

(a)    Deficit Capital Account Allocations.    Subject to the remaining provisions of this Section, in accordance with applicable Treasury Regulations, including Treasury Regulation Section 1.704-1 (b) (2)(ii)(d), no allocation of expenses or losses shall be made pursuant to the terms of this Agreement to the extent such allocation would cause or increase a net deficit balance in a Member's Capital Account as of the end of the period to which such allocation relates in excess of any dollar amount of such net deficit balance that such Member is obligated to restore under this Agreement.  Such expenses and losses shall instead be allocated among the other Members not subject to this limitation in accordance with their relative Percentage Interests.  For purposes of this paragraph (a), the following rules shall apply:

(i)    each Member's net deficit balance in such Member's respective Capital Account shall be determined by adding to such Capital Account balance the amount of such Member's share (as determined pursuant to Treasury Regulation Section 1.704-2) of the Total Minimum Gain of the Company as of the end of the period with respect to which such determination is being made; and

(ii)    in determining whether an allocation of loss or expense would cause or increase a net deficit balance in a Member's respective Capital Account as of the end of the period to which such allocation relates, the initial balance in such Member's respective Capital Account shall be treated as if it reflected an amount equal to the excess of any distributions that, as of the end of such period, reasonably are expected to be made to such Member in any future period over the Net Profits reasonably expected to be allocated to such Member during (or prior to) the period in which such distributions are expected to be made.

(b)    Qualified Income Offset Provision.    If a Member unexpectedly receives an adjustment, allocation or distribution pursuant to this Agreement which causes or increases a net deficit balance in such Member's respective Capital Account as of the end of the period to which such adjustment, allocation or distribution relates in excess of any dollar amount of such net deficit balance that such Member is obligated to restore pursuant to this Agreement, such Member will be allocated items of gross income and gain in an amount and manner sufficient to eliminate such net deficit balance as quickly as possible.  The rules set forth in subparagraph (a) (i) and (a) (ii) of this Section shall apply for purposes of

Deleted: 45

Exhibit 6
Page 49

Case 1:10-bk-13001-GM    Doc 46    Filed 04/26/10    Entered 04/26/10 12:47:23    Desc
Case 1:10-bk-13001-GM    Main Document 03/26/10 Page 18 of 76 Entered 03/26/10 16:05:25    Desc
Exhibit 6 (Part 1 of 2)    Page 13 of 23

determining whether any adjustment, allocation or distribution would cause or increase a net deficit balance in any Member's Capital Account.

(c)    Minimum Gain Chargeback Provision.  If there is a net decrease in the Minimum Gain of the Company (as determined pursuant to applicable Treasury Regulations, including Treasury Regulation Section 1.704-2), during any period, then each Member shall be allocated items of gross income and gain in accordance with the provisions of applicable Treasury Regulations, including Treasury Regulation Section 1.704-2.

(d)    Special Allocations of Nonrecourse Deductions.   Notwithstanding any other provision in this Agreement, in compliance with applicable Treasury Regulations, including Treasury Regulation Section 1.704-2, allocations of Member Nonrecourse Deductions shall be made among the Members in accordance with the ratios in which the Members (or the affiliates of any Members) share the economic risk of loss with respect to the Member Nonrecourse Liabilities to which such member Nonrecourse Deductions are attributable.

(e)    Nonrecourse Liability Minimum Gain Chargeback.  If there is a net decrease in the Member Nonrecourse Liability Minimum Gain (as determined pursuant to applicable Treasury Regulations, including Treasury Regulation Section 1.704-2) during any period, then each Member shall be allocated items of income and gain in accordance with the provisions of applicable Treasury Regulations, including Treasury Regulation Section 1.704-2.

(f)    Subsequent Allocations.  Any special allocations of items of income, gain, loss or expense made pursuant to this Section shall be taken into account in computing subsequent allocations of income, gain, loss and expense pursuant to this Agreement, so that the net amount of any item of income, gain, loss and expense allocated to each Member pursuant to this Agreement shall, to the extent possible, be equal to the amount of such items of income, gain, loss and expense that would have been allocated to such member pursuant to this Agreement if the special allocations of income, gain, loss or expense required by this Section had not been made.

(g)    Interpretation of these provisions.  The provision of this Section are intended to comply with the provisions of applicable Treasury Regulations, including Treasury Regulation Section 1.704-1(b)(2) and 1.704-2, and shall be interpreted consistently therewith.

4.06    Federal Income Tax Allocations.  The allocations of income, gain, loss and expense made pursuant to the previous Sections are allocations of book income which are made for accounting purposes to determine the respective balances in the Capital Accounts of the Members and to establish the rights of the Members among themselves with respect to the assets of the Company.  These allocations may be different from the

CONFIDENTIAL

Body of Agreement
Page 12 of 25

Deleted: 43

Exhibit 6
Page 50

allocations among the Members of the income, gain, loss, deduction, tax preference and tax credits of the Company for Federal income tax purposes. Allocations of income, gain, loss, deduction, tax preference and tax credits of the Company for Federal income tax purposes for each taxable year shall be made among the Members as follows:

(a)     General Rules Regarding Allocations of Income, Loss, Etc.  In general, for Federal income tax purposes, all items of income, gain, loss, deduction and tax preference of the Company for each taxable year shall be allocated among the Members in the same manner as the items of income, gain, loss and expense which gave rise to such items of income, gain, loss, deduction and tax preference for Federal income tax purposes are allocated among the Members pursuant to the terms of this Agreement.

(b)     Special Rules Where Tax Basis Differs from Book Value.  If the Company's adjusted tax basis for Federal income tax purposes of any of its property differs from the Book Value of such property at the beginning of any taxable year, in determining each Member's distributive share of the taxable income or loss (or items thereof) of the Company, each item of income, gain, loss or deduction with respect to such property shall be allocated among the Members in such manner as will take into account (as required by Code Section 704(c) and any applicable Treasury Regulation, including Section 1.704-1(b)(i)) the difference between the adjusted tax basis for Federal income tax purposes of such property and its Book Value, all as of the beginning of such taxable year.

4.07    Allocation of Taxable Income and Loss and Tax Credits on the Transfer of a Members' Interest.  The items of income, gain, loss expense, deduction, tax preference and/or tax credit allocable under the terms of this Agreement to any Interest in the Company which may have been transferred during any period shall be allocated among the persons who were the holders of such Interest during such period in a manner which takes into account the varying Interests of the Members in the Company during such period, all in accordance with any Treasury Regulations promulgated under Code Section 706 (d); provided, that the allocation of gain or loss on the disposition of any property in which the Company has a direct or indirect interest shall, to the extent not prohibited under such regulations, be allocated among the Members who are Members in the Company on the date the event giving rise to such gain or loss occurs in accordance with the provisions of this Agreement otherwise dealing with Federal income tax allocations.

4.08    Special Tax Audit Allocations.    Notwithstanding anything contained in this Agreement to the contrary, in the event that the taxable income of the Company for Federal income tax purposes (or any item thereof) is adjusted as the result of an audit by the Internal Revenue Service, the Members' Capital Accounts shall be adjusted in a manner which reflects such adjustments as though corresponding book adjustments had been originally reflected in the Net Profits or Net Losses of the Company determined pursuant to the terms of this Agreement.

CONFIDENTIAL

Body of Agreement
Page 13 of 23

Deleted: 43

Exhibit 6
Page 51

4.09   Interest.   If, pursuant to applicable law, a portion of the amounts paid on any Member notes issued with respect to capital contributions to the Company shall be deemed to constitute interest rather than principal for Federal income tax purposes, the interest income attributable thereto shall be allocated to the Members who shall have made such deemed interest payments on such Member notes; and the amount of such interest income shall be taken into account in determining the amount of Capital Contributions made by such Member to the Company.

4.10   Credits.   Any investment tax credits, targeted job credits and other tax credits available to the Company shall, subject to applicable Treasury Regulations and provisions of the Code, be allocated among the Members as determined by the Managers in a manner which is designed to reflect the economic interests of the Members in the Company as otherwise described in this Agreement.

4.11   Tax Withholding.   If the Company incurs a withholding tax obligation with respect to the share of income allocated to any Member, (a) any amount which is (i) actually withheld from a distribution that would otherwise have been made to such Member and (ii) paid over in satisfaction of such withholding tax obligation shall be treated for all purposes under this Agreement as if such amount had been distributed to such Member, and (b) any amount which is so paid over by the Company, but which exceeds the amount, if any, actually withheld from a distribution which would otherwise have been made to such Member, shall be treated as an interest-free advance to such Member. Amounts treated as advanced to any Member pursuant to this Section shall be repaid by such Member to the Company within thirty (30) days after the Managers, acting by Approval, give notice to such Member making demand therefor.   Any amounts so advanced and not timely repaid by such Member shall bear interest, commencing on the expiration of said 30-day period, compounded monthly on unpaid balances, at an annual rate equal to the lowest Applicable Federal Rate as of such expiration date.   The Company shall collect any unpaid amounts so advanced from any Company distributions that would otherwise be made to such Member.

4.12   Distributions to Cover Members' Tax Liabilities.   To the extent the Managers determine in good faith that the Company has sufficient cash on hand to meet current and reasonably anticipated operating requirements, the Managers shall distribute annually to each Member, prior to April 15 of each year, an amount intended to be sufficient to cover the federal, state and local tax obligations of such Member with respect to the fiscal year of the Company ended immediately preceding such April 15 on account of the cumulative allocation to such Member (pursuant to this Agreement) of net taxable income; provided, that such amount shall be reduced by the aggregate amount of all distributions of Positive Cash Flow made to such Member prior thereto in excess of the aggregate amount of all such tax obligations of such Member incurred with respect to cumulative allocations of net taxable income to such Member in all prior fiscal years of the Company.   For purposes of the foregoing, such federal, state and local tax obligations of each Member shall be conclusively determined by the Managers to be either a fixed rate established by the Managers or the highest effective combined federal, state and local

Deleted: 43

CONFIDENTIAL

Body of Agreement
Page 14 of 43

Exhibit 6
Page 52

income tax rate applicable to any Member.

4.13    Dissolution.  Distribution to Members upon a liquidation and dissolution of the Company shall be determined pursuant to Article IX.

4.14    Distribution of Assets in Kind.  No Member shall have the right to require any distribution of any assets of the Company in kind.  If any assets of the Company are distributed in kind, such assets shall be distributed on the basis of their fair market value as determined by the Managers.  Any Member entitled to any interest in such assets shall, unless otherwise determined by the Managers, receive separate assets of the Company and not an interest as a tenant-in-common with other Members so entitled in any asset being distributed.

### ARTICLE V
### MANAGERS, MANAGEMENT, AND MEMBER MEETINGS

5.01    Management.  The overall business and affairs of the Company shall be managed by the Managers and the day to day operations of the Company shall be managed by the Officers (each as further described below).  All management and other responsibilities not specifically reserved for the Members and/or the Managers in this Agreement shall be reserved for the Officers.  The Members shall have no voting rights except as specifically provided in this Agreement.

5.02    Number and Appointment of Managers.  The Company shall be managed by three Managers.  Each of the Founders shall (a) be entitled to appoint one Manager, (b) ensure that the Manager it appoints complies with this Agreement and does all things required to give effect to this Agreement, and (c) have the right to dismiss at any time any Manager which it has designated and to replace him or her by another of its choice.  The Founders may appoint, remove and/or replace their designated Managers at their respective discretions at any time without the need for a meeting of or consent from the other Members.  A Manager may only be dismissed by the Founder who designated that Manager, except to the extent of any Manager's breach of this Agreement, gross negligence or material violation of applicable law, in which case said Manager may be removed by a majority vote of the Members' voting rights.  In the event of a vacancy in any (or all) of the Manager positions, the relevant Founder(s) shall endeavor to appoint a new Manager within five (5) business days of notice or actual knowledge of the vacancy, and, during any interim period, shall itself act as Manager.  The number of Managers of the Company and/or the right of the Founders to appoint, remove and replace the Managers may be amended (including the elimination of such rights) from time to time by Consent of the Members and the written Approval of the Founders.  In the event of any Transfer by one or more Founders of all of its/their Interest in the Company (in accordance with Article VII), the rights and obligations of the remaining Founder(s) (as described above) shall continue without need to appoint a second and/or third Manager (as the case may be) or to grant any other Member(s) the withdrawn Founder's(s') rights and obligations stated above, and the Manager(s) appointed by the Transferring

Deleted: 43

CONFIDENTIAL

Body of Agreement
Page 15 of 43

**Exhibit 6**
**Page 53**

Founder(s) shall be deemed to be dismissed by the Transferring Founder(s), at which time the Company shall have only one (1) or two (2) Managers as the case may be.  In the event all three of the Founders cease to be Members, the remaining Members shall hold a meeting as soon as practicable and shall approve by a majority of the voting rights of such remaining Members a new management structure for the Company.

