Jeffrey W. Dulberg (CA Bar No. 181200)
Gabrielle Albert Rohwer (CA Bar No. 190895)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 11th Floor
Los Angeles, California 90067-4100
Telephone: 310/277-6910
Facsimile: 310/201-0760

Proposed Attorneys for Alleged Debtor

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SAN FERNANDO VALLEY DIVISION

| In re: | Case No.: 1:10-bk-13001-GM |
|---|---|
| **ESCOM LLC,** | Chapter 11 |
| Alleged Debtor. | **DEBTOR'S RESPONSE TO ORDER TO SHOW CAUSE WHY A CHAPTER 11 TRUSTEE SHOULD NOT BE APPOINTED IN THIS BANKRUPTCY CASE** |
| | Date: April 27, 2010
Time: 10:00 a.m.
Place: Ctrm 303
21041 Burbank Blvd.
Woodland Hills, CA 91367
Judge: Hon. Geraldine Mund |

23880-001\DOCS_LA:218910.3
DOCS_LA:218910.4

The above-captioned alleged debtor and debtor in possession (the "Debtor") hereby responds to the Order to Show Cause Why a Chapter 11 Trustee Should Not Be Appointed in this Bankruptcy Case (the "OSC")[1] entered by the Court on April 21, 2010 [Docket #35]. The Debtor respectfully represents as follows:

## I.

## INTRODUCTION

Despite the somewhat tumultuous origins of this case, the Debtor is equipped with the management and authority to operate as a debtor-in-possession and serve as a fiduciary to its bankruptcy estate. All parties in interest agree that a prompt sale of the Debtor's primary asset is critical. The Debtor's Chief Executive Officer – the company's sole employee – would like nothing more than to execute upon a sale initiative and has every intention of doing so should he be permitted to do so. As this response will demonstrate, it is not the Debtor's Chief Executive who is caused the deadlock that has lead to court oversight, rather it is the Debtor's managers. Appointing a chapter 11 trustee would generate a layer of unnecessary expense – akin to the expenses of a chapter 7 trustee – without a corresponding benefit. Rather, the Debtor should be permitted to pursue the sale initiative as a debtor-in-possession under the auspices of its Chief Executive. This will maximize recoveries while minimizing expenses which will inure to the benefit of all stakeholders.

## II.

## BACKGROUND

ESCOM, LLC, the alleged debtor herein (the "Debtor"), was formed in 2006 to operate a website with the domain name www.sex.com (the "Domain Name"). The Debtor is governed by three managers pursuant to the terms of the Forth Amended and Restated Limited Liability Company Agreement of ESCOM, LLC (the "Operating Agreement"), a copy of which is attached to Declaration of Del Anthony Polikretis (the "Anthony Declaration") as Exhibit B. Those managers are DOM Partners LLC ("DOM"), Washington Technology Associates, LLC ("WTA") (one of the petitioning creditors), and Domain Name Acquisition Group ("DNAG" and, collectively with DOM

---

[1] The OSC incorporates the Court's tentative ruling issued prior to the April 19, 2010 hearing, docket number 36. References to the OSC shall include that tentative ruling.

and WTA, the "Managers"). According to the terms of the Operating Agreement, the majority of actions taken outside the ordinary course of business must be approved by a unanimous vote of the Managers.

Del Anthony Polikretis ("Anthony") is the Debtor's Chief Executive Officer and sole employee. Anthony has run the Debtor's day-to-day operations, including management of the website and all business functions since March 2007. *See* Anthony Declaration.

At its inception, the Debtor was funded by secured loans from DOM and WTA.[2] The Debtor borrowed $3,000,000 from DOM secured by a blanket lien on the Debtor's assets. The Debtor borrowed $5,000,000 from WTA also secured by a blanket lien on the Debtor's assets which shares priority *pari passu* with DOM. Finally, in August 2007, iEntertainment, a petitioning creditor, waived its rights under a Linking Agreement with the Debtor in exchange for $2,500,000 which was paid by Debtor in the form a note which obligation is secured by a blanket lien subordinate to those of DOM and WTA. The obligations to DOM and WTA have been in default since January 2009 but specific action to enforce those notes was not taken until one year later in January 2010. The Debtor has been in default under the iEntertainment note since August 2008.

