Daniel G. Gurfein (*pro hoc* application pending)
James Regan (*pro hoc* application pending)
SATTERLEE STEPHENS BURKE & BURKE LLP
230 Park Avenue
New York, New York 10169
Phone: (212) 818-9200
Facsimile: (212) 818-9606
Email: dgurfein@ssbb.com
Attorneys for Nuthin' But Net, LLC

Peter J. Gurfein (State Bar No. 127173)
Michael I. Gottfried (State Bar No. 146689)
LANDAU GOTTFRIED & BERGER LLP
1801 Century Park East, Suite 1460
Los Angeles, CA 90067
Phone: (310) 557-0050
Facsimile: (310) 557-0056
Email: pgurfein@lgbfirm.com
Local Counsel for Nuthin' But Net, LLC

# UNITED STATES BANKRUPTCY COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

## SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re:<br><br>ESCOM, LLC,<br><br>        Debtor. | Bk. No. 1:10-bk-13001-GM<br><br>Chapter 11<br><br>**OPPOSITION TO MOTION FOR ORDER (I) AUTHORIZING DEBTOR TO SELL ASSETS FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANVCES, (II)APPROVING ASSET PURCHASE AGREEMENT WITH SUCCESSFUL BIDDER CLOVER HOLDINGS LIMITED, (III) AUTHORIZING PAYMENT OF SALE COMMISSIONS FROM SALE PROCEEDS, AND (IV) GRANTING RELATED RELIEF**<br><br>**Scheduled Hearing:**<br>Date:  October 27, 2010<br>Time: 10:00 a.m.<br>Place:  Courtroom 303<br>       21041 Burbank Blvd<br>       Woodland Hills, CA 91367 |

**TO THE HONORABLE GERALDINE MUND, UNITED STATES BANKRUPTCY JUDGE, AND TO ALL PARTIES IN INTEREST**:

**PLEASE TAKE NOTICE** that creditor Nuthin' But Net ("NBN") hereby opposes and objects to that portion of the *Motion for Order (I) Authorizing Debtor to Sell Assets Free and Clear of Liens, Claims, and Encumbrances, (II) Approving Asset Purchase Agreement with Successful Bidder Clover Holdings Limited, (III) Authorizing Payment of Sale Commissions from Sale Proceeds, and (IV) Granting Related Relief* [Dkt. No. 115] (the "Sale Procedures Motion") that seeks to provide the Debtor authorization to "distribute the net sale proceeds upon the closing to the Secured Lenders."

NBN objects to the purported amounts claimed by the purported Secured Lenders and asserts that purported creditor iEntertainment's claim should be disallowed.

**PLEASE TAKE FURTHER NOTICE** that NBN therefore requests, that if the Court otherwise approves the relief requested in the Sale Procedures Motion, that the disputed portion of the net sale proceeds be placed in a segregated, interest bearing escrow account pending determination by this Court of the allowance, amount, and priority of the claims that are in dispute.

This Objection is based on the accompanying Memorandum of Points and Authorities, the Declaration of Gabriel Fried, the Declaration of Harold Baldauf, all pleadings, papers and records on file with the Court, and such other evidence, oral or documentary, as may be presented to the Court prior to or at the time of hearing of this Objection.

Dated: October 26, 2010

///

///

///

///

///

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Daniel G. Gurfein
James Regan
SATTERLEE STEPHENS BURKE & BURKE LLP
230 Park Avenue
New York, NY 10169

And

Peter J. Gurfein
Michael I. Gottfried
LANDAU GOTTFRIED & BERGER LLP
1801 Century Park East, Suite 1460
Los Angeles, CA 90067


By  /s/ _____

Attorneys for Nuthin' But Net, LLC

# MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

1.  Nuthin But Net ("NBN") objects to the *Motion for Order (I) Authorizing Debtor to Sell Assets Free and Clear of Liens, Claims, and Encumbrances, (II) Approving Asset Purchase Agreement with Successful Bidder Clover Holdings Limited, (III) Authorizing Payment of Sale Commissions from Sale Proceeds, and (IV) Granting Related Relief* [Dkt. No. 115] (the "Sale Procedures Motion") solely as it relates to the distribution of proceeds from the sale to the putative Secured Lenders, as defined in the Sale Procedures Motion. NBN does not object to the sale *per se.* As set forth more fully below, the insiders who control the Debtor are also the Secured Lenders who will be paid from the sale proceeds. In effect, the controlling insiders will be paying themselves unlawfully, to the detriment of all other creditors. Under the equities of this case, they should not be permitted to do so.

2.  Rather than risk the loss of this sale, NBN asks that all sale proceeds, after payment of the costs of the sale and any undisputed portion of the Secured Lenders' claims, be deposited into an interest bearing escrow account, with any further distribution to be made only upon further order of this court.

3.  As the Court is already aware at this point (*see* Motion to Dismiss Involuntary Bankruptcy Petition by Dom Partners LLC, Dkt. No. 3), the relevant purported secured creditors who filed this involuntary bankruptcy petition – iEntertainment, Inc. ("iEntertainment") and Washington Technology Associates, LLC ("WTA")[1] – are insiders of the Debtor, both controlled by Michael Mann ("Mann"). What has not been disclosed to the Court, however, is that Mann, through a series of self-dealing transactions, essentially gave away Escom's most valuable rights to iEntertainment (i.e., to himself) and then had Escom "buy back" those rights from his wholly owned and controlled subsidiary, iEntertainment, in exchange for a $2.5 million secured note (the

---

[1] In addition, AccountingMatters.com, LLC, a nominal unsecured creditor that joined in the involuntary petition, is also controlled by Mann.

