Daniel G. Gurfein (*pro hac* application pending)
James Regan (*pro hac* application pending)
SATTERLEE STEPHENS BURKE & BURKE LLP
230 Park Avenue
New York, New York 10169
Phone: (212) 818-9200
Facsimile: (212) 818-9606
Email: dgurfein@ssbb.com
Attorneys for Nuthin' But Net, LLC

Peter J. Gurfein (State Bar No. 127173)
Micahel I. Gottfried (State Bar No. 146689)
LANDAU GOTTFRIED & BERGER LLP
Michael1801 Century Park East, Suite 1460
Los Angeles, CA 90067
Phone: (310) 557-0050
Facsimile: (310) 557-0056
Email: pgurfein@lgbfirm.com
Local Counsel for Nuthin' But Net, LLC

UNITED STATES BANKRUPTCY COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re:<br><br>ESCOM, LLC,<br><br>        Debtor. | Bk. No. 1:10-bk-13001-GM<br><br>Chapter 11<br><br>**DECLARATION OF GABRIEL FRIED IN SUPPORT OF OPPOSITION TO MOTION FOR ORDER (I) AUTHORIZING DEBTOR TO SELL ASSETS FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES, (II) APPROVING ASSET PURCHASE AGREEMENT WITH SUCCESSFUL BIDDER CLOVER HOLDINGS LIMITED, (III) AUTHORIZING PAYMENT OF SALE COMMISSIONS FROM SALE PROCEEDS, AND (IV) GRANTING RELATED RELIEF**<br><br>Hearing Scheduled:<br>Date:  October 27, 2010<br>Time:  10:00 a.m.<br>Place:  Courtroom 303<br>          21041 Burbank Blvd.<br>          Woodland Hills, CA 91367 |

# DECLARATION OF GABRIEL FRIED

1. I am the founder and managing principal of Streambank LLC, a leading advisory firm specializing in the valuation, disposition and management of intangible assets. Attached as **Exhibit A** hereto is my curriculum vitae.

2. I have been retained by Nuthin' But Net, LLC ("NBN") to opine on the commercial reasonableness or "market" nature of the Web Site Linking Agreement between Escom, LLC and iEntertainment, Inc. I am being compensated at the rate of $500/hour, with a $2500 non-refundable retainer.

3. Attached hereto as **Exhibit B** is letter directed to NBN, care of its counsel, detailing my opinion as to the commercial reasonableness or "market" nature of the Web Site Linking Agreement. I have personal knowledge of the matters set forth therein, and if called upon to do so, would competently testify as to them.

4. As set forth more fully in my attached opinion letter, the Web Site Linking Agreement is overly advantageous to iEntertainment and does not reflect commercially reasonable, arm's length market terms.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 26th day of October, 2010 at 2 PM

_____
GABRIEL FRIED

# Exhibit A



**Gabriel Fried** is an intangible asset transaction and valuation expert. As founder and managing principal of Streambank LLC, Mr. Fried has built a consulting practice focused on the valuation, disposition and management of intangible assets. He has advised numerous high profile clients on the sale and license of trademarks, domain names, patents and proprietary technologies. Mr. Fried has also served as an expert witness in matters concerning the value and disposition methods of IP assets associated with bankruptcy. His areas of expertise include automotive, retail, consumer products, manufacturing, e-commerce and high technology. Gabe earned a BS with honors in economics from the University of Massachusetts, Amherst and a master's in economics from the University of Illinois. He has spoken at national and regional Turnaround Management Association meetings on the issues of brand value and the role of brand management in corporate turnarounds, and authored articles on strategies for IP monetization. He is frequently quoted in the press as an expert on matters of intangible asset value. Mr. Fried is also a member of the Turnaround Management Association and the American Bankruptcy Institute.