5.03   Powers of Managers.   When a decision, approval or consent of the Managers is required or authorized in this Agreement, a unanimous vote of all Managers shall be required.  In the event that the Managers fail to reach unanimity with respect to a particular issue, such that if no action is taken regarding the issue at all, there would be a material adverse affect on the Company, each Manager shall submit a written report to the Members describing their view of the issue and recommended course of action.  The other Members (who are not Managers or Founders) shall then decide on the appropriate course of action by written Consent or pursuant to a vote in a meeting called in accordance with this Article V.   Except to the extent otherwise provided herein, the Managers shall have the responsibility and authority do such things that are reasonably necessary, proper, customary, advisable or incidental to carry out their responsibilities.  The Managers shall have the authority to establish one or more committees to handle any matters generally designated as part of their duties.  Except as otherwise set forth in this Agreement, the Managers shall have the exclusive power and authority, on behalf of the Company, to:

(a)   Acquire (by purchase, lease, exchange or otherwise), transfer, sell, finance, refinance, encumber or otherwise dispose of (by exchange, abandonment or otherwise), any asset with a book or fair market value greater than or equal to $25,000, unless covered by the Budget (as defined below);

(b)   Relocate the Company's principal office/headquarters outside the states of California, Massachusetts, or Maryland;

(c)   Commence business operations outside of the 50 United States (other than via the Internet), change the nature of the business to be conducted by the Company, or add a new line of business;

(d)   Change the legal name of the Company or adopt any trade name or DBA for the Company;

(e)   Approve the annual budget (the "Budget") and financial statements of the Company, and any material deviations therefrom;

(f)   Acquire any interest in securities issued by an entity other than a wholly owned subsidiary of the Company;

(g)   Borrow money, issue any evidence of indebtedness, provide any guaranty, indemnity or other assurance for the debt of another Person or with respect to the

Deleted: 43

CONFIDENTIAL

Body of Agreement
Page 16 of 24

Exhibit 6
Page 54

Case 1:10-bk-13001-GM    Doc 46    Filed 04/26/10    Entered 04/26/10 12:47:23    Desc
Case 1:10-bk-13001-GM    Doc 4-6 Main Document 03/26/10    Page 23 of 76 03/26/10 16:05:25    Desc
Exhibit 6 (Part 1 of 2)    Page 18 of 23

financial condition of such Person, secure any of the same by mortgage, deed of trust, pledge or other lien on any assets or property of the Company, and/or prepay, extend, amend or otherwise modify the terms of any such indebtedness;

(h)   Adopt any benefit plan of the Company, provided, however, that the CEO is hereby authorized to establish a reasonable group health insurance plan for the Company's employees;

(i)   Establish the compensation, if any, to be paid to the Officers and/or Managers for their service to the Company, and alter the authorization and/or responsibilities of the Officers;

(j)   Encumber, abandon, transfer, sell, assign, license or otherwise dispose of, alter or modify any intellectual property right or interest of the Company, including, without limitation, the Domain Name; provided, however, that in the event the Company determines in good faith that it will be unable to pay any amounts next coming due under either or both of the Long Term Notes, and the Company has received a bona fide offer to purchase the Domain Name for at least US$16,000,000 in cash (the "Offer"), the Lenders shall meet (in person or via teleconference) and attempt to mutually agree on taking one or more of the following courses of action in an effort to avoid foreclosure on either of the Long Term Notes: (i) cause the Managers appointed by them to approve the Company's sale of the Domain Name pursuant to the Offer, which approval shall be conditioned upon the Company's agreement to satisfy the Notes in full with the proceeds therefrom immediately upon consummation of such sale, (ii) restructure or extend the payment terms of either or both Long Term Notes on terms no less favorable to the Company than those currently in such Notes, or on any other terms as agreed by all the Managers, or (iii) cause the Managers appointed by them to approve the sale of new equity in the Company on terms agreed by all the Managers in order to satisfy either or both Long Term Notes or to enable the Company to continue servicing them (the "New Equity"), (iv) purchase the Domain Name from the Company on the same payment terms as in the Offer (which right shall be exercised within thirty (30) days of receipt of written notice of the Offer and all relevant terms thereof) with all proceeds therefrom going to satisfy the Long Term Notes in full immediately upon consummation of the purchase, and/or (v) purchase all or a portion of any New Equity and/or convert any remaining amounts (or any portion thereof) due under either or both Long Term Notes to additional interests in the Company at the same valuation (and same class) offered to third parties for the New Equity or, if no such offering has been made, at a valuation (and class) agreed by all the Managers. With respect to option (iv) above, the Lenders may agree to purchase the Domain Name jointly (equally or pursuant to any split they may choose) or to allow one of them to purchase it alone. With respect to any course of action described above and agreed on by the Lenders that does not expressly require agreement by all the Managers to certain relevant terms (e.g. extending the Long Term Notes on terms no less favorable than those currently

Deleted: 43

CONFIDENTIAL

Body of Agreement
Page 17 of 23

Exhibit 6
Page 55

contained therein), DNAG agrees to cause its Manager to approve the same without condition or delay. However, in the event the Lenders cannot agree on a course of action that will avoid foreclosure on either of the Long Term Notes, the Lenders agree to cause their Managers to abstain from any vote relating to the sale of the Domain Name, provided that the sale price shall not be less than US$16,000,000 in cash and the first funds from the proceeds of such sale are to be used to repay the Long Term Notes in full (including all remaining principal and any other amounts owed thereunder) to the satisfaction of the Lenders.

(k)    Hire or employ the Company's auditors;

(l)    Pay, extend, renew, modify, adjust, submit to arbitration, prosecute, defend and/or compromise, upon such terms as they may determine and upon such evidence as they may deem sufficient, any obligation, suit, liability, litigation or similar procedure, cause of action or claim, including related to taxes, either in favor of or against the Company involving matters greater than $25,000 in value, where the cost thereof is expected to exceed $25,000, or involving matters of strategic importance to the Company (which shall be deemed to include anything relating to or in connection with the Domain Name);

(m)    Determine the appropriate accounting method or methods to be used by the Company, and/or cause the Company to make or revoke any of the elections referred to in any section of the Code;

(n)    Establish and maintain reserves for such purposes and in such amounts as the Managers deem appropriate from time to time with advice from the CEO;

(o)    Incur liability of the Company in excess of $25,000 in a single item or aggregate of related items not covered by the relevant Budget;

(p)    Exercise all other powers and authority granted by the Act to Managers, except as otherwise provided in or limited by this Agreement;

(q)    Make, release or disseminate any public statements, promotions, press releases or announcements that reference (expressly or implicitly) any Member or Manager, provided, however, that the Managers first must obtain the prior written consent of any Managers and/or Members that will be mentioned or identified (directly or indirectly) therein; and

(r)    Return any Capital Contribution to an Interest Holder, or issue or grant additional Interests or other equity of the Company, provided however, that the authority to issue the Class B Interests referred to in Section 3.03(b) shall rest exclusively with the Founders.

5.04    No Management by other Members; Binding Authority.    Except as otherwise

Deleted: 43

Exhibit 6
Page 56

expressly provided herein, no Member other than the Officers and Managers, shall take part in the day-to-day management, or the operation or capital of the business and affairs, of the Company. No Person shall have any power or authority to bind the Company other than the Managers and the Officers unless such Person has been authorized by the Managers to act on behalf of the Company.

5.05   Contracts with Affiliated Persons.   With the Approval of the Managers (excluding any interested Manager or any Manager appointed by an interested Member), the Company may enter into one or more agreements, leases, contracts or other arrangements for the furnishing to or by the Company of goods, services or space with any Member, Manager or Affiliated Person, and may pay compensation thereunder for such goods, services or space, provided in each case the amounts payable thereunder are reasonably comparable to those which would be payable to unaffiliated Persons under similar agreements, and if the determination of such amounts is made in good faith it shall be conclusive absent manifest error.   The Members acknowledge that the Founders previously authorized and directed the Company to enter into that certain Web Site Linking Agreement dated February 3, 2006 (the "Linking Agreement") and that certain Option Agreement of even date therewith (the "Option Agreement") with iEntertainment, Inc., a WTA Affiliate.   The Members further acknowledge that the Company entered into that certain Agreement to Waive Linking Rights dated August 1, 2007, in order to modify the parties' respective rights and obligations under the Linking and Option Agreements.

5.06   Limited Liability for Certain Acts.   A Manager shall not be personally liable to the Company or its Members for damages for any breach of duty as a Manager, except for any matter in respect to which such Manager shall be liable by reason that, in addition to any and all other requirements for such liability, there shall have been a judgment or other final adjudication adverse to such Manager that establishes that such Manager's acts or omissions were in bad faith or involved intentional misconduct or a knowing violation of law or that such Manager personally gained in fact a financial profit or other advantage to which such Manager was not legally entitled or that with respect to a distribution such Manager's acts were not performed in accordance with the Act or this Agreement. Neither the amendment or the repeal of this Section 5.06 shall eliminate or reduce the effect of this Section 5.06 in respect to any matter occurring, or any cause of action, suit or claim that, but for this Section 5.06, would accrue or arise, prior to such amendment, repeal or adoption of an inconsistent provision.

5.07   Indemnification.

(a)   In General.   Subject to Section 5.07(b), the Company shall indemnify and hold harmless the Managers, officers and each Member from and against all claims and demands to the maximum extent permitted under the Act.   The Company shall to the fullest extent permitted by law advance funds to indemnified individuals in respect of defending and/or fulfilling all such claims and demands.   In addition, subject to Section 5.07(b), no Manager, or his Affiliates, or officer, shall have any liability to the Company or

Deleted: 43

Exhibit 6
Page 57

to any Member for any loss suffered by the Company or any Member which arises out of any action or inaction of any Manager or his Affiliates or officer if such Manager or his Affiliates or officer, as the case may be, in good faith, determined that such course of conduct was in the best interests of the Company.

(b)  Exception. Notwithstanding Section 5.07(a), the Company shall not indemnify a Manager, officer or Member (or any of his, her or its Affiliates) from or against any claim or demand to the extent arising from his, her or its negligent or willful misconduct which was the basis for any conviction of, or plea of no contest to, a felony having a material adverse effect on the Company. In addition, to the extent a Manager, officer or Member (or any of his, her or its Affiliates) is denied indemnification pursuant to the preceding sentence, the Company and its Members reserve all claims it and/or they may have against any such persons pursuant to applicable law arising from such conduct.

5.08  Officers.

(a)  Appointment.  The Managers may designate individuals (who may be but do not need to be Manager(s)) to serve as officers of the Company having such titles as the Managers may determine, including, but not limited to, Chief Executive Officer, President, and Vice President (each, an "Officer", and collectively, the "Officers"), provided, however, that the authority of any Officer to legally bind the Company shall be subject to the limitations imposed by Section 5.03 above.  Subject to the terms of any relevant employment contracts, such Officers may be dismissed by the Managers at any time, except to the extent of any Officer's breach of this Agreement, failure to follow the lawful directives of the Managers, gross negligence or material violation of applicable law, in which case said Officer may be removed by two Managers or the Consent of the Members.

(b)  Authority of CEO.  Subject to the limitations set forth in Section 5.03 above, the specific authority of the Chief Executive Officer ("CEO") shall include, but is not limited to, the following (with any delegation or further division of responsibility and/or authority amongst the other Officers determined by the CEO in his reasonable discretion):

- Directing and supervising the day-to-day operations of the Company;
- Relocating the Company's principal office/headquarters to the extent within the states of California, Massachusetts or Maryland;
- Establishing such charges for services and products of the Company as may be necessary to provide adequate income for the efficient operation of the Company;
- Retaining such accountants, attorneys, and other professionals (other than the Company's auditors) necessary or appropriate to carry out the business and operations of the Company;
- Making, releasing or disseminating any public statements, promotions, press releases or announcements relating to the Company or its business

CONFIDENTIAL

Body of Agreement
Page 20 of 54

Deleted: 43

Exhibit 6
Page 58

that do not expressly or implicitly reference any Manager or Member of the Company;

- Within the Budget established by the Managers, setting and adjusting wages and rates of pay for all personnel of the Company (other than any wages or compensation to be paid to any Officer or Manager, and as otherwise restricted by this Agreement), which the Managers hereby agree may include a profit share pursuant to which those employees deemed appropriate for such a benefit by the CEO are entitled to share in the Company's Net Income, provided that the aggregate share and amount, respectively, of the Company's annual Net Income paid to employees does not exceed, in the aggregate, 5% of Net Income or $100,000 per annum without Approval of the Managers, and appointing, hiring and dismissing all such personnel and regulating their hours of work;
- Obtaining and continuing in force all policies of insurance required by any mortgage, lease or other agreement relating to the Company's business or any party thereof, or determined by the Officers to be in the best interests of the Company;
- Causing to be paid any and all taxes, charges and assessments that may be levied, assessed or imposed upon any of the assets of the Company, unless the same are contested by the Company; and
- Keeping the Managers and Members advised in all matters pertaining to the operation of the Company, services rendered, operating income and expense, and financial position at times as may be directed by the Managers and/or the Members

5.09   [Intentionally Deleted]

5.10   <u>Member Matters</u>.  Notwithstanding anything herein to the contrary, the following matters shall require the Approval of the Managers and the Consent of the Members:

(a)    Entering an agreement (including a letter of intent or similar document) to sell (whether or not for cash, stock or any other asset or a combination thereof) all or substantially all of the assets or Interests in the Company or to merge the Company;

(b)    Terminating the business of, or voting to dissolve or liquidate, the Company, or taking any steps in furtherance thereof (including, the appointment of a liquidator);

(c)    Entering into an arrangement or incurring a liability that is not done at arm's length (e.g. with an Affiliate where the terms are not in accordance with Section 5.05);

(d)    Making distributions other than on a non-discriminatory basis to all Members in a particular Class; and

(e)    Causing or permitting the Company to take any steps to convert the Company to

Deleted: x3

CONFIDENTIAL

Body of Agreement
Page 21 of 23

Exhibit 6
Page 59

another form (e.g., to permit trading of the securities of the Company on a recognized exchange).

5.11    Meetings.   For purposes of any matters specified in Section 5.10 above, or for any other purpose, a meeting of the Members may be called by a Manager or any Member holding not less than ten percent (10%) of the Interests of the Company.

5.12    Place of Meetings.   Whenever the Members of the Company are required or permitted to take action by vote, a meeting of the Members may be held at any place reasonably convenient to the Members as designated in any notice of such meeting, within or outside the state in which the principal office of the Company is located.   If no such designation is made, the place of any such meeting shall be the principal office of the Company.   Meetings of the Members may be conducted by teleconference, provided all Members can hear and be heard.   Attendance by teleconference shall be deemed to be attendance in person.

5.13    Notice of Meeting.   Written notice stating the place, day and hour of the meeting indicating that it is being issued by or at the direction of the person or persons calling the meeting, stating the purpose or purposes for which the meeting is called shall be delivered no fewer than ten (10) nor more than sixty (60) days before the date of the meeting.   Notice given by facsimile (provided successful transmission is confirmed by the sending machine) or email shall be deemed to be written notice.

5.14    Record Date.   For the purpose of determining the Members entitled to notice of or to vote at any meeting of Members or any adjournment of such meeting, or Members entitled to receive payment of any distribution, or to make a determination of Members for any other purpose, the date on which notice of the meeting is mailed or the date on which the resolution declaring distribution is adopted, as the case may be, shall be the record date for making such a determination.   When a determination of Members entitled to vote at any meeting of Members has been made pursuant to this Section, the determination shall apply to any adjournment of the meeting.