The Debtor maintains a revenue generating cash flow positive operation. In fact, the Debtor's revenue increased 194% between September 2009 and March 2010 while traffic on the website increased 155% during the same period. As a result, the Debtor has approximately $200,000 of cash on hand. While the Debtor does not presently generate adequate cash to fully service its debt, the Debtor does generate sufficient revenue to fund operations and accumulate free cash on hand which can be used to pay down its debt.

As the OSC points out, the Debtor has been unable to execute any plan surrounding the sale of Domain Name. The Operating Agreement requires unanimous consent to sell the Debtor's assets or file a bankruptcy petition, so DOM and WTA's failure to reach consensus hindered the Debtor's ability to operate. This hindrance was directly caused by disputes between DOM and WTA, not Anthony's management. Anthony has been operating the website and working on ways to maximize

---

[2] The Debtor presents the following recitation of its secured obligations for the principal purpose of edifying the Court. None of these statements are intended as admissions nor should they be treated as such. The Debtor reserves all rights with respect thereto.

the value of the Domain Name, just as a trustee would be expected to do. In fact, Anthony has been able to generate a positive cash flow sufficient to fund operations and make debt payments.

## A. The Debtor's Operating Agreement Provides Sufficient Mechanisms for Handling a Deadlock Among the Managers

Section 5.03 of the Operating Agreement requires the three Managers to give unanimous approval prior to any significant action being taken. That section also provides the means for the Debtor to break a deadlock if the Managers do not have a unanimous direction. Section 5.03 of the Operating Agreement states:

> In the event that the Managers fail to reach unanimity with respect to a particular issue, such that if no action is taken regarding the issue at all, there would be a material adverse affect on the Company, each Manager shall submit a written report to the Members describing their view of the issue and recommended course of action. The other Members (who are not Managers or Founders) shall then decide on the appropriate course of action by written Consent or pursuant to a vote in a meeting called in accordance with this Article V.

The above provision lays out three steps that the Debtor must take in the event that the Managers cannot reach a unanimous decision. First, it must be established that there will be harm to the company. While there is no guidance regarding how that determination is to be made, it is beyond doubt that the Managers' failure to reach consensus regarding the filing of a bankruptcy petition has caused harm to the company – especially considering that WTA was one of the petitioning creditors and DOM filed a motion to dismiss the case. Second, the Managers are required to put their recommended course of action in writing. As described in the e-mails from WTA's counsel, Brian Leventhal to Anthony attached to the Anthony Declaration as Exhibit C (the "Leventhal E-mails"), WTA notified DOM and DNAG that it was invoking section 5.03 of the Operating Agreement. WTA then provided its own written recommendations to the members and requested that DOM and DNAG do the same, as required by the Operating Agreement. These efforts were to no avail as neither DOM nor DNAG provided any written recommendations.[3] Third, the dispute goes to the

---

[3] It could be argued that WTA's and DOM's pleading related to DOM's motion to dismiss the bankruptcy case satisfied this provision. In addition, DNAG formally abstained.

non-founder Members, I-95 Investment Group, LLC ("I-95")[4] and Nuthin' But Net ("NBN" and, jointly with I-95, the "Members") who must vote on the matter.

### B. Authority to Consent to the Bankruptcy Petition and Operate as the Debtor-In-Possession

After following the above procedure, I-95 issued the "Written Consent of the Non-Founder Members of Escom, LLC" (the "Resolution"), a copy of which is attached to the Declaration of Corey Bialow as Exhibit A, which authorizes Anthony to manage the Debtor in the bankruptcy proceeding. Specifically, the authority granted to Anthony is as follows:

> [Anthony] Polikretis is hereby authorized and directed to take any necessary action and file any necessary documentation with the Bankruptcy Court to consent to the Petition on behalf of the Company and to act for the Company in all matters relating to the Bankruptcy thereafter and to conduct the Bankruptcy on behalf of the Company, all as he deems appropriate in the best interest of the Company, its creditors and members in his reasonable good faith discretion and upon the advice of counsel.