1    "iEntertainment Note"). The ultimate, and clearly intended result of this shell game, was to allow

2    Mann to reap a disproportional recovery upon Escom's sale of its assets, primarily at the expense

3    of NBN, which the Debtor presently owes approximately $2,337,562.39, but which NBN will not

4    recover if Mann's self-dealing is sanctioned.

5       4.   Thus, NBN contends the iEntertainment Note was wrongfully obtained, and that

6    iEntertainment's purported secured claim must therefore be disallowed. Upon filing of the Sale

7    Procedures Motion, NBN has sought discovery in order to adduce additional facts to support its

8    objection to the iEntertainment claim. Incredibly, even though Mann signed the involuntary

9    bankruptcy petition initiating these proceedings, he now seeks to personally avoid service of a

10    deposition notice and any discovery concerning the relationship between iEntertainment and

11    Escom or the circumstances of the iEntertainment transactions. Moreover, iEntertainment and

12    WTA have both refused to cooperate with NBN's requests for discovery or comply with

13    subpoenas seeking a deposition of the person most knowledgeable regarding each entities'

14    dealings with Escom and with each other.

15    Because this discovery is necessary to provide the Court a complete picture of the impermissible

16    self-dealing which lead to the iEntertainment Note, if the Sale Procedures Motion is otherwise

17    approved by the Court, the proceeds of the sale purportedly due iEntertainment should be held in

18    escrow pending resolution of this contested matter.[2]

19       5.   Further, that portion of the sale proceeds purportedly due WTA and DOM arising

20    from default interest rates, late payment penalties, and collection costs should be held in escrow

21    to determine the actual amount properly recoverable. While their secured claims may be

22    allowable, the amounts claimed by the Secured Lenders are presently overstated, as the secured

23

24    _____

25    [2] While NBN immediately engaged the Debtor and its insiders (and then served discovery) following the filing of the
Sale Procedure Motion in order to obtain necessary discovery, the short time frame provided as a result of the
Debtor's Motion to Shorten Time for Notice of Hearing has presented additional hurdles to NBN's ability to obtain

26    all relevant facts. Notably, the Debtor has rushed the Sale Procedure Motion to a hearing with just a week's notice
even though it waited approximately 10 days after entering into the Asset Purchase Agreement before filing this
motion.

1    claimants are not entitled to the penalties or default interest rates included in their presently stated

2    claims, nor have they proven the "necessary" collection costs they are entitled to under their

3    respective Notes. The Sales Procedure Motion reflects collection costs of approximately

4    $491,000 for DOM, $90,000 for WTA and $48,000 for iEntertainment. An unrelated debtor

5    would require proof as to the fact and necessity of these alleged expenses. Indicative of the

6    Secured Lenders' control of the Debtor, at his deposition on October 25, 2010, Del Anthony

7    Polikretis, the Debtor's CEO/President ("Polikretis"), testified that he had not even seen evidence

8    of detailed costs asserted to be recoverable by the Secured Lenders and the amounts of claims

9    owed the Secured Lenders had only been calculated by the Secured Lenders, not by the Debtor.

10        6.        This case presents the highly unique circumstance under which the controlling

11    insiders have announced that they intend to sell the assets, pay themselves all of the proceeds, and

12    dismiss the case[3] before other creditors can be paid. Under normal circumstances, the Debtor

13    would have a fiduciary duty to maximize recovery for all creditors. Here, that might include

14    confirming a plan of liquidation under which secured claims might be reinstated and paid at non-

15    default rates, and where inequitable conduct by creditors might cause a debtor to seek equitable

16    subordination or disallowance of claims. But this is not the normal case. This debtor intends to

17    pay its controlling equity holders and leave all other creditors in the dust. That would be wrong,

18    and would be contrary to the principles of the Bankruptcy Code.

19                        **RELEVANT FACTS**

20        7.        NBN is a creditor of the Debtor with a claim in the amount of $2,143,791.74,

21    based on a Convertible Promissory Note dated May 12, 2006, as amended by an Extension

22    Agreement dated September 11, 2006, and Interest Payment Extension Agreement, dated

23    December 31, 2006, and the Amendment to the Interest Payment Extension Agreement, dated

24    August 1, 2007, and Amendment # 2 to the Interest Payment Extension Agreement, dated January

25    9, 2008 (the "NBN Note"). NBN's claim is detailed in its Proof of Claim separately filed with

26    ───────────────

[3] See Chapter 11 Status Report, Dkt No. 107, at 3, ll. 23-26.

1    the Court.

2        8.      NBN is also a "Member" of Escom, LLC ("Escom" or "the Debtor"), as set forth

3    in the Fourth Amended and Restated Limited Liability Agreement of Escom, LLC (the "Escom

4    Operating Agreement").

5        9.      As set forth in the Operating Agreement, Dom Partners, LLC ("Dom") and WTA

6    are Founders, Managers and Members of Escom.

7        10.     Although NBN's consent to the sale of the Debtor's assets was required under the

8    Escom Operating Agreement, it was neither requested nor obtained.  Nevertheless, NBN does not

9    oppose an order (a) authorizing the Debtor to sell assets free and clear of liens, claims, and

10   encumbrances, or (b) approving the asset purchase agreement with successful bidder Clover

11   Holdings Limited, or (c) authorizing the payment of sale commissions from sale proceeds (d) or

12   permitting distribution of the undisputed portion of WTA's and Dom's secured claims.