**Valuation Experience**

- **Furniture** patents, trademarks and other intangible assets. Appraisal for new financing.
- **Women's Apparel Retailer** intangible asset portfolio including e-commerce operations. Appraisal for debt refinancing.
- **Intimates Retailer** intangible asset portfolio including store name, product brands, catalog/internet business. Appraisal for term loan.
- **Motorcycle Company** intangible assets. Valuation to assess liquidation options for lender.
- **Fashion Designer** trademarks, e-commerce, and license portfolio. Review of another appraisal as part of annual review for term lenders.
- **Publicly Traded Retailer** trademarks and e-commerce operations. Appraisal for asset based lending facility.
- **Children's Apparel Retailer** trademark and copyright portfolio. Appraisal for asset based lending facility.
- **Plumbing Fixtures Manufacturer** patents, trademarks, and designs. Appraisal for asset based lending facility in support of merger.
- **Patented Textile Manufacturer** trademarks and patents. Appraisal for acquisition.
- **Denim** trademarks. Appraisal for asset based lending facility.
- **Footwear** trademark portfolio. Appraisal for liquidation value on behalf of minority shareholder.



**Liquidation Experience:**

- Whitehall Jewelers. Liquidation of trademarks, URLs, and customer data.
- KB Toys: Liquidation of trademarks and URLs.
- Circuit City: Liquidation of trademarks, URLs, toll-free numbers, customer data.
- Goody's Family Clothing: Liquidation of trademarks, URLs, customer data, and private label brands.
- Mervyn's LLC: Liquidation of portfolio of private label brands and store name.
- Dan River (textiles): triage of intangible asset portfolio including product designs, trademarks and license agreements.
- Collins & Aikman: Liquidation of 900+ patents for automotive parts, including chemistry, materials handling, manufacturing process and part design.
- Tower Records: Liquidation of e-commerce business and trademark portfolio.

**Collateral Monitoring:** An asset-based lender had provided a term loan secured against the intangible assets of a toy and game manufacturer. As planned sales failed to materialize, Mr. Fried provided collateral monitoring services and an updated liquidation analysis for the lender.

**Patent Portfolio Valuation:** A publicly traded operator of directory assistance call centers hired a national turnaround firm to help secure additional liquidity and improve their strategic positioning. Mr. Fried performed the necessary valuation of the client's patent portfolio with the purpose of informing the turnaround team about IP-based fundraising options and enhancing the comfort level of new preferred stockholders.

**Expert Witness:** Mr. Fried takes on expert witness assignments for which his knowledge of intangible assets, valuation, and the bankruptcy process can prove valuable for his clients.

> **Compuware Corp. v. Innovatec Communications, LLC et. al.** Mr. Fried was retained by the defendant, an early-stage venture-backed firm developing electricity metering and AMR capability in a lawsuit filed by an unsecured creditor after the company had liquidated. At issue were both the value of the IP assets of the debtor at the time of the liquidation and whether or not the liquidation process was conducted in a manner designed to maximize recovery for the secured and unsecured creditors. Mr. Fried's testimony on behalf of the debtor party was instrumental in mitigating claims for damages.
>
> **In re Levitz (Bankruptcy).** Mr. Fried prepared an expert report on the likely recovery value for the Levitz and Seaman's names under two scenarios. His report was presented during a dispute between the Unsecured Creditor's Committee and the Bondholders Committee on the issue of value.

**streambank**

**Prior Employment:**

**XRoads Solutions Group, LLC**, a California based turnaround and crisis management firm. Mr. Fried worked on projects including investment banking for an Internet based business, valuation expert for a retail bankruptcy, and other valuation projects.

**The Fried Group** and **IP, Recovery, Inc.**, which he founded/co-founded, where his list of clients included: The Ozer Group; Buxbaum Group; The Men's Wearhouse, Inc., Woodworkers Warehouse; the estate of Montgomery Ward (GE Capital); Service Merchandise; Jacobson's; Mr. Rags; Hey! Inc.; and Ames Discount Department Stores. In addition, he provided quantitative analysis of IP transactions, supported complex litigations and provided collateral valuations on IP assets for asset-based loans and structured transactions for the sale of surplus IP assets.

**Gordon Brothers Group**, where Mr. Fried was responsible for sourcing technology assets from distressed situations, creating brokerage agreements with companies and creditors, marketing assets and soliciting buyers.