5.15    Quorum.   Members holding not less than a majority of all Members' Interests, represented in person or by proxy, shall constitute a quorum at any meeting of Members; provided however that a quorum must include all Founders who are also Members.   In the absence of a quorum at any meeting of Members, a majority of the Members' Interests so represented may adjourn the meeting from time to time for a period not to exceed sixty (60) days without further notice.   However, if the adjournment is for more than sixty (60) days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each Member of record entitled to vote at such meeting.   At an adjourned meeting at which a quorum shall be present or represented, any business may be transacted that might have been transacted at the meeting as originally noticed.   The Members present at a meeting may continue to transact business until adjournment, notwithstanding the withdrawal during the meeting of Members Interests whose absence results in less than a quorum being

Deleted: 43

Exhibit 6
Page 60

present.

5.16    Manner of Acting.    If a quorum is present at any meeting, the vote or written consent of Members in accordance with Section 5.10 above shall be the act of the Members.

5.17    Action by Members Without a Meeting.    Whenever the Members of the Company are required or permitted to take any action by vote, such action may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken shall be signed by the Members who hold the voting Interests having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all of the Members entitled to vote therein were present and voted and shall be delivered to the President.    Delivery made to the office of the Company shall be by hand or by certified or registered mail, return receipt requested.    Prompt notice of the taking of the action without a meeting by less than unanimous written consent shall be given to each Member who have not consented in writing but who would have been entitled to vote thereon had such action been taken at a meeting.

5.18    Waiver of Notice.    Notice of a meeting need not be given to any Member who submits a signed waiver of notice, in person or by proxy, whether before or after the meeting.    The attendance of any Member at a meeting, in person or by proxy, without protesting prior to the conclusion of the meeting the lack of notice of such meeting, shall constitute a waiver of notice by him or her.

## ARTICLE VI
## FISCAL MATTERS; TRADE SECRETS; RESTRICTIVE COVENANT

6.01    Books and Records.    The Managers shall keep or cause a designated third party to keep, complete and accurate books and records of the Company on the income tax method of reporting and otherwise in accordance with generally accepted accounting principles consistently applied, which shall be maintained and be available, in addition to any documents and Certificate required to be furnished to the Members under the Act, at the office of the Company for examination and copying by any Member or Manager, or his duly authorized representative, at his reasonable request and at his expense during ordinary business hours.    A current list of the full name and last known address of each Member and Manager, a copy of this Agreement, any amendments thereto, the Certificate, including all certificates of amendment thereto, executed copies of all powers of attorney, if any, pursuant to which this Agreement, any amendment, the Certificate or any certificate of amendment has been executed, copies of the Company's financial statements and federal, state and local income tax returns and reports, if any, for the three most recent fiscal years, shall be maintained at the principal office of the Company.

The Company shall have no obligation to deliver or mail a copy of the Certificate or any amendment thereto to the Members.

Deleted: 43

CONFIDENTIAL

Body of Agreement
Page 23 of 43

Exhibit 6
Page 61

6.02    Reports.  The Managers shall cause to be prepared and sent to all Members
financial reports of the Company annually, and at such other intervals as the Managers
may determine to be reasonable, and, upon the request of any Member, for any quarterly
period or periods within 45 days of the end of the last such quarterly period.  Within ninety
(90) days after the end of each fiscal year, the Managers shall furnish (or cause to be
furnished) to all Members such Certificate as may be needed to enable the Members to
file their federal income tax returns and any applicable state income tax returns.  The cost
of all such reporting shall be paid by the Company as a Company expense.

6.03    Fiscal Year.  The fiscal year of the Company shall end on December 31st of each
year.

6.04    Tax Matters Partner.  DNAG is hereby designated as the "Tax Matters Partner,"
and an officer or Manager of DNAG shall act on its behalf in this capacity.  The Tax
Matters Partner is hereby authorized to and shall perform all duties of a Tax Matters
Partner under the Code and shall serve as Tax Matters Partner until his, her or its
resignation or until the designation of his, her or its successor by the Managers,
whichever occurs sooner.

6.05    Bank Accounts.  Bank accounts and/or other accounts of the Company shall be
maintained in such banking and/or financial institution(s) as shall be selected by the CEO
and withdrawals shall be made and other activity conducted on such signature or
signatures as shall be Approved by the Managers.

6.06    Trade Secrets.

(a)    The Members stipulate and agree that all information relating to the Company and
its activities, including, but not limited to, identity of customers, lists or compilations
of data concerning customers or prospective customers solicited or targeted for
solicitation, contracts, technical and production know-how, developments,
formulae, devices, inventions, processes, administrative procedure, business or
marketing strategies, and financial information ("Trade Secrets") shall be the sole
property of the Company.

(b)    The Members agree that they shall not, during the term of this Agreement and
thereafter, use such Trade Secrets for the benefit of anyone other than the
Company, or disclose Trade Secrets to any third party.  Notwithstanding the
foregoing, it is understood that it shall not be deemed a breach of this Agreement if
a Member is compelled by judicial or administrative proceedings to disclose such
Trade Secrets if that Member has diligently tried to avoid such disclosure and has
afforded the Company the opportunity to obtain assurance that the compelled
disclosure will be kept confidential.

(c)    None of the Members, Managers or Officers shall disclose the identity of the
Founders (including its members, officers or directors) to any Person without the

| Deleted: 43 |

Exhibit 6
Page 62

prior written consent of such Person, except as may be required by legal process and then only after as much written notice as is reasonably practicable is given to the relevant Person(s) so they may seek a protective order. To the extent the identity of the Founders becomes generally known to the public through no fault of the Members, Managers or Officers (or any of their members, officers or directors), any subsequent disclosure shall not be deemed a breach hereunder, provided, however, that commercially reasonable efforts shall be used to avoid further disclosure which in any event shall be limited to the extent reasonably necessary to further the Company's goals and interests and then only if the relevant Person(s) is given as much advance notice as reasonably practicable.

6.07   <u>Restrictive Covenant</u>. During the term of this Agreement and for the relevant period set forth below, without prior written Approval of the Managers and Consent of the Members, which Approval and/or Consent may be withheld, conditioned or delayed in their sole and absolute discretion, no Founder, Manager or Officer, nor any of their respective officers, managers, members, directors or shareholders (collectively, "Covered Persons") shall, for a period of eighteen months after such Covered Person ceases to be associated with the Company as a Member, Manager or Officer, or as an officer, manager, member, director or shareholder thereof, (such cessation hereafter referred to as the "Separation Event", and the 18 month period thereafter as the "Restrictive Period") directly or indirectly be engaged in, employed by (as an employee or independent contractor), concerned with, or financially interested in, or participate in, invest in or assist, individually or as an owner, part owner, shareholder, manager, director, officer, partner, or joint venturer, any Person or business that directly or indirectly creates, provides, sells or makes available any Adult Oriented (as defined below) goods, publications, content, media, products and/or services, which shall include, but not be limited to, information services, software, and the operation of any Adult Oriented Internet site (collectively, "Adult Products and/or Services"), except for those Persons or businesses currently in existence as of the date hereof with which any Covered Person already has such a relationship as of the date hereof, including, without limitation, Love Tactics, LLC and iEntertainment, Inc., with which DNAG and WTA, respectively, are affiliated ("Excluded Businesses"). For the avoidance of doubt, any business, investment or other opportunity related to Adult Products and/or Services that may be presented, offered or proposed to or may be discovered or developed by any Covered Person at any time after the date hereof, shall immediately be disclosed to the Company and shall be deemed the sole and exclusive opportunity of the Company. For purposes of this paragraph, the term "Adult Oriented" shall refer to being characterized by an emphasis on depicting, describing, or relating to sexuality, sexual activity or anatomical areas commonly associated with sexuality. The restrictions contained in this Section 6.07 shall apply within the boundaries of the United States of America, but shall not prohibit any Covered Person from purchasing or holding passive investments in no more than five percent (5%) of the stock or other securities of any corporation (regardless of its business) which has securities listed upon any recognized

| Deleted: 43 |

securities exchange or traded on a recognized market in the United States. Except as expressly provided in this Section 6.07, the Members and Managers, and any Affiliates of any of them, may engage in and possess interest in other business ventures and investment opportunities of every kind and description, independently or with others, including serving as directors, officers, stockholders, managers, members and general or limited partners of corporations, partnerships or other limited liability companies. Neither the Company nor any other Member or Manager shall have any rights in or to such ventures or opportunities or the income or profits therefrom solely by reason of their status hereunder.

6.08    Covenants Severable; Equitable Relief.

(a)    The provisions of Section 6.06 through this Section 6.08 shall be construed as agreements independent of any other provision of this Agreement, and the existence of any claim or cause of action of any Officer, Manager or Member against the Company or each other, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by the Company of any such provisions. The Company's rights of termination under this Agreement shall be in addition to and shall not affect its rights under these provisions, and such rights and remedies shall survive termination of this Agreement.

(b)    The Members acknowledge that the restrictions contained in the provisions of Sections 6.06 through this Section 6.08, in view of the nature of the business in which the Company is engaged, are reasonable and necessary in order to protect the legitimate interests of the Company, and that any violation thereof would result in irreparable and substantial harm to the Company for which it does not have an adequate remedy at law.

<div align="center">

**ARTICLE VII**
**TRANSFERS OF INTEREST; ADMISSION OR WITHDRAWAL OF MEMBERS**

</div>

7.01    General Restrictions on Transfer.

(a)    No Member may Transfer all or any part of his, her or its Interest in the Company to a non-Member except as provided herein or with the Approval of the Managers.

(b)    Every Transfer of an Interest in the Company permitted by this Article VII, including without limitation, Transfers permitted by Sections 7.01(a) and 7.02, shall nevertheless be subject to the following:

(i)    No Transfer of any interest in the Company may be made if such Transfer would cause or result in a breach of any agreement binding upon the Company or of then applicable rules and regulations of any governmental authority having jurisdiction over such Transfer. The Managers, acting by Approval, may require as a condition of any Transfer that the transferor

Deleted: 43

<div align="center">

CONFIDENTIAL

Body of Agreement
Page 26 of 47

</div>

**Exhibit 6**
**Page 64**

Case 1:10-bk-13001-GM   Doc 46   Filed 04/26/10   Entered 04/26/10 12:47:23   Desc
Case 1:10-bk-13001-GM   Main Document   Page 33 of 76   Entered 03/26/10 16:05:25   Desc
Doc 4-7   Filed 03/26/10   
Exhibit 6 (Part 2 of 2)   Page 5 of 25

assume all costs incurred by the Company in connection therewith and furnish an opinion of counsel, satisfactory to the Company both as to counsel and opinion, that the proposed Transfer complies with applicable law, including federal and state securities laws.

(ii) The Managers shall require, as a condition to the admission to the Company as a Member of any transferee who is not otherwise a Member, that such transferee demonstrate to the reasonable satisfaction of the Managers that he, she or it either is a financially responsible person or has one or more financially responsible persons who have affirmatively assumed the financial obligations of the transferor under this Agreement, if any, on his, her or its behalf. In addition, a transferee of an Interest pursuant to Section 7.02, who is not otherwise a Member, shall not be admitted to the Company as a Member without the Approval of the Managers, which may be withheld for any reason or for no reason, and such a transferee who is not so admitted need not be recognized by the Company for any purpose and shall be entitled only to the rights which are required under the Act to be afforded to a transferee who does not become a Member.

(iii) Notwithstanding anything contained herein to the contrary, no Interest in the Company shall be transferred if, by reason of such Transfer, the classification of the Company as a partnership for federal income tax purposes would be adversely affected or jeopardized, or if such transfer would have any other substantial adverse effect for federal income tax purposes or otherwise pursuant to the Code (e.g. Section 708). In addition, no Transfer shall be permitted if it requires registration of Interests under any federal or state securities laws or if it will result in the Company being subject to the Investment Company Act of 1940, as amended;

(iv) In the event of any Transfer, there shall be filed with the Company a duly executed and acknowledged counterpart of the instrument effecting such Transfer. The transferee, if any, shall execute such additional instruments as shall be reasonably required by the Managers. If and for so long as such instruments are not so executed and filed, the Company need not recognize any such Transfer for any purpose, and the transferee shall be entitled only to the rights which are required under the Act to be so afforded to a transferee who does not become a Member to receive distributions otherwise payable to the transferor's Interest.

(v) Upon the admission or Involuntary Withdrawal of a Member, this Agreement (including without limitation Schedule A hereto) and/or the Certificate shall be amended appropriately to reflect the then existing names and addresses of the Members and Managers and their respective Percentage Interests.

CONFIDENTIAL

Body of Agreement
Page 27 of 38

Deleted: 43

Exhibit 6
Page 65

(c)    A transferor of an Interest in the Company shall, if the transferee is a Member hereunder or if the transferee becomes a Member pursuant to the provision of this Agreement, be relieved of liability under this Agreement with respect to the transferred Interest arising or occurring on or after the effective date of the Transfer (unless such transferor affirmatively assumes liability as provided in Section 7.01 (b)(ii)).

(d)    Any Person who acquires in any manner whatsoever an Interest (or any part thereof) in the Company, whether or not such Person has accepted and assumed in writing the terms and provisions of this Agreement or been admitted into the Company as a Member as provided in Section 7.01(b), shall be deemed by acceptance of the acquisition thereof, to have agreed to be subject to and bound by all of the obligations of this Agreement with respect to such Interest and shall be subject to the provisions of this Agreement with respect to any subsequent Transfer of such Interest.

(e)    Any Transfer in contravention of any of the provisions of this Agreement shall be null and void and ineffective to transfer any Interest in the Company, and shall not bind, or be recognized by, or on the books of, the Company, and any transferee or assignee in such transaction shall not be or be treated as or deemed to be a Member for any purpose.  In the event any Member shall at any time Transfer an Interest in the Company in contravention of any of the provisions of this Agreement, then each other Member shall, in addition to all rights and remedies at law and equity, be entitled to a decree or order restraining and enjoining such transaction, and the offending Member shall not plead in defense thereto that there would be an adequate remedy at law; it being expressly hereby acknowledged and agreed that damages at law would be an inadequate remedy for a breach or threatened breach of the violation of the provisions concerning such transactions set forth in this Agreement.