This language is sufficient to give Anthony the ability to operate the Debtor's business as a debtor-in-possession and as a fiduciary of the bankruptcy estate instead of being paralyzed by the Managers' failure to reach consensus.

The Debtor understands that DOM objects to the Resolution. By letter dated April 19, 2010 from Scott R. Matthews, DOM's counsel, to Anthony, DOM asserted that the parties failed to comply with the Operating Agreement and thus could not authorize the Resolution. A copy of the letter is attached to the Anthony Declaration as Exhibit B. DOM's objection can be summarized as follows: (1) no Manager vote was taken; (2) no determination was made that failure to act would have a material adverse effect on the Debtor; and (3) no written reports were submitted to the Members.

WTA expressly sought consent and approval of the bankruptcy filing from DOM and DNAG which DOM denied (DNAG has abstained from all discussions related to the bankruptcy filing). DOM's opposition to the bankruptcy filing provides ample evidence of the material adverse effect on the Debtor of the Managers' disagreement. Finally, WTA tried to obtain a written

---
[4] I-95 owns the majority of the non-manager interest in the company making its vote controlling.

recommendation from DOM as described in the Leventhal E-mails (see Exhibit C attached to the Anthony Declaration). According to the Leventhal E-mails, WTA made multiple attempts to obtain DOM and DNAG's consent to the bankruptcy filing or written statement opposing it. No response was received from either party. Yet DOM refused to provide a recommendation, instead stating that they would not consider the issue unless and until the stay was lifted (i.e. unless and until they obtained the result they wanted, which would obviate the need for a vote). DNAG's response was to abstain.

C.  **Anthony's Ability to Operate the Debtor in Bankruptcy**

The Debtor is aware of the Court's concern that Anthony will not be able to operate the business as a debtor-in-possession based on DOM's allegations that it has been "shut out" by the Debtor's management for the last year. Nothing could be further from the truth. As is more fully described in the Anthony Declaration, Anthony has served as the Debtor's CEO for over three years and has *never* locked DOM out of management. Attached to the Anthony Declaration are a series of e-mails regarding the Debtor's operations between Anthony and various representatives of DOM. Of particular note are the following emails:

(1)  From Robert Muzzy ("Muzzy"), counsel to DOM, to Anthony dated April 5, 2009, thanking Anthony for his support of DOM;

(2)  From Robert Seaman to Anthony dated April 8, 2009, apologizing from putting Anthony in the middle of the fighting between WTA and DOM.

(3)  Among Leventhal, counsel to WTA, Muzzy and Anthony dated May 13, 2009, regarding steps that the Debtor needed to take to become more "mainstream" and thus more marketable.

(4)  From Anthony to Muzzy (DOM) and Leventhal (WTA) in July 2009, regarding the increased traffic on the Debtor's website.

(5)  Between Muzzy and Leventhal dated August 11, 2009, regarding Anthony's "good work."

DOM's assertion that it has been locked out of the Debtor's management by WTA and Anthony is simply untrue. It is also untrue that Anthony operates the Debtor for WTA's benefit. In fact, on

numerous occasions Anthony refused to take orders from principals of WTA without the other Managers' consent.

It should also be noted that in February of this year Anthony attempted to make a cash distribution to the Managers. However, DOM would not agree to take any money because it "did not want *anyone* getting any money." *See* e-mail dated February 2, 2010 from Muzzy to Anthony attached to the Anthony Declaration as Exhibit I (italics added). In the same e-mail, Muzzy claims that "While [DOM has] no say or control of any kind of the domain or operations, you [Anthony] have been taking direction and instructions exclusively from WTA – Mike [Mann] and his Team since approximately last February." Obviously, based on the string of e-mails referenced above, Anthony was not taking direction exclusively from WTA. He was working with both DOM and WTA, as well as DNAG, as he was required to do under the terms of the Operating Agreement. DOM's claim that it has been "shut out" of the Debtor's management and that WTA controls the Debtor is utterly baseless. Anthony, alone, operates the Debtor, taking direction from all of the Managers as proscribed by the terms of the Operating Agreement. As recently as February 2010, Anthony reported the Debtor's financial to all of the Managers. See Exhibit H attached to the Anthony Declaration.