13       11.     NBN does object to the Debtor's request that the Court authorize the full

14   distribution of "the net sale proceeds upon the closing to the Secured Lenders."  NBN has no

15   objection to distribution of the sale proceeds to reimburse undisputed amounts due under the Dom

16   Note or the WTA Note, but does dispute the distribution of amounts sought under the Dom Note

17   or the WTA Note beyond the principal and non-default interest.  Further, NBN contends the

18   iEntertainment Note should be disallowed and no sale proceeds should be distributed to

19   iEntertainment.

20       12.     Pursuant to the NBN Note, the Debtor promised to pay NBN $1.5 million that

21   NBN had loaned to the Debtor, at an interest rate of 15%.  The NBN Note is a non-recourse

22   obligation of the Debtor, secured solely by Membership Units in Escom.  While the NBN Note

23   permitted, in the event of default, NBN to foreclose on its collateral by converting the Note to

24   Membership Units in Escom, NBN did not foreclose on its collateral prior to the commencement

25   of the Debtor's Chapter 11 case. Pursuant to Bankruptcy Code § 506(a), NBN's claim will be

26   deemed a general unsecured claim to the extent that the claim exceeds the value of the collateral.

13.     In addition to, and as a consequence of its loan to the Debtor, on or about the time such loan was agreed to, NBN became a member of Escom.  As the Escom Operating Agreement (Schedule A) reflects, NBN holds one Class A Membership Unit in Escom.  See accompanying Declaration of Harold Baldauf, Exhibit C.

14.     In addition to the NBN Note, as detailed in the Escom Operating Agreement (§ 3.03), the Debtor's purported currently outstanding debt includes three notes held by insiders of the Debtor: a $5 million Secured Promissory Note payable to WTA ( the "WTA Note"); a $3,000,000 Secured Promissory Note payable to Dom Partners LLC (the "Dom Note"), and the $2.5 million iEntertainment Note.  See Baldauf Declaration Exhibits A, D, E, and F, respectively.

**A. The Purported Claims of the "Secured Lenders"**

15.     The WTA Note, the Dom Note, and the iEntertainment Note all include an 8% interest rate, a default interest rate of 12%, late payment penalties, and a right to recovery of all "necessary" collection costs.

16.     The WTA Note, the Dom Note and the iEntertainment Note are all secured by collateral consisting of the sex.com domain name and all tangible and intangible property of Escom, as set forth in the applicable security agreements

17.     WTA, iEntertainment and Dom entered into a Stipulation dated May 20, 2010 resolving the parties' dispute among themselves regarding the proper procedure for the sale of Escom's assets, and agreeing that the Debtor be permitted to operate as a debtor in possession subject to the terms of the attached Settlement Agreement, also dated May 2010. (*See* Dkt. No. 52).  Pursuant to the Settlement Agreement, Section 4, WTA, DOM and iEntertainment "acknowledge and agree," among themselves, to the purported "true and accurate amounts owed under" their respective Notes, as of April 30, 2010.

18.     Significantly, NBN promptly opposed the stipulating parties' request for an order approving the stipulation as written. (*See* Dkt. No. 53).  NBN's opposition was resolved by an order on the stipulation including language proffered by NBN.  Specifically, the language in

1   paragraph 1 of the June 9, 2010 Order ultimately approving the Stipulation states: "This

2   stipulation is approved, provided, however, that the Stipulation shall not waive the rights of any

3   creditor or other party in interest to object to the allowance, amount, status or priority of claims

4   evidenced by the Notes set forth in section 4 of the Stipulation, or to assert any claims against the

5   Debtor, and all such rights are expressly reserved."

6       19.      In Section 4 of the Settlement Agreement, the parties to that agreement

7   "acknowledge and agree" that as of April 30, 2010, (a) WTA's secured claim is $6,799,281.79, of

8   which $1,709,293.53 is purported "unpaid interest and late fees," and $89,988.26 is purported

9   "costs, expenses, attorneys fees and disbursements;" (b) that DOM's secured claim is

10   $4,500,427.11, of which $1,009,622.73 is purported "unpaid interest and late fees," and

11   $490,804.38 is purported "costs, expenses, attorneys fees and disbursements;" and (c) that

12   iEntertainment's secured claim is $3,577,264.61, of which $1,029,919.64 is purported "unpaid

13   interest and late fees," and $47,344.97 is purported "costs, expenses, attorneys fees and

14   disbursements."

15       20.      Upon information and belief, based on the data made available to NBN as an

16   Escom Member, including the payments made, and absent the default interest rates, late fees and

17   presently unsupported collection costs relating to each of the purported Secured Lenders' Notes,

18   the unpaid balance and non-default interest due on each of the three Notes, respectively, as of

19   April 30, 2010, is approximately: (a) $5,744,626.84 on the WTA Note; (b) $3,461,691.57 on the

20   Dom Note; and (c) $3,121,896.68 on the iEntertainment Note.

21       21.      Notably, the difference between the amounts claimed by the purported Secured

22   Lenders and the amounts due absent default interest and late fees is $1,920,620.70 and the

23   collections costs sought total $628,137.61. Thus, the interest rate, late fee and collection cost

24   dispute has an aggregate value of $2,548,758.31. The aggregate difference for just the WTA and

25   DOM Notes is $2,093,389.

26       22.      While NBN disputes the iEntertainment Note in its entirety, as well as WTA's and

1    Dom's entitlement to default interest, late fees and collection costs, NBN does not dispute the

2    distribution to WTA and Dom of their secured claims at non-default interest, for a total of

3    $9,206,317.