**Toysmart.com, LLC**, an Internet retailer of children's toys, where Mr. Fried gained retail experience, working with senior management to measure, analyze and report on key operational areas of the company, including marketing effectiveness, website usability and efficiency, and fulfillment operations. During his time at Toysmart.com Mr. Fried authored and co-authored numerous pieces on internet marketing, marketing measurement, performance improvement and other e-commerce topics. Mr. Fried's final role at Toysmart.com was the supervision of the liquidation of the company's intangible assets.

**Articles:**

IP: A Reason To Exist
    (Mergers & Acquisitions June 2010)
Playing Your IP Hand: Maximizing Value from the Cards You're Dealt
    (ABF Journal, Summer 2008)

**Education:**

BA with honors (Economics), University of MA, Amherst    1995

MS (Economics), University of IL, Champaign-Urbana    1997

Streambank LLC                                    97 Chapel Street, Needham, MA 02492

# Exhibit B



Gabriel Fried
Managing Principal
Streambank LLC
97 Chapel Street
Needham, MA 02492

October 23, 2010

Nothin' But Net, LLC
c/o Daniel Gurfein
Satterlee, Stephens, Burke & Burke LLP
230 Park Avenue
New York, NY 10169

RE: Escom

Mr. Gurfein,

    The following reflects my opinion with respect to the commercial reasonableness or "market" nature of the Web Site Linking Agreement (attached) between Escom LLC (Host) and iEntertainment, Inc (Weblive).

    I am qualified to render this expert opinion based on my experience drafting and reviewing several dozen e-commerce, web linking, and intangible asset licensing agreements as part of my professional career. I am the founder and managing principal of Streambank LLC, a leading advisory firm specializing in the valuation, disposition and management of intangible assets. Streambank has valued and sold several hundred million dollars worth of intangibles, many of which contained contracts in place that are similar in nature to the Web Site Linking Agreement. In that capacity, and in my prior roles as an independent consultant specializing in assisting clients with respect to intangible asset value and disposition, I have helped draft, evaluate, and validate numerous similar contracts.

Industry Background

    Consumer oriented internet businesses have to attract traffic and then sell the consumer a good or a service in order to monetize that traffic. The mechanisms for attracting traffic frequently include the purchase of advertising on search engines, the purchase of advertising on networks that syndicate advertisements across multiple websites, and also to engage directly with website operators through affiliate, or linking agreements.

    Web Site Linking Agreements are typically designed to accomplish a merger of capabilities with the goal of maximizing collective value, while simultaneously minimizing respective risk. The rationale for linking websites, or for embedding the content of a content provider into the website of a host, is

Escom Opinon Letter                                                                                                                p. 2

simply a matter of leveraging the host's ability to draw traffic from the internet and the provider's ability to monetize that traffic, either through direct commerce, or by through the paid placement of advertisements. In a working relationship between host and content provider, the host will invest in maintaining and growing its traffic levels while the content provider will invest in finding ways to monetize that traffic either to a greater extent, or with greater efficiency, or both.

A "commercially reasonable", "arm's-length", or "market" contract should embody the terms and conditions that provide proper consideration for each party's respective contribution, a mutual performance requirement, and a mechanism for renewal and early termination that relates specifically to performance. With respect to payments specifically, a "market" contract should reflect terms and conditions readily available to either party in a similar contract with a third party. When there are deviations from market prices those should reflect some other form of consideration.

Escom –iEntertainment Web Site Linking Agreement

   Timeline:

The parties appear to have executed the attached agreement in February 2006, with a term of 4 years. The agreement was subsequently suspended for a 6-month period in order to allow the Host to enter into a similar agreement with Playboy as a pilot (test) for a future relationship. The pilot agreement with Playboy ran its course and was not renewed or converted into a longer term contract. The suspension was lifted and the agreement was in force until July 2007 at which point it was terminated by mutual consent according to the consideration provided for in the Agreement to Waive Linking Rights.