7.02    Permitted Transfers for Involuntary Withdrawal.  The following Transfers shall be permitted without the Approval of the Managers otherwise required under Section 7.01(a) above, but such permitted Transfers shall in any event be subject to Sections 7.01 (b)-(e) hereof:

(a)    The right to distributions and allocations of profits and losses of the Company, but no other aspect of a Member's Interest, may be transferred from time to time as part of any proceeding under the present or any future federal bankruptcy act or any other present or future applicable federal, state or other statute or law relating to bankruptcy, insolvency, or other relief for debtors and subject to the requirements and provisions thereof.

(b)    The right to distributions and allocations of profits and losses of the Company, but no other aspect of a Member's Interest, may be transferred from time to time to

Deleted: 43

Exhibit 6
Page 66

Case 1:10-bk-13001-GM    Doc 46    Filed 04/26/10    Entered 04/26/10 12:47:23    Desc
Case 1:10-bk-13001-GM    Main Document    Filed 03/26/10    Page 35 of 76    16:05:25    Desc
Exhibit 6 (Part 2 of 2)    Page 7 of 25

any Legal Representative(s) and/or member(s) of the Immediate Family of the transferring Member.

7.03    Right of First Refusal.    Subject to the terms of Section 7.01, if any Member proposes to sell, assign or transfer all or a portion of its Member's Interest (a "Transferor"), and has received a bona fide offer in writing to purchase any or all of such Member's Interest (other than a transfer to an Affiliate), the Transferor shall give written notice to the Company and each Member of the proposed transaction specifying (i) the aggregate amount of Interests to be offered in such transaction and the Percentage Interest thereof (the "Offered Interests"), (ii) the amount and type of consideration which the Transferor will receive for such Offered Interests, (iii) the identity of the offeror in such transaction, (iv) the place and date on which the transaction is to be consummated and (v) all other material terms of the proposed transaction.    Upon receipt of such notice, each Member shall have the right and option during the 10 business day period following receipt of such notice to elect to sell, at the price and on the same terms and conditions stated in the notice, such Member's pro rata portion of the Offered Interests (which shall be based on such Member's Percentage Interest).    If any participating Member sells less than its pro rata share of the Offered Interests, each other participating Member will be entitled to sell such additional Members Interests as shall equal such participating Member's unused allotment, on a pro rata basis.

7.04    Voluntary Withdrawal.    No Member shall have the right or power to Voluntarily Withdraw from being an Interest Holder of the Company or to have its Interest repurchased by the Company.

7.05    Tag-Along Rights and Obligation.    Subject to the terms of Section 7.01 hereof, in the event that holders of a majority of the Percentage Interests shall elect to sell all or substantially all of their Percentage Interests in a bona fide transaction pursuant to which they will receive cash and/or marketable securities, and so long as the gross proceeds which may result from such sale of Percentage Interests exceeds any remaining portion of the Class B Priority Return (or if the Class B Priority Return has previously been distributed in full), then all other Members shall have the right, and upon the request by a majority of the Percentage Interests, the obligation, to participate pro rata in such transaction on the same terms and conditions regarding such Members' Percentage Interests as apply to such majority holders, and shall provide and be bound by all representations, warranties, covenants and indemnities as apply to such majority holders such that all involved shall pro rata follow the fortunes of the majority holders.    In the event that the gross proceeds from such sale of Percentage Interests shall be equivalent to or less than the remaining portion of the Class B Priority Return, then the Class B Members, if any, must approve such transaction by the vote of Class B Members holding a majority of the Percentage Interests held by Class B Members.

7.06    Section 754 Election.    Upon (a) the death of a Member and/or (b) the sale of any portion of a Member's Interest pursuant to the provisions hereof, at the request of the Legal Representative of such deceased Member or of the purchaser of such Member's

Deleted: 43

CONFIDENTIAL

Body of Agreement
Page 29 of 1

Exhibit 6
Page 67

Case 1:10-bk-13001-GM    Doc 46    Filed 04/26/10    Entered 04/26/10 12:47:23    Desc
Case 1:10-bk-13001-GM    Main Document    Page 36 of 76    Entered 03/26/10 16:05:25    Desc
Exhibit 6 (Part 2 of 2)    Page 8 of 25

Interest, as applicable, the Company shall file an election under Section 754 of the Code, permitting an adjustment to basis under Section 743 and/or Section 734 of the Code, or any successor provisions thereto.

## ARTICLE VIII
## DISSOLUTION AND TERMINATION

8.01   Events Causing Dissolution.   The Company shall be dissolved and its affairs wound up upon the first to occur of the following events:

(a)   The sale or other disposition of all or substantially all of the assets of the Company, unless the disposition is a transfer of assets of the Company in return for consideration other than cash and the Managers elect not to distribute any such non-cash items to the Members and to continue the Company.

(b)   A Transfer by a Founder of all of its Interest in the Company, unless (i) at least one other Founder remains a Member, or (ii) in the event there will be no remaining Founders, the remaining Members, acting by Consent within ninety days thereafter, elect to continue the Company and the business of the Company in which case a new management structure shall be established as specified in Section 5.02.

(c)   The election to dissolve the Company made in writing by the Approval of the Managers with the Consent of Members in accordance with Section 5.10;

(d)   Any consolidation or merger of the Company with or into any entity following which the Company is not the resulting or surviving entity;

(e)   Upon the occurrence of an event specified under the laws of the State of Delaware as one resulting in dissolution of a limited liability company irrespective of the terms of a limited liability company agreement, except that where, under the terms of this Agreement the Company is not to terminate, then the Company shall immediately be reconstituted and reformed on all of the applicable terms, conditions and provisions of this Agreement. The Company shall not be dissolved upon the death, insanity, retirement, resignation, expulsion, bankruptcy, dissolution or occurrence of any other event which terminates the membership of a Member under the Act or the terms of this Agreement, except as provided in Section 8.01(b); or

(f)   The failure of the Company to complete and close the equity fundraising described in Section 3.03(b) by the maturity date set forth in the Bridge Note, unless the Managers Approve the continuation of the Company within five (5) business days thereafter.

Deleted: 43

CONFIDENTIAL

Body of Agreement
Page 30 of

Exhibit 6
Page 68

Case 1:10-bk-13001-GM    Doc 46    Filed 04/26/10    Entered 04/26/10 12:47:23    Desc
Case 1:10-bk-13001-GM    Main Document    Page 37 of 76    Entered 03/26/10 16:05:25    Desc
Exhibit 6 (Part 2 of 2)    Page 9 of 25

8.02   Procedures on Dissolution.  Dissolution of the Company shall be effective on the day on which occurs the event which gave rise to the dissolution, but the Company shall not terminate until the Certificate shall have been canceled and the assets of the Company shall have been distributed as provided herein.  Notwithstanding the dissolution of the Company, prior to the termination of the Company, as aforesaid, the business of the Company and the affairs of the Members, as such, shall continue to be governed by this Agreement.  Upon dissolution of the Company, the Managers acting by Approval or, if there be none, a liquidator appointed with the Consent of the Members, shall liquidate the assets of the Company, apply and distribute the proceeds thereof as contemplated by this Agreement and cause the cancellation of the Certificate.

### ARTICLE IX
### DISTRIBUTIONS UPON LIQUIDATION

9.01   Distribution of Proceeds From the Liquidation of the Company.  The net proceeds of liquidation and any other funds or property of the Company shall be distributed and applied to the extent available in the following order of priority:

(a)   to the payment of secured debts and liabilities of the Company, including the Notes and any other debts and liabilities to any Member(s)

(b)   to the payment of unsecured debts and liabilities of the Company, including any other debts and liabilities to any Member(s);

(c)   to the setting up of any reserves which the Managers or the liquidating agent or committee, as the case may be, deems reasonably necessary for contingent or unforeseen liabilities or obligations of the Company;

(d)   to Class B Members up to the Class B Priority Return, but only to the extent that less than the total Class B Priority Return has been paid or distributed to Class B Members prior to the liquidation:

(d)   to the Members with net positive balances in their respective Capital Accounts in the proportion that each such positive balance bears to the aggregate sum of balances in the Capital Accounts of all Members with net positive balances in their respective Capital Accounts; and

(e)   to the Capital Accounts of Members in proportion to the respective Percentage Interests.

9.02   Capital Account Adjustments.   For purposes of the preceding Section, the respective balance in the Capital Account of each member shall be determined (i) after allocating all income, gain, loss and expense of the Company pursuant to the terms of this Agreement and (ii) after taking into account all prior distributions to the Members.  In addition, if property is distributed in kind to the Members, for purposes of the preceding

Deleted: 43

CONFIDENTIAL

Body of Agreement
Page 31 of 43

Exhibit 6
Page 69

Section, any unsold Company property shall be valued by the Managers or the liquidating agent or committee, as the case may be, to determine the gain or loss which would have resulted if the property were sold for its fair market value, and, to the extent not previously reflected in the Members' Capital Accounts, the respective balance of the Capital Account of each Member shall be adjusted to reflect such gain or loss that would have been allocated to such Member if such property had been sold at its then fair market value.

9.03   <u>Compliance with Treasury Regulations.</u>   In the event the Company or any Manager's interest in the Company is "liquidated" within the meaning of Treasury Regulation Section 1.704-1(b)(2)(ii)(g), the following action shall be taken by the later to occur of (i) the last day of the Company's taxable year in which such liquidation occurred or (ii) the 90th day following the date of such liquidation:

(a)     If the Company is actually liquidated, distributions shall be made to the Members who have positive Capital Account balances in compliance with Treasury Regulation Section 1.704-1(b)(2)(ii)(b)(2).

(c)     In the discretion of the Managers or the liquidating agent or committee, as the case may be, distributions pursuant to this Section 9.03 may be distributed to a trust of which the Managers or the liquidating agent or committee is the trustee (hereinafter referred to as the "Trustee") established for the benefit of the Members for the purposes of liquidating Company assets, collecting amounts owed to the Company, and paying any contingent or unforeseen liabilities or obligations of the Company so long as an opinion of counsel is obtained to the effect that such trust will not be taxed as an association taxable as a corporation.  The assets of any such trust shall be distributed to the Members from time to time, in the reasonable discretion of the Trustee, in the same proportions as the amount distributed to such trust by the Company would otherwise have been distributed to the Members pursuant to this Agreement; and a portion or all of such assets may be withheld by the Trustee to provide a reasonable reserve for liabilities.

<div align="center">

**ARTICLE X**
**GENERAL PROVISIONS**

</div>

10.01   <u>Notices.</u>   Any and all notices under this Agreement shall be effective (a) when delivered or refused if sent by registered or certified mail, return receipt requested, postage prepaid; (b) on the first business day after being sent by express mail, or commercial overnight delivery service providing a receipt for delivery; (c) on the date of hand delivery; or (d) on the date actually received, if sent by any other method.  In order to be effective, all such notices shall be addressed, if to the Company at its principal office, if to a Member at the last address of record on the Company books, and copies of such notices shall also be sent to the last address for the recipient which is known to the sender, if different from the address so specified.

10.02   <u>Word Meanings.</u>   The words such as "herein", "hereinafter", "hereof" and

Deleted: 43

<div align="center">

CONFIDENTIAL

Body of Agreement
Page 32 of 43

</div>

<div align="center">

**Exhibit 6**
**Page 70**

</div>

Case 1:10-bk-13001-GM    Doc 46    Filed 04/26/10    Entered 04/26/10 12:47:23    Desc
Case 1:10-bk-13001-GM    Main Document 03/26/10 Page 39 of 76 Entered 03/26/10 16:05:25    Desc
Exhibit 6 (Part 2 of 2)    Page 11 of 25

"hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires. The singular shall include the plural and the masculine gender shall include the feminine and neuter, and vice versa, unless the context otherwise requires.

10.03 <u>Binding Provisions.</u>  Subject to the restrictions on Transfers set forth herein, the covenants and agreements contained herein shall be binding upon, and inure to the benefit of, the parties hereto, their heirs, Legal Representative, successors and assigns. In addition, each of the Founders represents and warrants that any Officers or Managers designated by them for purposes of this Agreement shall be bound in writing to comply with the terms hereof and shall so comply.

10.04 <u>Applicable Law.</u>  This Agreement shall be governed by, construed and enforced in accordance with the laws of the State of Delaware, including the Act, without regard to the choice of law rules of such jurisdiction. Any dispute or controversy arising out of this Agreement shall be brought exclusively in the Federal or State courts located in Wilmington, Delaware. Each Member agrees not to commence any action, suit or other proceeding arising from, relating to, or in connection with this Agreement except in such a court and each Member irrevocably and unconditionally consents and submits to the personal and exclusive jurisdiction of such courts for the purposes of litigating any such action, and hereby grants jurisdiction to such courts and to any appellate courts having jurisdiction over appeals from such courts or review of such proceedings.

10.05 <u>Separability of Provisions and Validity under the Act.</u>  Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law. However, if any provision of this Agreement shall be prohibited by or invalid under such law, it shall be deemed modified to conform to the minimum requirements of such law or, if for any reason it is not deemed so modified, it shall be prohibited or invalid only to the extent of such prohibition or invalidity without the remainder thereof or any other such provision being prohibited or invalid. To the extent that any provision of this Agreement is prohibited or ineffective under the Act, this Agreement shall be considered amended to the smallest degree possible in order to make the Agreement effective under the Act (and, if the Act is subsequently amended or interpreted in such manner as to make effective any provision of this Agreement that was formerly rendered invalid, such provision shall automatically be considered to be valid from the effective date of such amendment or interpretation).

10.06 <u>Section Titles and Headings.</u>  Section titles and Headings are for descriptive purposes only and shall not control or alter the meaning of this Agreement as set forth in the text.