Now that the Members have spoken to break the deadlock according to the procedure in section 5.03 of the Operating Agreement, Anthony has the authority to operate the Debtor and is empowered to serve as the proper fiduciary.

## III.

## ARGUMENT

A. **There Are Insufficient Facts to Reach the Level of Evidence Needed to Satisfy the High Burden of Proof Required to Appoint a Trustee**

Section 1104(a) of the Bankruptcy Code provides for the appointment of a trustee:

> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause…;
>
> (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate…; or

>   (3) if grounds exist to convert or dismiss the case ... but the court determines that the appointment of a trustee or an examiner is in the best interests of the estate.

11 U.S.C. § 1104(a). The party seeking appointment of a trustee has the burden of establishing the need for such appointment by clear and convincing evidence. *In re Marvel Entertainment Group, Inc.*, 140 F.3d 463, 471 (3d Cir. 1998); *In re Sharon Steel Corp.*, 871 F.2d 1217, 1226 (3d Cir. 1989); *In re PRS Insurance Group, Inc.*, 274 B.R. 381, 384 (Bankr. D. Del. 2001); 7 Collier on Bankruptcy, ¶ 1104.02[4][b], at 1104-24 (15th ed. Rev. 2006) (evidentiary standard should be clear and convincing).

As courts have noted, the "standard for § 1104 appointment is very high." *Smart World Technologies, LLC et al., v. Juno Online Services, Inc. (In re Smart World Technologies, LLC)*, 423 F.3d 166, 176 (2nd Cir. 2005). The appointment of a chapter 11 trustee represents an "extraordinary remedy." *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 167 (Bankr. S.D.N.Y. 1990); *In re Adelphia Communications Corp.*, 336 B.R. 610, 658 (Bankr. S.D.N.Y. 2006) (and cases cited therein).

Accordingly, there is a "strong presumption" that a debtor's current management should not be displaced by a chapter 11 trustee. *Marvel Entertainment Group*, 140 F.3d at 471; *In re Clinton Centrifuge Inc.*, 85 B.R. 980, 984 (Bankr. E.D. Pa. 1988) ("I note, as have many other courts, that there is a strong presumption in chapter 11 that the debtor is to continue in control and possession of its business"). *See also In re Justus Hosp. Props. Inc.*, 86 B.R. 261, 267 (Bankr. M.D. Fla. 1988) ("there is a strong presumption in favor of leaving a reorganizing debtor in possession in charge of its operations"); *In re Macon Prestressed Concrete Co.*, 61 B.R. 432, 439 (Bankr. M.D. Ga. 1986); (same); *In re Sea Queen Kontaratos Lines. Ltd.*, 10 B.R. 609, 609 (Bankr. D. Me. 1981) (same). The presumption is especially strong when the debtor is a closely held entity. *In re 4 C Solutions, Inc.*, 289 B.R. 354 (Bankr. C.D. Ill. 2003).

B.   **The Debtor Is No Longer Deadlocked**

The Debtor is aware of the Court's concern that it will not be able to function in the bankruptcy because of the deadlock among the Managers that ultimately lead to the necessity of the bankruptcy filing. However, now that the Members have issued the Resolution, Anthony has the

ability to conduct the bankruptcy and operate the Debtor without the need for further approval from the Managers. This case is clearly distinguishable from *In re New Orleans Paddlewheels, Inc.*, where the board of directors was deadlocked and the management was alleged to be engaged in improper conduct including "allegations of hidden assets, claims against insiders for preferences or unauthorized payments ...." 350 B.R. 667, 693 (Bankr. E.D. La. 2006). While the Debtor was deadlocked prior to the issuance of the Resolution, that is no longer the case. Moreover, in contract with the *New Orleans Paddlewheels* case, there are no allegations of fraudulent behavior by the Debtor. The Debtor has competent management that is capable of fulfilling its fiduciary duty to the estate with the experience and skills necessary to sell the Domain Name in a manner that he believes will be most beneficial to the estate.