4    **B. The iEntertainment Transactions**

5    23.    The iEntertainment Note was the ultimate result of a series of transactions between

6    Escom and iEntertainment. On February 3, 2006, Escom entered into an agreement with

7    iEntertainment granting iEntertainment exclusive and broad based linking and marketing rights

8    with respect to sex.com (the "Web Linking Agreement"). Under the Web Linking Agreement,

9    which had a four year term, Escom was entitled to only 10% of the sales revenue generated by

10    iEntertainment. See Baldauf Declaration, Ex. G.

11    24.    On September 18, 2006, iEntertainment and Escom entered into an Agreement to

12    Suspend Linking Rights, pursuant to which iEntertainment agreed to suspend its exclusive rights

13    for 6 months in order to license use and control of sex.com to Playboy.com for that six month

14    period. In exchange for agreeing to suspend its linking rights, iEntertainment was to receive 25%

15    of all revenue Escom received from Playboy.com pursuant to the six month license agreement to

16    Playboy. See Baldauf Declaration, Ex. H.

17    25.    Notably, under the Playboy License Agreement, Baldauf Declaration, Ex. I, Escom

18    was entitled to 70% of the monthly "Net Revenue," as defined therein, that Playboy.com

19    generated from its use of and liking with sex.com.

20    26.    Playboy.com did not extend its license beyond the initial six months, and

21    iEntertainment's rights under the Web Linking Agreement resumed in April 2007.

22    27.    On August 1, 2007, purportedly wishing to regain full control of sex.com, Escom

23    entered into an Agreement to Waive Linking Rights, pursuant to which iEntertainment agreed to

24    waive its linking rights for the remainder of the term in exchange for a $2.5 million "buy out".

25    As set forth in the Agreement to Waive Linking Rights, because Escom did not then have

26    sufficient capital to pay iEntertainment the Buyout Fee, iEntertainment agreed to accept payment

1   in the form of a secured promissory note.  See Baldauf Declaration Ex. J.

2       28.        WTA is one of the three managers of Escom.  As indicated on the Involuntary

3   Bankruptcy Petition, Michael Mann ("Mann") is the Chairman of WTA.

4       29.        As set forth in Dom's Motion to Dismiss Involuntary Bankruptcy Petition, "WTA

5   manages Escom.  Escom's only employee and Chief Executive Officer, Del Anthony

6   ("Anthony")(*sic*), reports to and received instructions from WTA's Chairman, Mann." (Dkt. No.

7   3, p. 4).

8       30.        Mann also controls iEntertainment.  Mann signed the Involuntary Bankruptcy

9   Petition as Chairman of iEntertainment as well.  iEntertainment's corporate filings with the

10  Nevada Department of State identify Mann as President, Secretary, Treasurer and Director of

11  iEntertainment. See Baldauf Declaration, at 5.

12      31.        The Escom Operating Agreement, Baldauf Exhibit C, to which NBN is a

13  signatory, acknowledges in Section 5.05 that iEntertainment is an "affiliate" of WTA.  Section

14  5.05 also includes a specific acknowledgement by the Members of Escom that Escom entered into

15  the Web Linking Agreement and Agreement to Waive Linking Rights with iEntertainment.

16  Notably, Section 5.05, which is titled "Contracts with Affiliated Persons," also makes explicit that

17  Escom, with the approval of the Managers, could enter into agreements with "any Member,

18  Manager or Affiliated Person," "<u>provided</u> in each case the amounts payable thereunder are

19  <u>reasonably comparable</u> to those which would be payable to unaffiliated Persons. . ."

20      32.        As set forth in the accompanying Declaration of Gabriel Fried, the amounts

21  payable to iEntertainment under the Web Linking Agreement and Agreement to Waive Linking

22  Rights were not "reasonably comparable" to what an unaffiliated person could expect to receive

23  under similar agreements.[4]  Specifically, (a) Escom could have achieved a higher commission

24  payment, most likely a minimum of 20-25% from any number of providers of similar services in

25

26  _____

[4] The opinions of Gabriel Fried are being offered at this point to apprise the Court of what NBN intends to establish, once adequate discovery has been obtained, with respect to the iEntertainment transactions.

1   the business; (b) Escom did not have to provide exclusivity to iEntertainment in exchange either

2   for its services or for its commission structure; (c) iEntertainment was under no obligation to

3   perform as part the exclusivity it was able to secure; (d) iEntertainment therefore acquired an

4   asset of value without any consideration; and (e) there is no audit provision in the agreement,

5   permitting Escom to audit its licensee.   See accompanying Declaration of Gabriel Fried, filed

6   contemporaneously herewith

### III.  ARGUMENT

**A.  The Secured Lenders Are Not Entitled to the Sale Proceeds Unless and Until Their
Claims are Proven to be Recoverable**

10   33.        NBN objects to the amount of the WTA and DOM secured claims, and objects not

11   only to the amount of iEntertainment's purported secured claim, but intends to demonstrate that

12   iEntertainment's claim should not be allowed.