   Mechanics:

The mechanics of the agreement are such that Weblive is to provide Host with links (images with hyperlinks, banner ads, text links) that Host is to place within the website found at sex.com. Those links will transport the user to a site hosted by Weblive for the purpose of engaging in a commercial transaction. The commercial transactions are the basis for which royalty payments will be made from Weblive to Host.

   Contribution:

Outlined in the recitals of the Web Site Linking Agreement, the parties appear to intend to utilize the web traffic present at the Host's website sex.com and the video, video chat, and other commercial services offered by Weblive in order monetize that traffic. Host's commitment includes maintenance and availability of the site, the obligation to include links to Weblive on its pages, security, and respect of consumer privacy rules, and reports of web traffic/site utilization data to Weblive.

Weblive's commitment is to remit to Host 10% of revenues it receives through the linking arrangement.  Additionally, Weblive agrees to abide by the same consumer privacy rules as the Host, and to provide a non-exclusive license to the Host for the use of Weblive's images and trademarks.

The indemnifications provisions are mutual, and the provision on Limitation of Liability (11) appears to only allow for liability in the case of breach of the confidentiality obligations or the Host's failure to host Weblive's images (passive termination) or failure to uphold Weblive's exclusivity.

Exclusivity:

The agreement provides Weblive with exclusivity relative to the services that Weblive offered at the time of the agreement (section 5). These services included webcam, streaming video, chat, and related services.

Test for Market

A test for determining the terms and conditions of the Agreement are reflective of the "market" for similar agreements of this nature would consist of asking the following question in one of two ways: first, could the participants improve their outcome by dealing with a different party, or conversely, would a different party want to participate in the agreement in question.

Exclusivity:

It is extremely common to find website operators offering links to numerous competitive websites and earning affiliate fees or commissions from all of them relating to traffic that the host site sourced for the publisher (this term is used to describe the position of Weblive in this agreement). In a non-exclusive relationship, the publisher offers consideration that the host accepts, and the host inserts one or more links to the publisher site with the understanding that to the extent these links generate revenues for the publisher the host shall be paid a commission.

In order for a publisher to gain exclusivity by matter of contract, it would typically have to offer a performance guarantee to justify locking up the host's site for the period of the contract. That performance guarantee could take the form of a minimum royalty or commission payment, or a reciprocal exclusivity that would make the host the sole source for the publisher's content. The performance guarantee could include development milestones in lieu of financial guarantees, but the milestones are typically the basis for termination if the licensee fails to make the contractually required commitment.

In the Web Site Linking Agreement there is no performance consideration given to Host for the exclusivity granted to Weblive. This structure is inconsistent with what would be expected in an arm's length contract negotiated by two parties with access to other publishers or hosts. While it is conceivable that the Agreement reflects consideration paid by Weblive to Host in the form of an above market commission rate, that appears not to be the case.

Revenue Share:

Section 2(c) states that Weblive shall pay to Host a 10% revenue share based on revenue generated by traffic originating at Host's site and engaging in commercial transactions with Weblive.

Escom Opinon Letter    p. 4

According to the tables in Exhibit 1, which are copied from various websites advertising and promoting affiliate networks for adult websites, the lowest available commission is 15% and the publishers do not require exclusivity. Commission rates frequently are as high as 40-50% and occasionally higher. Publishers also commission hosts for the lifetime spending of a customer acquired through the host site. There is no such provision or requirement in the Web Site Linking Agreement. While the commission structures presented on Exhibit 1 are current as of October 2010, many of them have not been modified for over 2 years. It appears as though these structures and rates are mature, and they were likely available to Escom at the time of the Web Site Linking Agreement. The agreement with Playboy provides additional validation to the assumption that significant percentages (20-50%) were available at that time. The agreement that Escom entered into with Playboy did grant Playboy exclusivity but provided for revenue share of at least 35%.

Audit:

There is no provision in this agreement for Host to audit Weblive's web logs or transaction records. While there are not necessarily audit provisions in other affiliate relationships, those contracts can be terminated by either party at any time. If the Host in a market affiliate agreement feels as though their counterparty is failing to uphold their end of the agreement, the Host can terminate without cost.