10.07 <u>Amendments.</u>  Except as otherwise specifically provided in this Agreement, this Agreement may be amended or modified only with the Approval of the Managers and the Consent of the Members; provided, however, that (i) an amendment or restatement that would modify Section 2.02 in a way that is materially adverse to any non-Founder

| Deleted: 43 |
| --- |

CONFIDENTIAL

Body of Agreement
Page 33 of 35

Exhibit 6
Page 71

Case 1:10-bk-13001-GM    Doc 46    Filed 04/26/10    Entered 04/26/10 12:47:23    Desc
Case 1:10-bk-13001-GM    Main Document    Page 40 of 76
Doc 4-7    Filed 03/26/10    Entered 03/26/10 16:05:25    Desc
Exhibit 6 (Part 2 of 2)    Page 12 of 25

Member or that would subject any non-Founder Member to liability for the debts or obligations of the Company shall require for its effectiveness the consent or approval of such non-Founder Member, (ii) an amendment or restatement that would materially modify the terms of Section 5.07 (Indemnification) shall require for its effectiveness the Approval of the Managers and the Consent of the non-Founder Members, and (iii) an amendment that would materially and adversely modify the rights or obligations of the non-Founder Members other than in the same fashion as those of the Founder Members shall require for its effectiveness the Consent of the non-Founder Members.

10.08 _Third Party Beneficiaries._  The provisions of this Agreement, including Article III, are not intended to be for the benefit of any creditor (other than a Member who is a creditor) or other Person (other than a Member or Manager in his capacity as such) to whom any debts, liabilities or obligations are owed by (or who otherwise have any claim against) the Company or any of the Members or Managers.  Moreover, notwithstanding anything contained in this Agreement, including without limitation Article III, no such creditor or other Person shall obtain any rights under this Agreement or shall, by reason of this Agreement, make any claim in respect of any debt, liability or obligation (or otherwise) against the Company or any Member or Manager.

10.09 _Entire Agreement._   This Agreement embodies the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings (whether express or implied, oral or written) related thereto, including (a) that certain Letter of Intent dated November 21, 2005, entered into by DNAG and the sole member of WTA, (b) the Initial Operating Agreement, (c) the First Amended and Restated Operating Agreement, and (d) the Second Amended and Restated Operating Agreement.

10.10 _Reliance._  The Members hereby agree that each Member and each Manager shall be entitled to rely on the provisions of this Agreement, and no Member or Manager shall be liable to the Company or any other Member or Manager for any action or refusal to act taken in good faith in reliance on the terms of this Agreement.  The Members hereby agree that the duties and obligations imposed on the Members and Managers as such shall be those set forth in this Agreement, which is intended to govern the relationship among the Company, the Members and the Managers, notwithstanding any provision of the Act or common law to the contrary.

10.11 _Waiver of Partition._  Each Member agrees that irreparable damage would be done to the Company if any Member brought an action in court to dissolve the Company. Accordingly, unless otherwise expressly authorized in this Agreement, each Member agrees that he shall not, either directly or indirectly, take any action to require partition or appraisal of the Company or of any of the assets or properties of the Company, and notwithstanding any provisions of this Agreement to the contrary, each Member (and his successors and assigns) accepts the provisions of the Agreement as his sole entitlement on termination, dissolution and/or liquidation of the Company and hereby irrevocably waives any and all right to maintain any action for partition or to compel any sale or other

| Deleted: 43

**Exhibit 6**
**Page 72**

Case 1:10-bk-13001-GM    Doc 46    Filed 04/26/10    Entered 04/26/10 12:47:23    Desc
Case 1:10-bk-13001-GM    Main Document    Page 41 of 76
Doc 4-7    Filed 03/26/10    Entered 03/26/10 16:05:25    Desc
Exhibit 6 (Part 2 of 2)    Page 13 of 25

liquidation with respect to his interest, in or with respect to, any assets or properties of the Company; and each member agrees that he will not petition a court for the dissolution, termination or liquidation of the Company.

10.12  Survival of Certain Provisions.  The Members acknowledge and agree that this Agreement contains certain terms and conditions which are intended to survive the dissolution and termination of the Company, including without limitation, the provisions of Section 2.04 and 5.06.  The Members agree that any provisions of this Agreement which by their terms require, given their context, that they survive the dissolution and termination of the Company or the execution of any document terminating this Agreement, shall so survive unless such termination document specifically provides for non-survival by reference to this Section 10.12 and to specific non-surviving provisions.

10.13  No partnership Intended for Non-tax Purposes.  The Members have formed the Company under the Act, and expressly do not intend hereby to form a partnership under either Chapter 15 or Chapter 17 of Title 6 of the Delaware Code or under any other provision of Delaware or other law.  The Members do not intend to be partners one to another, or partners as to any third party.  To the extent any Member, by word or action, represents to another party that any other Member is a partner or that the Company is a partnership, the Member making such wrongful representation shall be liable to any other Member who incurs personal liability by reason of such wrongful representation.

10.14  Intent of Agreement.  This Agreement is made under and pursuant to the Act and shall be construed and interpreted in all respects to qualify the Company as a limited liability Company formed under the Act, to provide the Company with all the rights and privileges of a limited liability Company formed under the Act and to be taxed for federal income tax purposes as a partnership in all respects under the Code and Regulations.

10.15  Waiver.  No failure of a Member to exercise, and no delay by a Member in exercising, any right or remedy under this Agreement shall constitute a waiver of such right or remedy.  No waiver by a Member of any such right or remedy under this Agreement shall be effective unless made in a writing duly executed by all Members and specifically referring to each such right or remedy being waived.

10.16  Counterparts.  This Agreement may be executed in several counterparts, each of which shall be deemed an original and all of which taken together shall constitute one and the same instrument.

10.17  Specific Performance.  The obligations of the parties hereunder are acknowledged to be unique and the parties consent that, in the event of its default in any obligations hereunder, the other parties may, in addition to all other remedies which may be available, also obtain injunctive relief to compel the specific performance by any breaching party of such parties obligations hereunder.

<div style="text-align:center">

**ARTICLE XI**

CONFIDENTIAL

Body of Agreement
Page 35 of 43

</div>

Deleted: 43

**Exhibit 6**
**Page 73**

## DEFINITIONS

The following capitalized terms used in this Agreement shall have the respective meanings ascribed to them below:

"Act" means the Delaware Limited Liability Company Act, 6 Del. C. Sec. 18_101 et seq., in effect at the time of the initial filing of the Certificate with the Office of the Secretary of the State of Delaware, and as thereafter amended from time to time.

"Affiliated Person" or "Affiliate" means, with respect to any Member, Manager and/or officer of the Company, any Person: (i) which owns or controls more than 10% of the voting interests in the Member; or (ii) in which the Member, or any member of such Member's Immediate Family, owns or controls more than 10% of the voting interests.

"Agreement" means this Limited Liability Company Agreement as it may be amended, supplemented, or restated from time to time.

"Approval" (or any capitalized derivative of such term) means the written consent or approval of all Managers.

"Bankruptcy" means the occurrence of any of the following events:

(1)   A Member makes an assignment for the benefit of creditors;

(2)   A Member files a voluntary petition in bankruptcy;

(3)   A Member is adjudged a bankrupt or insolvent, or has entered against him an order for relief, in any bankruptcy or insolvency proceeding;

(4)   A Member files a petition or answer seeking for himself any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation;

(5)   A Member files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against him in any proceeding of this nature;

(6)   A Member seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Member or of all or any substantial part of his properties; or

(7)   One hundred twenty (120) days after the commencement of any proceeding against a Member seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation, if the proceeding has not been dismissed, or if within ninety (90) days after the appointment without his consent or acquiescence of a trustee, receiver or

Deleted: 43

CONFIDENTIAL

Body of Agreement
Page 36 of 76

Exhibit 6
Page 74

liquidator of the Member or of all or any substantial part of his properties, the appointment is not vacated or stayed, or within ninety (90) days after the expiration of any such stay, the appointment is not vacated.

"Book Value" shall mean, with respect to any Company asset, the asset's book value as carried on the books and records of the Company, determined in compliance with the provisions of applicable Treasury Regulations, including Treasury Regulation Section 1.704-1(b)(2)(iv).

"Capital Account" means the account maintained by the Company for each Interest Holder in accordance with the following provisions:

    (i)    an Interest Holder's Capital Account shall be credited with the Interest Holder's Capital Contributions, the amount of any Company liabilities assumed by the Interest Holder (or which are secured by Company property distributed to the Interest Holder), the Interest Holder's allocable share of Profit and any item in the nature of income or gain specially allocated to such Interest Holder pursuant to the provisions of Article IV (other than Section 4.05(b)); and

    (ii)    an Interest Holder's Capital Account shall be debited with the amount of money and the fair market value of any Company property distributed to the Interest Holder, the Interest Holder's allocable share of Loss, and any item in the nature of expenses or losses specially allocated to the Interest Holder pursuant to the provisions of Article IV (other than Section 4.05(b)).

"Capital Contribution" means the total capital contribution of a Member including such Member's initial capital contribution as well as all additional capital contributions made pursuant to Section 2.02.

"Certificate" means the Certificate of Organization creating the Company, as it may, from time to time, be amended in accordance with the Act.

"Class A Member" means any Member who has been classified as holding a Class A Interest in the Company.

"Class B Member" means any Member who has been classified as holding a Class B Interest in the Company.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Company" means the limited liability company the Members will form in the State of Delaware pursuant to the Certificate and this Agreement under the name Escom, LLC.

"Consent" means the written consent or approval of Members entitled to participate in giving such Consent holding sufficient Interest in the Company to take the action specified

Deleted: 43

Exhibit 6
Page 75

therein (as required by this Agreement).  Throughout this Agreement, where a specified percentage of Interests is required to take certain action, unless specifically stated otherwise in the Agreement, the required percentage shall refer to an aggregate across both Class A and Class B Interests.  Wherever the Agreement is silent as to the required percentage of voting Interests to take a certain action, a majority of the Members' voting Interests shall be sufficient.

"Domain Name" means the Internet domain name registration for "sex.com" and certain intellectual property rights associated therewith, as further described in that certain Domain Name Purchase and Sale Agreement dated July 13, 2005, by and between DNAG and Grant Media, LLC, as amended (the "Domain Name Purchase Agreement")

"Domain Name Rights" means the exclusive right to acquire the Domain Name free and clear of all liens and encumbrances from DNAG, who currently holds an exclusive right to purchase the same pursuant to the Domain Name Purchase Agreement.

"Fair Market Value" means the fair market value of any non-cash property as reasonably determined by the Managers in good faith.  If any Member disputes the Managers' determination of fair market value within 15 days after notification thereof, then a valuation appraisal shall be conducted by an independent appraiser mutually agreeable to the parties at the expense of the Company. The appraiser shall afford the Managers and the Member the right to submit evidence with respect to the fair market value and shall, as promptly as practicable, make its determination in writing and give notice thereof to the Managers and the Member.   The fair market value so determined shall be controlling and shall be binding upon the Company, the Managers and the Members and shall be specifically enforceable in a court having jurisdiction.

"Gross Fair Market Value" shall mean the agreed fair market value of an asset determined without taking into account any liabilities which are secured by such asset or which are otherwise associated with such asset.

"Immediate Family" (i) with respect to any individual, means his ancestors, spouse, issue, spouses of issue, any trustee or trustees, including successor and additional trustees, principally for the benefit of any one or more of such individuals, and any entity or entities all of the beneficial owners of which are such trust and/or such individuals, but (ii) with respect to a Legal Representative, means the Immediate Family of the individual for whom such Legal Representative was appointed and (iii) with respect to a Trustee, means the Immediate Family of the individual with respect to whom the principal beneficiaries are members of the Immediate Family.

"Interest" means a Member's share of the Profits and Losses of, and the right to receive distributions from, the Company.

"Interest Holder" means any Person who holds an Interest, whether as a Class A or Class B Member, or as an unadmitted assignee or transferee of a Member.

Deleted: 43

Exhibit 6
Page 76

"Involuntary Withdrawal" means the death, incompetency, bankruptcy, liquidation, or dissolution of any Member (including as more specifically set forth in Section 18-304 of the Act).

"Legal Representative" means, with respect to any individual, a duly appointed executor, administrator, guardian, conservator, personal representative, or other legal representative appointed as a result of the death or incompetence of such individual.

"Manager" shall refer to any Person named as a Manager in this Agreement and any Person who becomes a Manager as permitted by this Agreement, in each such Person's capacity as (during the period during which such Person serves as) a Manager of the Company. "Managers" shall refer collectively to all of such Persons who hold the position of Manager at any given time.

"Member" shall refer to any Person named as Member in this Agreement and any Person who becomes an additional, substitute or replacement Member as permitted by this Agreement, in such Person's capacity as a Member of the Company. "Members" shall refer collectively to all such Persons in such capacity.

"Member Nonrecourse Deduction" shall mean an allocation of loss and/or expense (or item thereof) attributable to Member Nonrecourse Liabilities, determined in accordance with the provisions of applicable Treasury Regulations, including Treasury Regulation Section 1.704-2.

"Member Nonrecourse Liabilities" shall mean liabilities of the Company that are nonrecourse debt (as defined in applicable Treasury Regulations, including Treasury Regulation Section 1.704-2) but with respect to which one or more Members (or the affiliate of any Member) bears the economic risk of loss (as defined in applicable Treasury Regulations promulgated under Code Section 752).

"Member Nonrecourse Liability Minimum Gain" shall mean the aggregate amount of gain (of whatever character), computed with respect to each property of the Company which secures a Member Nonrecourse Liability of the Company, that would be recognized by the Partnership if, in a taxable transaction, the Company were to dispose of such property in full satisfaction of such Member Nonrecourse Liability.  The amount of Member Nonrecourse Liability Minimum Gain and the amount of any Member's share of Member Nonrecourse Liability Minimum Gain shall be determined in accordance with the provisions of applicable Treasury Regulations, including Treasury Regulation Section 1.704-2.

"Membership Unit" shall mean any of the equal parts into which the ownership of the Company is divided.

"Minimum Gain" shall mean the aggregate amount of gain (of whatever character),

Deleted: 43

CONFIDENTIAL

Body of Agreement
Page 39 of 75

Exhibit 6
Page 77

computed with respect to each property of the Company that secures a Third Party Nonrecourse Liability of the Company, that would be recognized by the Company if, in a taxable transaction, the Company were to dispose of such property in full satisfaction of such Third Party Nonrecourse Liability. The amount of Minimum Gain and the amount of any Member's share of Minimum Gain shall be determined in accordance with the provisions of applicable Treasury Regulations, including Treasury Regulation Section 1.704-2.