C.   **Appointment of a Trustee is Unwarranted Where the Alleged Prepetition Mismanagement is Unlikely to Recur in Chapter 11**

"[O]n a motion for the appointment of a trustee, the focus is on the debtor's current activities, not past misconduct. Speculation that a debtor may do something in the future does not overcome the strong presumption that the debtor should be permitted to remain in possession in a Chapter 11 case or justify the additional costs of a trustee." *In re Sletteland*, 260 B.R. 657, 672 (Bankr. S.D.N.Y. 2001) (citations omitted; emphasis added); *Ad Hoc Committee of Bondholders v. Citicorp Venture Capital Ltd. (In re Fairwood Corporation)*, 2000 WL 264319, *14-15 (S.D.N.Y. 2000), *aff'd*, 242 F.3d 364 (2d Cir. 2001). Indeed, "one would expect to find some degree of incompetence or mismanagement in most businesses which have been forced to seek the protections of chapter 11." *In re Anchorage Boat Sales, Inc.*, 4 B.R. 635, 645 (Bankr. E.D.N.Y. 1980); *see generally* 5 Collier on Bankruptcy 1104.01[c] at 1104-21 (15th ed. 1983).

Looking forward, now that the Debtor is no longer trapped between WTA and DOM, it will be able to perform the functions necessary to either successfully reorganize or orderly liquidate. At this point, appointing a trustee would be superfluous, adding an unnecessary expense and undue delay. *See In re General Oil Distributors, Inc.*, 42 B.R. 402, 410 (Bankr. E.D.N.Y. 1984) (despite finding mismanagement, "[u]nder the watchful eye of G.O.D.'s creditors, the court is convinced that

their interests are better served by permitting Gerald to lead G.O.D. into reorganization, rather than by saddling the estate with the expense of a trustee and additional counsel.").

### D. Appointment of a Trustee with Broad Powers is Unwarranted and Would Impose Great Costs for No Discernible Benefit, and Would Be Unfair to Creditors

As the Court acknowledges, there is obvious inefficiency and economic waste inherent in the request to appoint a trustee where the only arguable need for a trustee is as the person to steer the Debtor through a section 363 sale. No discernible benefit would be conferred by appointing a trustee to market the company, negotiate with a stalking horse and complete a sale. A trustee would have no greater authority to pursue a sale than another estate representative.

On the other hand, the detriment is certain and substantial. A trustee would have to learn a business from scratch which Anthony has spent the past three years operating. Educating the trustee about the unique aspects of operating the Domain Name would incur fees that would otherwise not accrue to the estate. The Debtor has limited liquid assets (and assets in general). The balance of benefits and burdens does not support a broad role for a trustee. *Cf. In re Dragone*, 266 B.R. 268, 271 (D. Conn. 2001) ("Beside the dislocation caused by the appointment of a trustee, the Court must also consider the cost of the trustee and balance the harm of such an appointment against the benefits of a trustee's appointment.") (citing 7 *Collier on Bankruptcy*, ¶ 1104.02[3][a], at 1104-10 (15th ed. Rev. 2006)). Consequently, the Debtor, and its creditors, should be spared the expense of funding a chapter 11 trustee.

## IV.

## CONCLUSION

For the foregoing reasons, the Debtors respectfully request that this Court find that cause does not exist to appoint a chapter 11 trustee, and grant such other and further relief as is just and proper under the circumstances.

| | |
|---|---|
| Dated: April 26, 2010 | PACHULSKI STANG ZIEHL & JONES LLP |
| | By  /s/ Jeffrey W. Dulberg |
| | Jeffrey W. Dulberg (CA Bar No. 181200) |
| | Gabrielle Albert Rohwer (CA Bar No. 190895) |
| | Proposed Attorneys for Escom LLC, Alleged Debtor and Debtor in Possession |