13   34.        NBN's objection, as a creditor and party in interest, precludes WTA, DOM and

14   iEntertainment from simply agreeing amongst themselves as to the amount and allowability of

15   their respective claims.  Pursuant to 11 U.S.C. § 502(a), once an objecting party submits

16   sufficient evidence to place the claimant's entitlement at issue, the burden of going forward with

17   the evidence to sustain the claim shifts to the claimant. *In re Harrison*, 987 F.2d 677 (10th Cir.

18   1993). The objecting party is not required to disprove the claim. *In re Kahn*, 114 B.R. 40 (Bankr.

19   S.D. N.Y. 1990). It is the claimant that must establish by a preponderance of the evidence that its

20   claim should be allowed. *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 97 B.R. 420,

21   424 (Bankr. N.D. Ill. 1989) (claimant bears burden of persuasion by preponderance of evidence);

22   *In re Ousley*, 92 B.R. 278 (S.D. Ohio 1988); *In re Twinton Properties Partnership*, 44 B.R. 420

23   (Bankr. Tenn. 1984).

24   35.        Here, in addition to seeking recovery of default interest and late fees which this

25   court should not allow, *see infra*, the purported Secured Lenders assert "necessary" collection

26   costs which collectively *exceed over $620,000*.  No evidence supporting these purported costs or

1   their purported necessity has been disclosed.

2       36.    These collection costs are not recoverable unless and until they are proven to have

3   been necessary. *See In re Dalessio*, 74 B.R. 721, 723-4 (9th Cir. B.A.P. 1987) (A creditor should

4   not "be given a blank check to incur fees and costs which will automatically be reimbursed out of

5   its collateral."); *see also In re Miracle Enterprises, Inc.*, 57 B.R. 133, 136 (Bankr. D.R.I. 1986) (It

6   is "inherently unreasonable to ask a debtor to reimburse attorneys' fees incurred by a creditor that

7   are not cost justified ... or necessary to preservation of the creditor's interest."); *.cf. SNTL Corp.*

8   *v. Centre Ins. Co.*, 571 F. 3d 826, 845-46 (9th Cir. 2009) (Court to determine entitlement to

9   attorneys fees and costs under relevant contracts or state law).

10       37.    Particularly where, as here, the purported Secured Lenders are also Managers of

11   the Debtor from who collection is sought, the necessity of significant collection costs – as

12   opposed to unrecoverable costs incurred as a result of in-fighting amongst Managers of the

13   Debtor – is arguably, on its fact, inherently unreasonable.  Indeed, the lion's share of the

14   collection costs currently sought ($490,804.38), were purportedly accrued by Dom, but as Dom's

15   own Motion to Dismiss Involuntary Bankruptcy Petition (Dkt. No. 3) acknowledges, these costs

16   were accrued primarily due to Dom's battle with WTA over the proper means of selling Escom's

17   assets, which is a dispute between the managers of Escom for control over the liquidation process,

18   and not costs incurred by DOM enforcing rights in a dispute with the Debtor.

19       38.    Of course, until those costs are documented, it is impossible to identify what

20   portion, if any, should be part of the allowed claims.

21

22   **B.  Default Interest Rates and Late Fees Should Not be Allowed For Secured Lenders
That Control the Debtor**

23       39.    Collectively, the default interest rates and late payments on the WTA Note, the

24   Dom Note, and the iEntertainment Note amount to approximately $1.9 million in additional fees

25   claimed by the purported Secured Lenders.

26       40.    In *General Electric Capital Corp. v. Future Media Productions, Inc.*, 547 F.3d 956

1   (9th Cir. 2008), the Ninth Circuit held that unlike the "per se" rule against payment of default

2   interest rates to oversecured creditors as part of a Chapter 11 plan, there was nothing in the

3   Bankruptcy Code to prevent an oversecured creditor from collecting interest at a default rate

4   where the debtor was paying creditor's claims out of the proceeds of a Section 363 sale of assets.

5   However, the Ninth Circuit, adopting the rule followed by the majority of federal courts, held a

6   contracted rate of default creates a presumption of allowability, but that presumption can be

7   rebutted. *Id.* at 961.

8       41.       Thus, the Ninth Circuit in *General Electric* made clear a Bankruptcy Court can be

9   guided by equitable considerations, and when necessary, rebut the presumption of a creditor's

10  entitlement to default interest. *Id.* (citing with approval *In re Laymon*, 958 F.2d 72, 75 (5th

11  Cir.1992) (holding "that when an oversecured creditor's claim arises from a contract, the contract

12  provides the rate of post-petition interest," subject to examination of "the equities involved in

13  [the] bankruptcy proceeding"), cert. den., 506 U.S. 917, 113 S.Ct. 328, 121 L.Ed.2d 247 (1992);

14  *In re Terry Ltd. P'ship*, 27 F.3d 241, 243 (7th Cir.1994) (noting the general rule that there is a

15  "presumption in favor of the contract rate subject to rebuttal based on equitable considerations").

16      42.       Here, the purported Secured Lenders status as controlling insiders of the Debtor

17  rebuts the presumption of entitlement to default interest. Where the very individuals responsible

18  for deciding whether the Notes defaulted would benefit from that default, the equities strongly

19  weigh against recovery of default interest. Generally, a Debtor owes a fiduciary duty to

20  maximize recovery for all creditors. Here, the Debtor and its insiders are doing just the opposite

21  – maximizing their own recovery to the detriment of non-controlling creditors. Of course, the

22  Debtor could maximize returns if it confirmed a liquidating plan, cured defaults, reinstated the

23  notes, and paid notes at contract rates. That would push value down to other creditors. Instead,

24  hoping to avoid an outcome that may reduce their take away by even a penny, the insiders seek to

25  sidestep their duties to the Debtor's creditors through their purported "Settlement Agreement"

26  and this Sale Procedures Motion. Thus, in this instance, "the equities involved the bankruptcy

1  proceeding," *In re Laymon*, 958 F.2d at 75, start with understanding that controlling insiders are

2  paying themselves and then intend to dismiss the case so that no one else gets paid anything.