Conclusion

It appears as though this is not a "market" agreement, for the following reasons:

- Host (Escom) could have achieved a higher commission payment, most likely a minimum of 20-25% from any number of providers of similar services in the business.

- Host (Escom) did not have to provide exclusivity to Weblive in exchange either for its services or for its commission structure.

- Weblive was under no obligation to perform as part the exclusivity it was able to secure. Weblive therefore acquired an asset of value without any consideration.

- There is no audit provision. In an arm's length contract in which exclusivity was granted to the licensee, the licensor would have the right to audit the licensee even if at the licensor's expense.

Referring to the "market test" with respect to unrelated third parties, one would expect that publishers of adult content would willingly step into Weblive's position as they could have access to web traffic with no direct competition as a result of the exclusivity AND retain a much higher percent of the revenues than they would under a traditional "market" relationship. Conversely, it would be unlikely that a host site that would step into Escom's position because such host would (i) forego the opportunity to earn greater revenues, and (ii) limit its flexibility to adjust its offerings to host other networks offering significantly greater revenue sharing with the ability to adjust the offering on an ad hoc basis.

Escom Opinon Letter                                                                                                                          p. 5

For the foregoing reasons, the Web Site Linking Agreement is overly advantageous to Weblive (iEntertainment) and does not reflect commercially reasonable, arms' length market terms.

/s/

Gabriel Fried

Escom Opinon Letter                                                                                                                          p. 5

Escom Opinon Letter                                                                                                         p. 6


Exhibit 1

Adult Affiliate Publishers and Commission Rates

**Source:** www.adultaffiliatenetwork.com

**Adam and Eve Affiliate Network**

The Adam and Eve affiliate program pays 20% commisions on a wide ranges of adult materials. Adam and Eve has more adult toys and videos in-stock and ready to ship in their warehouse than any of their competitors! Also, Adam and Eve has exclusive merchandise that your customers can't find anywhere else.

**Commissions:** 20% Commission.
**Date Updated:** 6/3/2008


**Adam and Eve Sex Toys Store**

The Adam and Eve Sex Toys Store sells a variety of adult related products and adult sex toys including Dildos, Vibrators, Stimulators, Strap Ons, Love Dolls, Dongs and more. Adam and Eve is one of the largest providers of sexy toys online.

**Commissions:** 20% Commission.
**Date Updated:** 8/21/2008


**AdultPlatform**

AdultPlatform is adult affiliate program network for VideoBox and XMovies. AdultPlatform web sites are top rated adult video sites that convert very well. The AdultPlatform program pays 50% recurring commissions.

**Commissions:** 50% Commission.
**Date Updated:** 9/17/2008


**AEBN**

AEBN Sites allow users to watch streaming adult movies online on a payperview basis. AEBN streaming movies include several adult oriented themes including amateur, celebrities, exhibitionism, hard core and several niche adult themes.

**Commissions**: Varies.
**Date Updated**: 8/12/2010

**AEODCash**

AEODCash is the Affiliate Program of AdamEve On Demand which is a streaming video provider of high quality adult videos. AEODCash pays publishers 30% lifetime residual commissions. Join the AEODCash Affiliate Program for free and start earning residual commissions today.

**Commissions**: 30% Commission.
**Date Updated**: 7/15/2010

**CamSense**

CamSense is one of the most successful and trusted adult affiliate programs online allowing you to promote and earn commissions with adult web cams. CamSense web sites include CamContacts among others. Earn 40% lifetime commissions by promoting CamSense.

**Commissions**: 40% Commission.
**Date Updated**: 6/23/2008

**JuggCash**

JuggCash is an adult affiliate network that strives to help their affiliates earn more commissions than anybody else out there. The JuggCash affiliate program offers a variety of unique content and pays 60% recurring commissions for the life of all referrals.

**Commissions**: 60% Commission.
**Date Updated**: 3/2/2010

**MoneyTree**

The MoneyTree Web Cam Network allows web site publishers to earn a lifetime 30% revshare by providing free memberships to a variety of live web cam sites. Joining the MoneyTree Network is free.