"Net Income" shall mean the Company's gross revenue for the relevant year minus the following amounts: (a) all operating expenses, including but not limited to salaries, office administration and equipment costs, professional fees, travel and entertainment, and contractual amounts due third-parties (including affiliates) and capital expenditures; (b) payment of all interest, principal and other amounts due in connection with any debt of the Company; and (c) any amount required to maintain a cash reserve held by the Company in the amount of not less than Two Hundred Fifty Thousand Dollars (US$250,000.00), or such other amount as the Managers may Approve from time to time.

"Net Losses and Net Profits" shall have the meanings ascribed to such terms in Section 4.03 hereof.

"Net Fair Market Value" shall mean, in connection with the contribution of an asset to the Company by a Member and/or in connection with the distribution of an asset by the Company to a Member, the Gross Fair Market Value of such asset reduced by any liabilities (i) assumed by such Member or the Company, or (ii) subject to which such Member or the Company takes such asset.

"Nonrecourse Deduction" shall mean an allocation of loss and/or expense (or item thereof) attributable to Third Party Nonrecourse Liabilities, determined in accordance with the provisions of applicable Treasury Regulations, including Treasury Regulation Section 1.704-2.

"Percentage Interest" shall mean, as to a Member, the Member's percentage of ownership in the Company as calculated below, and as to an Interest Holder who is not a Member, the Percentage of the Member whose Interest has been acquired by such Interest Holder, to the extent the Interest Holder has succeeded to that Member's Interest. A Member's percentage of ownership shall be calculated by dividing the number of Membership Units held by such Member, as set forth on Schedule A, by the total number of outstanding Membership Units held by all Members, also as set forth on Schedule A (as amended from time to time).

"Person" means any natural person, partnership (whether general or limited), limited liability company, trust, estate, association, corporation or any other legal entity.

"Positive Cash Flow" shall have the meaning ascribed to it in Section 4.01.

| Deleted: 43 |
| --- |

Exhibit 6
Page 78

"Tax Matters Partner" shall mean the Member designated in this Agreement as the Tax Matters Partner as defined in Code Section 6231(a)(7).

"Third Party Nonrecourse Liabilities" shall mean liabilities of the Company which are nonrecourse debt (as defined in applicable Treasury Regulations, including Treasure Regulation Section 1.704-2) and which are not Member Nonrecourse Liabilities.

"Total Minimum Gain" shall mean the aggregate of the Minimum Gain and the Member Nonrecourse Liability Minimum Gain.

"Transfer" and any grammatical variation thereof shall refer to any sale, exchange, issuance, redemption, assignment, distribution, encumbrance, hypothecation, gift, pledge, retirement, resignation, transfer or other disposition or alienation in any way as to any Interest. Transfer shall specifically, without limitation of the above, include assignments, transfers and distributions resulting from Involuntary Withdrawal. A Transfer will be deemed to occur upon a change in ownership of 20% or more of the equity of any Interest Holder.

"Treasury Regulations" shall mean any applicable regulations promulgated under the Code.

"Voluntary Withdrawal" means a dissociation from the Company by means other than a Transfer or an Involuntary Withdrawal. "Voluntarily Withdraw" means to effect a Voluntary Withdrawal.

The definitions set forth in the Act shall be applicable, to the extent not inconsistent herewith, to define terms not defined herein and to supplement definitions contained herein.

**[Remainder of this page is intentionally blank]**

Deleted: 43

**Exhibit 6**
**Page 79**

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement under seal as of the day and year first above written.

**BY DNAG HOLDINGS, LLC, ON BEHALF AND AS MANAGER OF DOMAIN NAME ACQUISITION GROUP, LLC:**

By: _____

Name: Andrew Miller

Title: Manager of DNAG Holdings, LLC

**BY BUILT TO LAST, LLC, ON BEHALF AND AS MANAGER OF DOMAIN NAME ACQUISITION GROUP, LLC:**

By: _____

Name: Mike Zapolin

Title: Manager of Built to Last, LLC

**BY WASHINGTON TECHNOLOGY ASSOCIATES, LLC:**

By: _____

Name: _____

Title: _____

**BY DOM PARTNERS LLC:**

By: _____

Name: Robert E. Seaman III

Title: _____

[Signatures Continue on Next Page]

Deleted: 43

CONFIDENTIAL

Body of Agreement
Page 42 of 43

Exhibit 6
Page 80

**BY NUTHIN' BUT NET, LLC:**

By: _____

Name: _____

Title: _____

CONFIDENTIAL

Body of Agreement
Page 43 of 43

Deleted: 43

**Exhibit 6**
**Page 81**

**SCHEDULE A**
to the Limited Liability Company Agreement of
Escom, LLC

| Members of the Company | Capital Contributions Pursuant to Section 2.02(a) | Membership Units | Class of Interest |
|---|---|---|---|
| Domain Name Acquisition Group, LLC | • $2,800.00<br>• The Domain Name Rights | 28 | A |
| Washington Technology Associates, LLC | • $2,200.00<br>• The WTA Loan Obligation | 22.0 | A |
| DOM Partners LLC | • $1,250.00<br>• The DP Loan Obligation<br>• The DP Bridge Obligation | 12.5 | A |
| Nuthin' But Net, LLC | • The NBN Loan Obligation | 1.0 | A |
| Washington Technology Associates, LLC | $1,000,000 | 7.5 | B |
| DOM Partners LLC | $1,000,000 | 7.5 | B |
| TOTAL | • $2,006,250.00<br>• The Domain Name Rights<br>• The WTA Loan Obligation<br>• The DP Loan Obligation<br>• The DP Bridge Obligation<br>• The NBN Loan Obligation | 78.5 | |

CONFIDENTIAL

Schedule A
Page 1 of 1

**Exhibit 6**
**Page 82**

IN WITNESS WHEREOF, the parties hereto have executed this Agreement under seal as of the day and year first above written.

BY DNAG HOLDINGS, LLC, ON BEHALF AND AS MANAGER OF DOMAIN NAME ACQUISITION GROUP, LLC:

By: _____

Name: Andrew Miller

Title: Manager of DNAG Holdings, LLC

BY BUILT TO LAST, LLC, ON BEHALF AND AS MANAGER OF DOMAIN NAME ACQUISITION GROUP, LLC:

By: _____

Name: Mike Zapolin

Title: Manager of Built to Last, LLC

BY WASHINGTON TECHNOLOGY ASSOCIATES, LLC:

By: _____

Name: _____

Title: _____

BY DOM PARTNERS LLC:

By: _____

Name: Robert E. Seaman III

Title: _____

[Signatures Continue on Next Page]

CONFIDENTIAL

Body of Agreement
Page 42 of 43

Exhibit 6
Page 83

Apr 11 2008 7:45PM    WashingtonVC                301469-0690              p.1

IN WITNESS WHEREOF, the parties hereto have executed this Agreement under seal as of the day and year first above written.

**BY DNAG HOLDINGS, LLC, ON BEHALF AND AS MANAGER OF DOMAIN NAME ACQUISITION GROUP, LLC:**

By: _____

Name: Andrew Miller

Title: Manager of DNAG Holdings, LLC

**BY BUILT TO LAST, LLC, ON BEHALF AND AS MANAGER OF DOMAIN NAME ACQUISITION GROUP, LLC:**

By: _____

Name: Mike Zapolin

Title: Manager of Built to Last, LLC

**BY WASHINGTON TECHNOLOGY ASSOCIATES, LLC:**

By: _~~Michael Mann~~_

Name: _Michael Mann_

Title: _sole member_

**BY DOM PARTNERS LLC:**

By: _____

Name: Robert E. Seaman III

Title: _____

[Signatures Continue on Next Page]

CONFIDENTIAL

Body of Agreement
Page 42 of 43

**Exhibit 6**
**Page 84**

APR. 11. 2008  5:14PM                                                    NO. 2866    P. 2

IN WITNESS WHEREOF, the parties hereto have executed this Agreement under seal as of the day and year first above written.

BY DNAG HOLDINGS, LLC, ON BEHALF AND AS MANAGER OF DOMAIN NAME ACQUISITION GROUP, LLC:

By: _____

Name: Andrew Miller

Title: Manager of DNAG Holdings, LLC

BY BUILT TO LAST, LLC, ON BEHALF AND AS MANAGER OF DOMAIN NAME ACQUISITION GROUP, LLC:

By: _____

Name: Mike Zapolin

Title: Manager of Built to Last, LLC

BY WASHINGTON TECHNOLOGY ASSOCIATES, LLC:

By: _____

Name: _____

Title: _____

BY DOM PARTNERS LLC:

By: _____

Name: Robert E. Seaman III

Title: AUTHORIZED SIGNATORY

[Signatures Continue on Next Page]

CONFIDENTIAL

Body of Agreement
Page 42 of 43

Exhibit 6
Page 85

# EXHIBIT B

WINDELS MARX LANE & MITTENDORF, LLP
156 WEST 56TH STREET
NEW YORK, NEW YORK 10019
TELEPHONE: 212.237.1000
FACSIMILE: 212.262.1215

Scott R. Matthews

212.237.1025

smatthews@windelsmarx.com

NEW BRUNSWICK, NJ
—
PRINCETON, NJ
—
STAMFORD, CT

April 19, 2010

**By Email and U.S. Mail**

Mr. Del Anthony
ESCOM, LLC
23480 Park Sorrento, Suite 206B
Calabasas, CA 91302

>       Re:     **Escom, LLC**
>               **Chapter 11, Case No. 10-13001 (GM)**

Dear Mr. Anthony:

As you know, I represent DOM Partners LLC ("DOM") in connection with the involuntary chapter 11 case commenced against ESCOM, LLC ("ESCOM") on March 17, 2010 in the United States Bankruptcy Court for the Central District of California (San Fernando Valley) (the "Bankruptcy"). I write in response to your email correspondence of April 17, 2010 and the document attached thereto entitled, "Written Consent of the Non-Founder Members of ESCOM, LLC" (the "Consent").

DOM objects to the Consent and any attempt by ESCOM to consent to the Involuntary Petition filed in the Bankruptcy. DOM has moved to dismiss the Bankruptcy for cause, including bad faith, and to modify the automatic stay to permit DOM to foreclose on its collateral as permitted by its agreements with ESCOM.

DOM disputes that any non-Manager Member of ESCOM may authorize ESCOM to take any actions. ESCOM's Fourth Amended and Restated Limited Liability Company Operating Agreement requires the unanimous vote of the Managers for ESCOM to consent to the Involuntary Petition in the Bankruptcy or settle any lawsuit. No vote of the Managers has been taken with respect to these matters. Further, in the event that the vote is not unanimous, there must be a determination that the failure to act would have a material adverse effect on ESCOM. There has been no discussion of this issue. Indeed, continuing the Bankruptcy would not benefit ESCOM; rather, it would harm ESCOM and cause further damage to ESCOM's creditors and equity participants.

{10561666;2}

WINDELS MARX LANE & MITTENDORF, LLP

Mr. Del Anthony
April 19, 2010
Page 2

Further, even assuming that there was a vote of the Managers, that it was not unanimous, that it was determined that the failure to act would have a material adverse effect on ESCOM, the Managers would each then be required to submit a written report to the Members describing their view of the issue and recommended course of action. Only at such time would the non-Manager Members be entitled to decide on the appropriate course of action by written consent or pursuant to a vote in a meeting called in accordance with the requirements of the operating agreement. These reports have not been issued. Accordingly, the Consent is not authorized by ESCOM's governing organizational documents and is of no force or effect.

Until all of these contract requirements are respected, the non-Manager Members cannot act. The Consent signed by I-95 Investment Group, LLC is of no force or effect.

Very truly yours,

Scott R. Matthews

Scott R. Matthews

cc:    Lawrence F. Morrison, Esq. (By email: lfm@msf-law.com)
       Brian Leventhal, Esq. (By email: brian@leventhallegal.com)
       Mr. Andrew Miller (By email: amiller@internetrealestate.com)
       Daniel Gurfein, Esq. (By email: dgurfein@ssbb.com)
       DOM Partners LLC

{10561666:2}

# EXHIBIT C

**From:** Brian Leventhal [mailto:brian@leventhallegal.com]
**Sent:** Friday, April 16, 2010 7:16 PM
**To:** 'Del Anthony'
**Subject:** Escom Resolution
**Importance:** High

Del,

As you know, the Managers of Escom have been in a deadlock regarding a variety of matters for the past several weeks, including settlement of the litigation against Sovereign Bank and the involuntary petition for Chapter 11 Bankruptcy. On April 6, 2010, WTA notified both DOM and DNAG that a decision regarding these matters had to be reached to avoid a materially adverse affect on the company and thus invoked the deadlock provision of the Operating Agreement, which can be found in Section 5.03. That provision calls for the managers to submit written recommendations to the other members (I-95 and Nuthin' But Net) and for those other members to make the decision.

Despite multiple requests from WTA, it does not appear that either of DOM or DNAG has submitted any recommendations to I-95 and NBN. I-95, who holds a majority of membership units relative to NBN (i.e. the ability to decide the vote itself), informed me today that they believe WTA's recommendation is the right approach. Attached is a written consent signed by Corey Bialow on behalf of I-95. Please proceed accordingly.

Thank you.

Regards,
Brian H. Leventhal
Attorney at Law
Tel: 301-637-3316
Fax: 301-637-2485
brian@leventhallegal.com
www.leventhallegal.com

This transmission may contain information that is PRIVILEGED, CONFIDENTIAL AND/OR PROPRIETARY. The information contained herein is for the exclusive use of the named addressee(s). If you are not the intended recipient, please note that any dissemination, distribution, disclosure, use or duplication of this message in whole or in part is strictly prohibited. If you have received this communication in error, please immediately delete it and notify me by telephone (301-637-3316) and electronic mail at the above address.

# EXHIBIT D

**From:** Del Anthony <del@escomllc.com>

**Date:** April 6, 2009 12:02:20 AM PDT
**To:** Robert Muzzy <rmuzzy@schoonercap.com>
**Subject: Re: Domain Sponsor**

I look forward to speaking with you tomorrow.