3      43.    A debtor truly concerned with the recovery for the estate would in fact propose a

4  plan under which the notes are reinstated, cured, and paid in full at the non-default rate. *See e.g.,*

5  *In re Sylmar Plaza, L.P.*, 314 F. 3d 1070, 1075 (9th Cir. 2002), *cert denied* 2003 U. S. Lexis 3748

6  (U.S., May 19, 2003),and cases cited therein.  Just as the better recovery for an estate selling real

7  property is pursuant to a plan, under which payment of state transfer taxes can be avoided, *see*

8  *Florida Dept. of Rev. v. Picadilly*, 128 S. Ct. 2326 (2008), a better recovery for the estate here is

9  one where the Debtor avoids payment of default fees and late penalties.

10      44.    The approximate $1.9 million in default penalties and late fees[5] is padding the

11  pockets of the very individuals who placed the Debtor into bankruptcy at the expense of

12  unsecured creditors.  The equitable considerations Bankruptcy Court's have found relevant in

13  deciding whether to award default interest at the contract rate include situations where

14  "application of the statutory interest rate would cause direct harm to the unsecured creditors."

15  *See Urban Communicators PCS Ltd. Partnership v. Gabriel Capital, L.P.*, 394 B.R. 325, 338

16  (S.D.N.Y. 2008).  Here, based on the sale price and the amount claimed by the purported Secured

17  Lenders, and depending on whether the iEntertainment claim is allowed, the $1.9 (or $1.5

18  excluding iEntertainment) million in default penalties may well determine whether the unsecured

19  creditors recover anything.

20  **C. The iEntertainment Claim Should Be Disallowed**

21      45.    Escom entered into a transaction with iEntertainment which provided

22  iEntertainment with essentially 90% of the value of sex.com.  Incredibly, in exchange for these

23  valuable rights, iEntertainment paid nothing, and was not obligated under the Web Linking

24  Agreement to do anything.  In the event that iEntertainment received revenue, it was required to

25  _____

26  [5] The $ 1.9 million includes iEntertainment's default interest and late fees. If you exclude the iEntertainment Note, which NBN contends should be disallowed, the default interest and late fees from the WTA Note and Dom Note alone is about $1.5 million.

1    pay 10% of its revenue to Escom.  But the Linking Agreement did not require iEntertainment to

2    generate revenue, had no penalty or termination clause for failure to generate any minimum

3    income, and had no audit rights to confirm either its operations or its revenue upon which

4    payments to Escom were to be calculated.  In fact, iEntertainment did not generate *any revenue*

5    for Escom during the period that it operated under the Web Linking Agreement after the end of

6    the Playboy license.  Notwithstanding its failure to generate any revenue in and after April 2007,

7    in August 2007 Escom paid iEntertainment $2.5 million (in the form of a secured promissory

8    note) to "buy back" its rights under the Web Linking Agreement.  In short, it was the ultimate

9    sweetheart deal providing all benefits to one party, controlled by Mann, to the detriment of the

10   Debtor. Contrary to the representations made to NBN, the Web Linking Agreement was overly

11   advantageous to iEntertainment and did not reflect commercially reasonable, arm's length market

12   terms.  See Baldauf Declaration, at 5, Fried Declaration, Ex. A.

13        46.        There is no commercially reasonable explanation for why Escom, controlled by

14   Mann, even needed to license these rights to another entity, also controlled by Mann.  The only

15   plausible explanation for this self-dealing is that it was a means of transferring a significant

16   portion of the value of Escom to Mann himself.  Escom, controlled by Mann, then agreed to pay

17   iEntertainment, also controlled by Mann, $2.5 million to give these rights back.

18        47.        A debtor actually concerned with protecting the interests of the estate would have

19   every reason, and multiple grounds, to challenge iEntertainment's rights to recovery on these

20   transactions.  But as the Debtor is presently controlled by the very insiders who benefit from this

21   self-dealing, it is left to NBN do so.

22        48.        Although purportedly approved and authorized, these transactions were not

23   permissible under the Operating Agreement, which only sanctioned contracts with affiliates that

24   are "reasonably comparable" to contracts with non-affiliated entities.

25        49.        Further, the iEntertainment transactions are a clear example of corporate waste and

26   are therefore void. *In re Infousa, Inc.*,  2007 WL 3325921, 28 (Del.Ch. 2007) (holding a

1   transaction to constitute waste where "no reasonable person could deem the received

2   consideration adequate," and finding a valid waste claim with respect to related-party

3   transactions, where board of directors allowed director to extract value from the company by

4   selling his own assets to the corporation at inequitable prices).  Instead of permitting Escom to

5   generate these revenues for itself, Mann usurped them for his other enterprise.