**Commissions**: Varies.
**Date Updated**: 5/20/2010

**Video Secrets**

Video Secrets is an affiliate network offering live video chat since 1996. Video Secrets provides on-time payouts, high-quality websites and excellent affiliate support.

**Commissions**: Varies..
**Date Updated**: 7/15/2010


**XonDemand**

The XonDemand Adult Affiliate Program pays lifetime commissions on new users you refer to their Adult Video on Demand Network. XonDemand converts well by offering your visitors free movie previews daily and by giving first time customers a free account with free minutes.

**Commissions**: 25% Commission.
**Date Updated**: 5/28/2008


Source: camsense.com

You can earn up to 40% of all the revenues depending on which site you send visitors to, each 2 weeks. There is a sliding scale to reward effort and success. You'll be paid the full commission on the revenues in each 2 week payment cycle.

| Product | www.allcams.com | www.webcamlife.com | www.camcontacts.com |
|---|---|---|---|
|  | Rev Share % | Rev Share % | Rev Share % |
| Sales in excess of $50,000 / p.p* | 40% | 30% | 30% |
| Sales in excess of $15,000 / p.p* | 35% | 25% | 25% |
| Sales in excess of $7,500 / p.p* | 30% | 20% | 20% |
| Sales from > $0 / p.p * | 25% | 15% | 15% |
| * - Payment period | | | |

| In re: | CHAPTER 11 |
|---|---|
| ESCOM, LLC<br>Debtor(s). | CASE NUMBER 1:10-bk-13001-GM |

## PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
Landau Gottfried & Berger LLP
1801 Century Park East, Suite 1460
Los Angeles, CA 90067

A true and correct copy of the foregoing document described
**DECLARATION OF GABRIEL FRIED IN SUPPORT OF OPPOSITION TO MOTION FOR ORDER (1) AUTHORIZING DEBTOR TO SELL ASSETS FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES, (II) APPROVING ASSET PURCHASE AGREEMENT WITH SUCCESSFUL BIDDER CLOVER HOLDINGS LIMITED, (III) AUTHORIZING PAYMENT OF SALE COMMISSIONS FROM SALE PROCEEDS, AND (IV) GRANTING RELATED RELIEF**
will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On __10/26/2010__, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒ Service information continued on attached page

**II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served):
On __10/26/2010__, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.
**By U.S. MAIL**
Honorable Geraldine Mund
Courtroom 303
21041 Burbank Blvd.
Woodland Hills, CA 91367

☒ Service information continued on attached page

**III. SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on_____, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| 10/26/2010 | Christopher R. Scott | /s/ Christopher R. Scott |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

January 2009                                                                                                                    F 9013-
3.1

| In re:                  |           | CHAPTER 11 |
|                         |           | CASE NUMBER 1:10-bk-13001-GM |
| ESCOM, LLC              |           |            |
|                         | Debtor(s).|            |

I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")**

Jeffrey W Dulberg on behalf of Debtor Escom LLC
jdulberg@pszjlaw.com

John W Kim on behalf of Creditor DOM Partners LLC
jkim@nossaman.com

Susan I Montgomery on behalf of Interested Party Courtesy NEF
susan@simontgomerylaw.com

S Margaux Ross on behalf of U.S. Trustee United States Trustee (SV)
margaux.ross@usdoj.gov

United States Trustee (SV)
ustpregionl6.wh.ecf@usdoj.gov

II. **TO BE SERVED BY U.S. MAIL**

**Office of the United States Trustee**
Margaux Ross
21051 Warner Ctr Ln, Ste 115
Woodland Hills, CA 91367
margaux.ross@usdoj.gov