Del

On Apr 5, 2009, at 6:44 AM, Robert Muzzy wrote:

> 1- I got your financials. Thanks.
> 2- Are you going to provide a "going forward" budget. I know you said cost
> might be lower, or maybe % of revenue higher.
> 3- I know they were opening an account, not sure if it actually happened. I
> will advise on Monday when I can check.
>
> Speak to you on Monday. Thanks for your support.
>
> **From:** Del Anthony
> **Sent:** Sunday, April 05, 2009 2:50 AM
> **To:** Robert Muzzy ; Robert Alfano
> **Subject:** Domain Sponsor
>
> Did Domain Sponsor open an account for you?  If so, are they
> showing any income in your account?
>
> The Escom account we are using has minimal income in it now and
> I want to make sure that we are properly getting credit/income for
> our traffic.
>
> Thanks.
>
> Del
>
> E S C O M  **Del Anthony** CEO/President
>            del@escomllc.com | 800-506-9810 x100 | fax 800-506-9811
>
> This transmission may contain information that is PRIVILEGED, CONFIDENTIAL AND/OR
> PROPRIETARY. The information contained herein is for the exclusive use of the named addressee
> (s). If you are not the intended recipient, please note that any dissemination, distribution, disclosure,
> use or duplication of this message in whole or in part is strictly prohibited. If you have received this
> communication in error, please immediately delete it and notify me by telephone and electronic mail
> at the above address.

E S C O M  **Del Anthony** CEO/President
           del@escomllc.com | 800-506-9810 x100 | fax 800-506-9811

# EXHIBIT E

**From:** "Robert Seaman" <resiii@proadvisorygroup.com>

**Date:** April 8, 2009 3:23:16 PM PDT
**To:** "'Del Anthony'" <del@escomllc.com>
**Subject: RE: Server**
**Reply-To:** <resiii@proadvisorygroup.com>

Del-  Sorry you are in the middle of all this…very, very uncomfortable for all….
Bob
Robert E. Seaman III
Pro Advisory Group, LLC
2050 Center Avenue, Suite 610
Fort Lee, New Jersey 07024
Telephone: (201) 346-0050
Fax: (201) 346-9162
E-mail: resiii@proadvisorygroup.com
Skype: r.seaman

E S C O M  **Del Anthony** CEO/President
del@escomllc.com | 800-506-9810 x100 | fax 800-506-9811

This transmission may contain information that is PRIVILEGED, CONFIDENTIAL AND/OR PROPRIETARY. The information contained
herein is for the exclusive use of the named addressee(s). If you are not the intended recipient, please note that any dissemination,
distribution, disclosure, use or duplication of this message in whole or in part is strictly prohibited. If you have received this communication in
error, please immediately delete it and notify me by telephone and electronic mail at the above address.

# EXHIBIT F

**From:** "Brian Leventhal" <bleventhal@washingtonvc.com>

    **Date:** May 13, 2009 3:29:43 PM PDT
    **To:** "'Del Anthony'" <del@escomllc.com>
    **Cc:** "'Robert Muzzy'" <rmuzzy@schoonercap.com>
    **Subject: RE: Mainstream Affiliates**

Ok. Good to know. Thx.
Brian H. Leventhal
General Counsel
WashingtonVC
Tel: 301-775-9240
Fax: 301-576-3538
bleventhal@washingtonvc.com

This transmission may contain information that is PRIVILEGED, CONFIDENTIAL AND/OR
PROPRIETARY. The information contained herein is for the exclusive use of the named
addressee(s). If you are not the intended recipient, please note that any dissemination,
distribution, disclosure, use or duplication of this message in whole or in part is strictly
prohibited. If you have received this communication in error, please immediately delete it
and notify me by telephone (301-775-9240) and electronic mail at the above address.

**From:** Del Anthony [mailto:del@escomllc.com]
**Sent:** Wednesday, May 13, 2009 6:24 PM
**To:** Brian Leventhal
**Cc:** 'Robert Muzzy'
**Subject:** Re: Mainstream Affiliates

That would not be a problem - the adult affiliate deals will always be there.
Del

On May 13, 2009, at 2:46 PM, Brian Leventhal wrote:

Ok. And if we did go this direction, went for a sale targeting a mostly mainstream
audience, failed to hit reserve and then wanted to go back to adult, would we be able to
get the affiliate deals you have now back?
Brian H. Leventhal
General Counsel
WashingtonVC
Tel: 301-775-9240
Fax: 301-576-3538
bleventhal@washingtonvc.com

This transmission may contain information that is PRIVILEGED, CONFIDENTIAL AND/OR
PROPRIETARY. The information contained herein is for the exclusive use of the named
addressee(s). If you are not the intended recipient, please note that any dissemination,
distribution, disclosure, use or duplication of this message in whole or in part is strictly
prohibited. If you have received this communication in error, please immediately delete it
and notify me by telephone (301-775-9240) and electronic mail at the above address.

**From:** Del Anthony [mailto:del@escomllc.com]
**Sent:** Wednesday, May 13, 2009 5:43 PM
**To:** Brian Leventhal
**Cc:** 'Robert Muzzy'

**Subject:** Re: Mainstream Affiliates
From experience - in the past, we even had Trojan Condoms pass on an advertising proposal because of the "reputation" and content on the site.
Del
On May 13, 2009, at 1:15 PM, Brian Leventhal wrote:

Are you saying you don't think that someone like WebMD would want to take one of those boxes (regardless of rev share) as long as it was alongside what we have currently in the other boxes? Is that speculation or based on actual attempts?
Thx.
Brian H. Leventhal
General Counsel
WashingtonVC
Tel: 301-775-9240
Fax: 301-576-3538
bleventhal@washingtonvc.com

This transmission may contain information that is PRIVILEGED, CONFIDENTIAL AND/OR PROPRIETARY. The information contained herein is for the exclusive use of the named addressee (s). If you are not the intended recipient, please note that any dissemination, distribution, disclosure, use or duplication of this message in whole or in part is strictly prohibited. If you have received this communication in error, please immediately delete it and notify me by telephone (301-775-9240) and electronic mail at the above address.

**From:** Del Anthony [mailto:del@escomllc.com]
**Sent:** Wednesday, May 13, 2009 4:06 PM
**To:** Brian Leventhal
**Cc:** 'Robert Muzzy'
**Subject:** Re: Mainstream Affiliates
If we want to move in this direction, we will have to get rid of all of the adult affiliate links, including the VOD and store sections.
This MIGHT get mainstream affiliates interested.
Let me know if you want me to put a plan in place for this.
Del
On May 13, 2009, at 12:13 PM, Brian Leventhal wrote:

Del,
Bob and I were just discussing the potential of attracting mainstream buyers with one of the broker candidates. What are your thoughts on your chances of being able to secure an affiliate deal with someone like WebMD so that one of the 12 "boxes" is mainstream? Even if it doesn't convert, it could be a way to make the site look better to potential mainstream buyers. This is the specific page I was thinking about:
http://www.webmd.com/sex-relationships/default.htm
Brian H. Leventhal
General Counsel
WashingtonVC
Tel: 301-775-9240
Fax: 301-576-3538
bleventhal@washingtonvc.com

This transmission may contain information that is PRIVILEGED, CONFIDENTIAL AND/OR PROPRIETARY. The information contained herein is for the exclusive use of the named addressee (s). If you are not the intended recipient, please note that any dissemination, distribution, disclosure, use or duplication of this message in whole or in part is strictly prohibited. If you have received this communication in error, please immediately delete it and notify me by telephone (301-775-9240) and electronic mail at the above address.

# E S C O M  **Del Anthony** CEO/President

del@escomllc.com | 800-506-9810 x100 | fax 800-506-9811

This transmission may contain information that is PRIVILEGED, CONFIDENTIAL AND/OR PROPRIETARY. The information contained herein is for the exclusive use of the named addressee(s). If you are not the intended recipient, please note that any dissemination, distribution, disclosure, use or duplication of this message in whole or in part is strictly prohibited. If you have received this communication in error, please immediately delete it and notify me by telephone and electronic mail at the above address.

No virus found in this incoming message.
Checked by AVG - www.avg.com
Version: 8.0.238 / Virus Database: 270.12.27/2112 - Release Date: 05/13/09 07:04:00

# E S C O M  **Del Anthony** CEO/President

del@escomllc.com | 800-506-9810 x100 | fax 800-506-9811

This transmission may contain information that is PRIVILEGED, CONFIDENTIAL AND/OR PROPRIETARY. The information contained herein is for the exclusive use of the named addressee(s). If you are not the intended recipient, please note that any dissemination, distribution, disclosure, use or duplication of this message in whole or in part is strictly prohibited. If you have received this communication in error, please immediately delete it and notify me by telephone and electronic mail at the above address.

No virus found in this incoming message.
Checked by AVG - www.avg.com
Version: 8.0.238 / Virus Database: 270.12.27/2112 - Release Date: 05/13/09 07:04:00

# E S C O M  **Del Anthony** CEO/President

del@escomllc.com | 800-506-9810 x100 | fax 800-506-9811

This transmission may contain information that is PRIVILEGED, CONFIDENTIAL AND/OR PROPRIETARY. The information contained herein is for the exclusive use of the named addressee(s). If you are not the intended recipient, please note that any dissemination, distribution, disclosure, use or duplication of this message in whole or in part is strictly prohibited. If you have received this communication in error, please immediately delete it and notify me by telephone and electronic mail at the above address.

No virus found in this incoming message.
Checked by AVG - www.avg.com
Version: 8.0.238 / Virus Database: 270.12.27/2112 - Release Date: 05/13/09 07:04:00

# E S C O M  **Del Anthony** CEO/President
del@escomllc.com | 800-506-9810 x100 | fax 800-506-9811

This transmission may contain information that is PRIVILEGED, CONFIDENTIAL AND/OR PROPRIETARY. The information contained herein is for the exclusive use of the named addressee(s). If you are not the intended recipient, please note that any dissemination, distribution, disclosure, use or duplication of this message in whole or in part is strictly prohibited. If you have received this communication in error, please immediately delete it and notify me by telephone and electronic mail at the above address.

4/26/2010

# EXHIBIT G

**From:** "Robert Seaman" <resiii@proadvisorygroup.com>

**Date:** April 8, 2009 3:23:16 PM PDT
**To:** "'Del Anthony'" <del@escomllc.com>
**Subject: RE: Server**
**Reply-To:** <resiii@proadvisorygroup.com>

Del- Sorry you are in the middle of all this...very, very uncomfortable for all....
Bob
Robert E. Seaman III
Pro Advisory Group, LLC
2050 Center Avenue, Suite 610
Fort Lee, New Jersey 07024
Telephone: (201) 346-0050
Fax: (201) 346-9162
E-mail: resiii@proadvisorygroup.com
Skype: r.seaman

E S C O M  **Del Anthony** CEO/President
del@escomllc.com | 800-506-9810 x100 | fax 800-506-9811

This transmission may contain information that is PRIVILEGED, CONFIDENTIAL AND/OR PROPRIETARY. The information contained herein is for the exclusive use of the named addressee(s). If you are not the intended recipient, please note that any dissemination, distribution, disclosure, use or duplication of this message in whole or in part is strictly prohibited. If you have received this communication in error, please immediately delete it and notify me by telephone and electronic mail at the above address.

# EXHIBIT H

**From:** Del Anthony <del@escomllc.com>
**Date:** February 3, 2010 11:10:09 PM PST
**To:** Robert Muzzy <rmuzzy@schoonercap.com>
**Cc:** <resiii@proadvisorygroup.com>, "'Robert Alfano'"
<ralfano@domaincapital.com>
**Subject: Re: Our Conversation Today**

Muzzy:

Thank you for advising me on your position regarding a potential disbursement. As
I am sure you are aware, this is contrary to what WTA is requesting. This puts me
in a difficult position, as you can understand - - especially in light of the default
situation you addressed.

Regarding your comment on direction, from my standpoint I have always been
available to you at all times during my tenure at Escom - and will continue to
be. This has never been an issue for me. If fact, I welcome the dialogue, input,
request for information, etc.

I look forward to working - and resolving the situation - with you ASAP.

Del

On Feb 2, 2010, at 11:52 AM, Robert Muzzy wrote:

> Del- Thank you for the call today regarding ESCOM.
>
> We are in the process of reviewing the financials, and it is good to know we
> can call you with any questions or if we need back-up.
>
> You asked me about disbursement of the "over $100,000.00" that you have in
> the bank. While we have no say or control of any kind of the domain or
> operations, you have been taking direction and instructions exclusively from
> WTA- Mike and his Team since approximately last February.
>
> However, since you asked, we do not want anyone getting any money,
> distribution or otherwise until the  method and type of payment being made
> have been worked out between the debtors since you have been in default for
> over 12 months now on principal and interest payments.
>
> Should you have any questions please feel free to call me or Bob Seaman.

ESCOM  **Del Anthony** CEO/President

4/26/2010

# EXHIBIT I

**From:** "Brian Leventhal" <brian@leventhallegal.com>
**Date:** April 16, 2010 7:22:35 PM PDT
**To:** "'Del Anthony'" <del@escomllc.com>
**Subject: FW: Escom Bankruptcy**

Fyi...
Brian H. Leventhal
Attorney at Law
Tel: 301-637-3316
Fax: 301-637-2485
brian@leventhallegal.com
www.leventhallegal.com
This transmission may contain information that is PRIVILEGED, CONFIDENTIAL AND/OR
PROPRIETARY.  The information contained herein is for the exclusive use of the named
addressee(s).  If you are not the intended recipient, please note that any dissemination,
distribution, disclosure, use or duplication of this message in whole or in part is strictly
prohibited.  If you have received this communication in error, please immediately delete it
and notify me by telephone (301-637-3316) and electronic mail at the above address.

**From:** Brian Leventhal [mailto:brian@leventhallegal.com]
**Sent:** Friday, April 09, 2010 5:25 PM
**To:** 'Matthews, Scott'
**Cc:** 'resiii@proadvisorygroup.com'; 'Andrew Miller'
**Subject:** RE: Escom Bankruptcy

Scott,

The stay does not prevent Escom from entering into a settlement agreement with respect
to a litigation in which it is a plaintiff.  The material adverse affect on Escom from not
entering into the settlement agreement as WTA is recommending is that its ability to
settle the case at all will be in jeopardy. Phone.com will not accept its share of the
proceeds being unjustly held up in escrow by DOM (for reasons previously stated) and,
thus, will pursue a separate settlement with Sovereign directly.  Thereafter, Sovereign may
not be willing to settle with Escom or may only do so for a lesser amount.