6        50.     While NBN acknowledged the iEntertainment transactions in the Operating

7   Agreement, NBN in fact understood the managers of Escom to be representing that these

8   affiliated transactions were nonetheless fair market transactions.  NBN has come to understand,

9   after acknowledging the deal, that these were not fair market transactions, and that the default on

10   the iEntertainment Note resulting from these transactions ultimately facilitated the involuntary

11   petition, through which Mann's entities – IEntertainment and WTA - ultimately profit.  See

12   Baldauf Declaration, at 5.

13        51.     Again, in consummating the iEntertainment transactions, WTA, as a Manager of

14   the Debtor, owed a fiduciary duty to NBN as a Member, which duties were breached in approving

15   these self-dealing transactions that were harmful to Escom.  *Cf. eBay Domestic Holdings, Inc. v.*

16   *Newmark*, 2010 WL 3516473, at * 29 (Del.Ch. 2010) (holding that even if interested directors of

17   Craigslist, Jim and Craig, engaged in conduct that "did not violate a technical provision of the

18   Shareholders' Agreement," they owed fiduciary duties to eBay as a minority shareholder, and as

19   fiduciaries, "Jim and Craig were bound not to approve an interested transaction unless that

20   transaction was entirely fair to craigslist and to eBay.").

21        52.     For all these reasons, iEntertainment's claim which is based entirely on these

22   improper transactions, must be disallowed.

23   **D.  Alternatively, the iEntertainment Claim Should be Equitably Subordinated**

24        53.     In order to exercise the power of equitable subordination, the bankruptcy court

25   must find that: (1) the creditor engaged in some type of inequitable conduct or fraud, (2) such

26   conduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair

1  advantage on the creditor, and (3) equitable subordination of the claim must not be inconsistent

2  with the provisions of the Bankruptcy Code. *U.S. v. Noland,* 517 U.S. 535, 538-39, 116 S.Ct.

3  1524, 134 L.Ed.2d 748 (1996); *Merrimac Paper Co., Inc. v. Harrison (In re Merrimac Paper Co.,*

4  *Inc.),* 420 F.3d 53, 59 (1st Cir.2005).  Here, the requirements are clearly met.

5       54.       Notably, "Claims arising from dealings between a debtor and an insider are

6  rigorously scrutinized by the courts." *604 Columbus Ave.,* 968 F.2d at 1360 ( *quoting In re*

7  *Fabricators, Inc.,* 926 F.2d 1458, 1465 (5th Cir.1991)). While "fraud or misrepresentation are the

8  most frequent justifications for equitable subordination of the noninsider" something less than

9  actual fraud is sufficient when looking at the claims of an insider. *Id.* Substantial misconduct

10  involving moral turpitude or a breach or misrepresentation where other creditors were deceived to

11  their damage or gross misconduct amounting to overreaching is sufficient. *Id.*

12       55.       Where, as here, a creditor and an insider of the Debtor manipulated the Debtor for

13  its own ends, the claims of that creditor – iEntertainment – are properly subordinated. *See Matter*

14  *of Century Glove, Inc.,* 151 B.R. 327 (Bankr. D.Del. 1993) (debtor in possession stated claim for

15  equitable subordination against one of its former officers and a creditor, alleging that creditor and

16  officer conspired to control debtor for their own benefit to detriment of debtor's unsecured

17  creditors).

18       56.       Accordingly, for the reasons set forth above, NBN respectfully requests that the

19  Court order that all sale proceeds, after  payment of the costs of the sale and any undisputed

20  portion of the Secured Lenders' claims, be deposited into an interest bearing escrow account, with

21  any further distribution to be made only upon further order of this Court, and that the Court

22  schedule a further hearing on this motion in order to provide an opportunity for all parties to

23  conduct necessary discovery and fully brief the issues respecting the disputed portion of the

24  Secured Lenders' claims.

25  //

26  //

1  Dated: October 26, 2010

2

3

Daniel G. Gurfein
James Regan
SATTERLEE STEPHENS BURKE & BURKE LLP
230 Park Avenue
New York, NY 10169

4

And

5

6

7

Peter J. Gurfein
Michael I. Gottfried
LANDAU GOTTFRIED & BERGER LLP
1801 Century Park East, Suite 1460
Los Angeles, CA 90067

8

9

10

By  /s/ _____

11

Attorneys for Nuthin' But Net, LLC

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

| In re:                      | CHAPTER 11                          |
|                             |                                     |
|          ESCOM, LLC         | CASE NUMBER 1:10-bk-13001-GM        |
|                  Debtor(s). |                                     |

## PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
Landau Gottfried & Berger LLP
1801 Century Park East, Suite 1460
Los Angeles, CA 90067

A true and correct copy of the foregoing document described
**OPPOSITION TO MOTION FOR ORDER (1) AUTHORIZING DEBTOR TO SELL ASSETS FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES, (II) APPROVING ASSET PURCHASE AGREEMENT WITH SUCCESSFUL BIDDER CLOVER HOLDINGS LIMITED, (III) AUTHORIZING PAYMENT OF SALE COMMISSIONS FROM SALE PROCEEDS, AND (IV) GRANTING RELATED RELIEF**
will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On ___10/26/2010_____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒   Service information continued on attached page

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL(indicate method for each person or entity served):**
On ___10/26/2010_____, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be</u> completed no later than 24 hours after the document is filed.
**By U.S. MAIL**
Honorable Geraldine Mund
Courtroom 303
21041 Burbank Blvd.
Woodland Hills, CA 91367

☒   Service information continued on attached page

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL (indicate method for each person or entity served):** Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on_____,  I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge <u>will be</u> completed no later than 24 hours after the document is filed.