**Debtor**
Escom LLC
Post Office Box 1410 Agoura
Hills, CA 91376 Attn: Del
Anthony del@escomllc.com

Del Polikretis
PO Box 1175
Agoura Hills, CA 91376
del@escomllc.com

DOM Partners, LLC
2050 Center Avenue Suite 600
Fort Lee, NJ 07024

DOM Partners, LLC
300B Lake Street
Ramsey, NJ 07446

| In re: | CHAPTER 11 |
|---|---|
| ESCOM, LLC <div style="text-align:right">Debtor(s).</div> | CASE NUMBER 1:10-bk-13001-GM |

**Counsel for Nothin' But Net, LLC**
Daniel G. Gurfein
Satterlee Stephens Burke & Burke LLP 230
Park Avenue, Suite 1130 New York, NY 10169
Tel: (212) 818-9200/Fax: (212) 818-9606
dgurfein@ssbb.com

**Counsel for Nothin' But Net, LLC**
Peter J. Gurfein
Landau Gottfried & Berger, LLP
1801 Century Park East, Suite 1460
Los Angeles, CA 90067
Tel: (310) 557-0050/Fax: (310) 557-0056
pgurfein@lgbfirm.com

Nuthin' But Net, LLC
210 Crossways Park West
Woodbury, NY 11797


**Counsel for DOM Partners LLC** Alan
Nisselson/Scott Matthews Windels Marx Lane &
Mittendorf, LLP
156 West 56th St.
New York, NY 10019
Tel: (212) 237-1000/Fax: (212) 262-1215
smatthews@windelsmarx.com
anisselson@windelsmarx.com


**Counsel for Dom Partners LLC**
Allan H. Ickowitz/John Kim Nossaman LLP
445 So. Figueroa Street, 31St Floor
Los Angeles, CA 90071
Tel: (213) 612-7800/Fax: (213) 612-7801
aickowitz@nossaman.com
jkim@nossaman.com

**Attorneys for Petitioning Creditors Washington Technology Associates, LLC, iEntertainment, Inc., and AccountingMatters.comLLC**

Susan I. Montgomery, Esq.
1925 Century Park East, Suite 2000
Los Angeles, CA 90067
Tel: (310) 556-8900/Fax: (310) 556-8905
susan@susanmontgomerylaw.com

Washington Technology Associates
9812 Falls Road, #114-331
Potomac, MD 20854

| In re: | CHAPTER 11 |
| --- | --- |
| ESCOM, LLC<br>Debtor(s). | CASE NUMBER 1:10-bk-13001-GM |

**Attorneys for Petitioning Creditors Washington Technology Associates, LLC, iEntertainment, Inc., and AccountingMatters.comLLC**
Lawrence F. Morrison, Esq.
Meister Seelig & Fein LLP
Two Grand Central Tower
140 East 45th St., 19th Floor
New York, NY 10017
Tel: (212) 655-3582/Fax: (646) 539-3682
lfm@msf-law.com

**Creditors or Parties in Interest**
i95 Invesment Group
60 Wells Ave., Suite 100
Newton, MA 02459
Attn: Corey Bialow
Tel: (617) 928-9423/Fax: (617) 964-5318
cbialow@bialow.com

iEntertainment, Inc.
9812 Falls Road, #114-331
Potomac, MD 20854

**Creditors or Parties in Interest**
Domain Name Acquisition Group, LLC 188 Needham St., Suite 255
Newton, MA 02464
Attn: Andrew Miller
Tel: (617) 236-0806/Fax: (617) 927-1199
amiller@internetrealestate.com

Accounting Matters
600 Jefferson St., #320 Rockville, MD 20852

**Taxing Authorities**
Employment Development Dept.
Bankruptcy Group Post Office Box 826880 Sacramento, CA 94280

Franchise Tax Board Attention:
Bankruptcy Post Office Box 2952
Sacramento, CA 95812

Franchise Tax Board
Post Office Box 942857
Sacramento, CA 94257-0631

Internal Revenue Service
Post Office Box 21126
Philadelphia, PA 19114

| In re: | CHAPTER 11 |
|---|---|
| ESCOM, LLC<br>Debtor(s). | CASE NUMBER 1:10-bk-13001-GM |

State Board of Equalization
Attn: Special Procedures Section
Post Office Box 942879
Sacramento, CA 95814