As for the bankruptcy related items, it is fairly obvious that the managers have a
disagreement as to whether the company should be in bankruptcy.  It is also obvious that
both managers believe that decision to be of critical importance.  To say that DOM will
wait to consider the items until the matter is essentially resolved in its favor makes little
sense. WTA already has submitted its recommendation to the members. If DOM refuses
to submit its own, then the members should have an easy time deciding.

Regards,
Brian H. Leventhal
Attorney at Law
Tel: 301-637-3316
Fax: 301-637-2485
brian@leventhallegal.com
www.leventhallegal.com
This transmission may contain information that is PRIVILEGED, CONFIDENTIAL AND/OR
PROPRIETARY.  The information contained herein is for the exclusive use of the named
addressee(s).  If you are not the intended recipient, please note that any dissemination,
distribution, disclosure, use or duplication of this message in whole or in part is strictly
prohibited.  If you have received this communication in error, please immediately delete it
and notify me by telephone (301-637-3316) and electronic mail at the above address.

**From:** Matthews, Scott [mailto:smatthews@windelsmarx.com]
**Sent:** Thursday, April 08, 2010 3:30 PM
**To:** Brian Leventhal
**Cc:** resiii@proadvisorygroup.com; Andrew Miller
**Subject:** RE: Escom Bankruptcy

Brian,

I write with respect to the Sovereign Bank litigation in response to your email from Tuesday.

DOM disputes that Section 5.03 of the Fourth Amended and Restated Limited Liability Company Operating Agreement of Escom, LLC applies. Because the settlement agreement cannot be effected due to the automatic bankruptcy stay caused by WTA's filing, there cannot be a material adverse effect on ESCOM, LLC due to the failure to agree on the appropriate distribution of funds to be received upon settlement of the Sovereign Bank lawsuit. Further, DOM has agreed to put the settlement funds in litigation counsel's escrow account pending resolution of the distribution issue. Thus, even if the action were not stayed, there would be no material adverse effect on ESCOM, LLC due to inaction related to this matter. Thus, there is no basis for a vote of the non-Managing Members.

DOM will consider the remaining contentions in your email if, as and when the automatic stay is lifted.

Finally, DOM will make the request to review the books and records to Mr. Anthony as you suggest. I had thought that Mr. Mann previously signed the tax returns on behalf of ESCOM, which led me to infer that WTA had possession of or maintained ESCOM's books and records.

Regards,
Scott

---

**From:** Brian Leventhal [mailto:brian@leventhallegal.com]
**Sent:** Tuesday, April 06, 2010 11:56 AM
**To:** Matthews, Scott
**Cc:** resiii@proadvisorygroup.com; 'Andrew Miller'
**Subject:** RE: Escom Bankruptcy
**Importance:** High

Scott,
Thank you for your prompt reply.  Clearly we have a difference of opinion on the facts and law relating to all of these matters (including interpretation of the May agreement with Del Anthony – the May 31 deadline only applies to the 3 bullet points in the middle of page 1 of that agreement, not to the 3rd paragraph which grants him the right to Escom's proceeds if he approves a settlement).  Thus, it seems the Managers are at a deadlock regarding these critical matters. Pursuant to  Section 5.03 of the Fourth Amended and Restated Limited Liability Company Operating Agreement of Escom, LLC, WTA hereby demands that DOM and DNAG immediately present written reports to the other Members who are not Managers or Founders (i.e. NBN and I-95) describing their respective views of these issues and recommended course of action.  WTA will do the same.  As provided for in the operating agreement, NBN and I-95 will then vote on how the Company will act with respect to these matters.
Regarding any request for inspection of Escom's books and records, that request should be made

to Del Anthony, not WTA as WTA does not maintain the Company's books.
Regards,
Brian H. Leventhal
Attorney at Law
Tel: 301-637-3316
Fax: 301-637-2485
brian@leventhallegal.com
www.leventhallegal.com
This transmission may contain information that is PRIVILEGED, CONFIDENTIAL AND/OR
PROPRIETARY.  The information contained herein is for the exclusive use of the named addressee
(s).  If you are not the intended recipient, please note that any dissemination, distribution,
disclosure, use or duplication of this message in whole or in part is strictly prohibited.  If you have
received this communication in error, please immediately delete it and notify me by telephone (301-
637-3316) and electronic mail at the above address.

**From:** Matthews, Scott [mailto:smatthews@windelsmarx.com]
**Sent:** Tuesday, April 06, 2010 11:35 AM
**To:** Brian Leventhal
**Cc:** resiii@proadvisorygroup.com; Andrew Miller
**Subject:** RE: Escom Bankruptcy
Brian,
I write at the request of Robert E. Seaman, III and on behalf of DOM Partners LLC ("DOM") in
response to your email from last evening.
The litigation involving ESCOM, Sovereign Bank and Phone.com, LLC is stayed due to the
involuntary petition filed by WTA. Until the stay is lifted, no settlement may be effected. WTA, not
DOM, will be held accountable for the results of its bad faith filing, including any effect that such
action may have on the Sovereign Bank litigation.
In addition, the terms of the May 7, 2009 letter agreement cited in your email and Fee Agreement
referenced therein states that the distribution of funds was subject to the settlement being agreed
upon before May 31, 2009. The settlement agreement has not yet been executed and, as your
email notes, the oral settlement was made on February 28, 2010, well after the May 31, 2009
deadline. Accordingly, I am not aware of any agreement concerning the distribution of funds to be
recovered in this settlement. To assist in the resolution of this dispute if, as and when the
bankruptcy stay is lifted, DOM repeats its request for inspection of ESCOM's books and records
and an accounting thereof to determine the proper allocation. Finally, DOM repeats its agreement to
permit the settlement funds to be deposited into an attorney escrow account maintained by
Stoneman, Chandler & Miller LLC if, as and when the bankruptcy stay is lifted and the settlement is
consummated.
As to the bankruptcy action itself, I note that ESCOM has not requested that DOM provide its
consent to the filing of any papers in the bankruptcy proceeding to consent to the Bankruptcy
Court's issuance of an Order for Relief or otherwise. In any event, WTA is in control of ESCOM
such that any claim that Del Anthony is acting on behalf of ESCOM without direction from WTA is
simply a pretense. DOM also disputes WTA's position that the Chapter 11 protection would
maximize value for all of ESCOM's creditors and equity holders and challenges WTA's assertion
that it filed the Chapter 11 involuntary petition for any reason other than to retain control over
ESCOM and www.sex.com. DOM disputes the legitimacy of the bankruptcy filing and has stated its
position in papers filed with the Bankruptcy Court.
Very truly yours,
Scott Matthews

**From:** Brian Leventhal [mailto:brian@leventhallegal.com]
**Sent:** Monday, April 05, 2010 6:21 PM
**To:** resiii@proadvisorygroup.com; Matthews, Scott; 'Andrew Miller'
**Subject:** Escom Bankruptcy
**Importance:** High

Bob/Scott and Andy,
It is WTA's understanding, based on Bob's email to me of 3/17/2010, that DOM Partners, LLC, in its
capacity as Manager of Escom, is unwilling to approve Escom's entry into any settlement

and an accounting thereof to determine the proper allocation. Finally, DOM repeats its agreement to permit the settlement funds to be deposited into an attorney escrow account maintained by Stoneman, Chandler & Miller LLC if, as and when the bankruptcy stay is lifted and the settlement is consummated.

As to the bankruptcy action itself, I note that ESCOM has not requested that DOM provide its consent to the filing of any papers in the bankruptcy proceeding to consent to the Bankruptcy Court's issuance of an Order for Relief or otherwise. In any event, WTA is in control of ESCOM such that any claim that Del Anthony is acting on behalf of ESCOM without direction from WTA is simply a pretense. DOM also disputes WTA's position that the Chapter 11 protection would maximize value for all of ESCOM's creditors and equity holders and challenges WTA's assertion that it filed the Chapter 11 involuntary petition for any reason other than to retain control over ESCOM and www.sex.com. DOM disputes the legitimacy of the bankruptcy filing and has stated its position in papers filed with the Bankruptcy Court.

Very truly yours,

Scott Matthews

---

**From:** Brian Leventhal [mailto:brian@leventhallegal.com]
**Sent:** Monday, April 05, 2010 6:21 PM
**To:** resiii@proadvisorygroup.com; Matthews, Scott; 'Andrew Miller'
**Subject:** Escom Bankruptcy
**Importance:** High

Bob/Scott and Andy,

It is WTA's understanding, based on Bob's email to me of 3/17/2010, that DOM Partners, LLC, in its capacity as Manager of Escom, is unwilling to approve Escom's entry into any settlement agreement with Sovereign Bank to memorialize the settlement verbally agreed to between Escom and Sovereign on 2/28/10 (pursuant to unanimous consent of Escom's three Managers) that calls for Phone.com, LLC (co-plaintiff with Escom in the Sovereign Bank litigation) to be paid its pro rata portion of the $300,000 settlement fee directly or that calls for Escom's portion of such funds to be paid directly to Del pursuant to that certain letter agreement entered into between Escom and Del dated May 7, 2009, pursuant to which Escom agreed to pay such proceeds in the event Del approved a settlement of the case. The pro rata portions mentioned above being calculated based on the relative damages claimed by Escom and Phone (the only remaining plaintiffs in the case) as follows:

$156,000/$462,000 = Phone damages (34%)
$306,000/$462,000 = Escom damages (66%)
Net proceeds from the $300k lump sum settlement after 20% contingency fee ($60k) paid to litigation counsel = $240,000
$240,000 x 34% = $81,600 to Phone
$240,000 x 66% = $158,400 to Mr. Anthony

If is also WTA's understanding, based on the fact that DOM has filed a Motion to Dismiss the Petition for Involuntary Bankruptcy filed by WTA, iEntertainment and AccountingMatters , that Dom, in its capacity as Manager of Escom, is unwilling to approve Del's filing of necessary papers on behalf of Escom to consent to the Bankruptcy Court's issuance of an Order for Relief Under Chapter 11 of the United States Bankruptcy Code.

WTA believes the failure to proceed with the Sovereign settlement as stated above is likely to jeopardize Escom's ability to settle the Sovereign litigation, which would result in the failure to recover a substantial sum from Sovereign and to settle a claim by Del of an even higher amount. This is based on the fact that Phone will not continue as co-plaintiff with Escom if it does not receive its full share of the settlement proceeds directly, which may impact Sovereign's willingness to settle with Escom at all.

WTA further believes that Chapter 11 protection would provide Escom an opportunity to maximize value for all creditors and equity holders and that the public foreclosure auction process previously initiated by DOM would have diminished the value of Escom's assets well below the

value that could be obtained via a commercially reasonable process conducted under Chapter 11
protection. WTA also believes that if the Company fails to act, and DOM succeeds with its Motion
to Dismiss, Escom, its creditors and its members will be harmed substantially.

In light of the foregoing, WTA hereby requests that DOM reconsider its views on the above
matters given its fiduciary duty as Manager and immediately provide its consent, in its capacity as
Manager of Escom, to the actions recommended by WTA above.   WTA requests that DNAG
provide its immediate consent as well.

Thank you.

Sincerely,

Brian H. Leventhal
Attorney at Law
Tel: 301-637-3316
Fax: 301-637-2485
brian@leventhallegal.com
www.leventhallegal.com

This transmission may contain information that is PRIVILEGED, CONFIDENTIAL AND/OR
PROPRIETARY.  The information contained herein is for the exclusive use of the named addressee
(s).  If you are not the intended recipient, please note that any dissemination, distribution,
disclosure, use or duplication of this message in whole or in part is strictly prohibited.  If you have
received this communication in error, please immediately delete it and notify me by telephone (301-
637-3316) and electronic mail at the above address.

Scott R. Matthews | Windels Marx Lane & Mittendorf, LLP | 156 West 56th Street, New York, New York
10019 | Direct Dial: 212.237.1025 | General Fax: 212.262.1215
| smatthews@windelsmarx.com | www.windelsmarx.com

IRS Circular 230 Disclosure: As required by Federal Regulations, we inform you that any tax advice contained herein was not written or intended
to be used (and cannot be used) for the purpose of avoiding federal tax penalties, or for the purpose of promoting, marketing, or recommending
any transaction or matter to another party.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error,
regardless of whether you are a named recipient, please notify the sender by reply e-mail and delete the message and any attachments.

No virus found in this incoming message.
Checked by AVG - www.avg.com
Version: 8.5.437 / Virus Database: 271.1.1/2794 - Release Date: 04/06/10 06:32:00

Scott R. Matthews | Windels Marx Lane & Mittendorf, LLP | 156 West 56th Street, New York, New York
10019 | Direct Dial: 212.237.1025 | General Fax: 212.262.1215
| smatthews@windelsmarx.com | www.windelsmarx.com

IRS Circular 230 Disclosure: As required by Federal Regulations, we inform you that any tax advice contained herein was not written or intended
to be used (and cannot be used) for the purpose of avoiding federal tax penalties, or for the purpose of promoting, marketing, or recommending
any transaction or matter to another party.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error,
regardless of whether you are a named recipient, please notify the sender by reply e-mail and delete the message and any attachments.

No virus found in this incoming message.
Checked by AVG - www.avg.com
Version: 8.5.437 / Virus Database: 271.1.1/2798 - Release Date: 04/08/10 06:32:00

E∫COM   **Del Anthony** CEO/President
del@escomllc.com | 800-506-9810 x100 | fax 800-506-9811

This transmission may contain information that is PRIVILEGED, CONFIDENTIAL AND/OR PROPRIETARY. The information contained herein is for the
exclusive use of the named addressee(s). If you are not the intended recipient, please note that any dissemination, distribution, disclosure, use or
duplication of this message in whole or in part is strictly prohibited. If you have received this communication in error, please immediately delete it and
notify me by telephone and electronic mail at the above address.

4/26/2010