☐   Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| 10/26/2010 | Christopher R. Scott |  |
|------------|----------------------|--|
| Date       | Type Name            | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*
**3.1**                                                                 **F 9013-**

| | |
|---|---|
| In re:<br><br>      ESCOM, LLC<br><br>Debtor(s). | CHAPTER 11<br><br>CASE NUMBER 1:10-bk-13001-GM |

## I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")

Jeffrey W Dulberg on behalf of Debtor Escom LLC
jdulberg@pszj law.com

John W Kim on behalf of Creditor DOM Partners LLC
jkim@nossaman.com

Susan I Montgomery on behalf of Interested Party Courtesy NEF
susan@simontgomerylaw.com

S Margaux Ross on behalf of U.S. Trustee United States Trustee (SV)
margaux.ross@usdoj.gov

United States Trustee (SV)
ustpregionl6.wh.ecf@usdoj.gov

## II. TO BE SERVED BY U.S. MAIL

**Office of the United States Trustee**
Margaux Ross
21051 Warner Ctr Ln, Ste 115
Woodland Hills, CA 91367
margaux.ross@usdoj.gov

**Debtor**
Escom LLC
Post Office Box 1410 Agoura
Hills, CA 91376 Attn: Del
Anthony del@escomllc.com

Del Polikretis
PO Box 1175
Agoura Hills, CA 91376
del@escomllc.com

DOM Partners, LLC
2050 Center Avenue Suite 600
Fort Lee, NJ 07024

DOM Partners, LLC
300B Lake Street
Ramsey, NJ 07446

| In re:<br><br>         ESCOM, LLC<br><br>                                    Debtor(s). | CHAPTER 11<br><br>CASE NUMBER 1:10-bk-13001-GM |
| --- | --- |

**Counsel for Nothin' But Net, LLC**
Daniel G. Gurfein
Satterlee Stephens Burke & Burke LLP 230
Park Avenue, Suite 1130 New York, NY 10169
Tel: (212) 818-9200/Fax: (212) 818-9606
dgurfein@ssbb.com

**Counsel for Nothin' But Net, LLC**
Peter J. Gurfein
Landau Gottfried & Berger, LLP
1801 Century Park East, Suite 1460
Los Angeles, CA 90067
Tel: (310) 557-0050/Fax: (310) 557-0056
pgurfein@lgbfirm.com

Nuthin' But Net, LLC
210 Crossways Park West
Woodbury, NY 11797

**Counsel for DOM Partners LLC** Alan
Nisselson/Scott Matthews Windels Marx Lane &
Mittendorf, LLP
156 West 56th St.
New York, NY 10019
Tel: (212) 237-1000/Fax: (212) 262-1215
smatthews@windelsmarx.com
anisselson@windelsmarx.com

**Counsel for Dom Partners LLC**
Allan H. Ickowitz/John Kim Nossaman LLP
445 So. Figueroa Street, 31st Floor
Los Angeles, CA 90071
Tel: (213) 612-7800/Fax: (213) 612-7801
aickowitz@nossaman.com
jkim@nossaman.com

**Attorneys for Petitioning Creditors Washington Technology Associates, LLC,
iEntertainment, Inc., and AccountingMatters.comLLC**

Susan I. Montgomery, Esq.
1925 Century Park East, Suite 2000
Los Angeles, CA 90067
Tel: (310) 556-8900/Fax: (310) 556-8905
susan@susanmontgomerylaw.com

Washington Technology Associates
9812 Falls Road, #114-331
Potomac, MD 20854

| In re:<br><br>      ESCOM, LLC<br><br>                      Debtor(s). | CHAPTER 11<br><br>CASE NUMBER 1:10-bk-13001-GM |
| --- | --- |

**Attorneys for Petitioning Creditors Washington Technology Associates, LLC,**
**iEntertainment, Inc., and AccountingMatters.comLLC**
Lawrence F. Morrison, Esq.
Meister Seelig & Fein LLP
Two Grand Central Tower
140 East 45th St., 19th Floor
New York, NY 10017
Tel: (212) 655-3582/Fax: (646) 539-3682
lfm@msf-law.com

**Creditors or Parties in Interest**
i95 Invesment Group
60 Wells Ave., Suite 100
Newton, MA 02459
Attn: Corey Bialow
Tel: (617) 928-9423/Fax: (617) 964-5318
cbialow@bialow.com

iEntertainment, Inc.
9812 Falls Road, #114-331
Potomac, MD 20854

**Creditors or Parties in Interest**
Domain Name Acquisition Group,
LLC 188 Needham St., Suite 255
Newton, MA 02464
Attn: Andrew Miller
Tel: (617) 236-0806/Fax: (617)
927-1199
amiller@internetrealestate.com

Accounting Matters
600 Jefferson St., #320 Rockville,
MD 20852

Taxing Authorities
Employment Development Dept.
Bankruptcy Group Post Office Box
826880 Sacramento, CA 94280

Franchise Tax Board Attention:
Bankruptcy Post Office Box 2952
Sacramento, CA 95812

Franchise Tax Board
Post Office Box 942857
Sacramento, CA 94257-0631

Internal Revenue Service
Post Office Box 21126
Philadelphia, PA 19114

| In re: | CHAPTER 11 |
| --- | --- |
| ESCOM, LLC | CASE NUMBER 1:10-bk-13001-GM |
| Debtor(s). | |

State Board of Equalization
Attn: Special Procedures Section
Post Office Box 942879
Sacramento, CA 95814