SUSAN I. MONTGOMERY (State Bar No. 120667)
1925 Century Park East, Suite 2000
Los Angeles, CA 90067
Telephone: (310) 556-8900
Fax: (310) 556-8905
susan@simontgomerylaw.com

Attorneys for WASHINGTON
TECHNOLOGY ASSOCIATES, LLC
and iENTERTAINMENT, INC.

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re<br><br>ESCOM, LLC,<br><br>            Debtor. | INVOLUNTARY CHAPTER 11 PETITION<br>CASE NO.: 1:10-bk-13001-GM<br><br>**RESPONSE AND OPPOSITION OF WASHINGTON TECHNOLOGY ASSOCIATES, LLC AND iENTERTAINMENT, INC. TO NUTHIN' BUT NET'S OBJECTION TO DISTRIBUTION OF SALE PROCEEDS AND TO ITS MOTION FOR AUTHORITY TO PURSUE ESTATE CAUSES OF ACTION**<br><br>[Exhibits Referenced herein are contained in the Statement of Undisputed Facts and Supporting Exhibits filed on November 29, 2010]<br><br><u>HEARING</u><br>Date: December 22, 2010<br>Time: 10:00 a.m.<br>Place: Courtroom 303 |

///

///

///

///

**TABLE OF CONTENTS**

I. INTRODUCTION ..................................................................................................... 1

II. THE MANAGERS FULLY COMPLIED WITH ALL CORPORATE GOVERNANCE AND THE SECURITY INTERESTS GRANTED TO WTA, DOM AND iENTERTAINMENT ARE VALID AND SHOULD BE ENFORCED ........................................................................................................ 1

    A. NBN Ratified the Second Operating Agreement Upon Admission as a Member of the Company and Cannot Now Complain About the Terms of that Agreement ........................................................................... 3

    B. NBN's Claim That iEntertainment Did Not Perform Under the Agreements for Four Years is Specious ........................................................... 6

III. THE WAIVER AGREEMENT WAS NEVER SUBJECT TO THE "REASONABLY COMPARABLE" STANDARD SET FORTH IN PARA. 5.05 OF THE OPERATING AGREEMENTS AND NBN'S ATTEMPT TO HAVE THE AGREEMENT EVALUATED UNDER THAT STANDARD MUST BE REJECTED ............................................................. 7

IV. THE COMPANY'S MANAGERS, INCLUDING WTA AND DOM, DID NOT VIOLATE ANY FIDUCIARY DUTY AND THERE IS NO COLORABLE CLAIM THAT CAN AND SHOULD BE PURSUED BY NBN ....................................................................................................................... 8

V. NEITHER WTA NOR DOM ENGAGED IN ANY INEQUITABLE CONDUCT THAT WOULD JUSTIFY DENIAL OF THEIR RIGHTS UNDER THEIR SECURED NOTES ................................................................. 11

VI. CONCLUSION ....................................................................................................... 12

# **TABLE OF AUTHORITIES**

**Cases**

*Butner v. United States*, 440 U.S. 45, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979) ........................ 8

*General Electric Capital Corp v. Future Media Productions Inc.*,
   536 F.3d 969 (9th Cir. 2008)........................................................................................ 12

*Hokanson v. Petty,* 2008 WL 5169633, (Del.Ch. Dec.10, 2008) ........................................... 9

*In re BH S & B Holdings LLC*, 420 BR 112 (Bankr. S.D.N.Y. 2009) ................................... 8

*In re The Heritage Organization, LLC*, 2008 WL 5215688, 15
   (Bankr. N.D. Tex. 2008) ............................................................................................... 9

*IT Litig. Trust v. D'Aniello (In re IT Group),* 2005 WL 3050611,
   (D.Del. Nov.15, 2005) ................................................................................................... 9

*Louisiana World Exposition v. Federal Insurance Company*,
   858 F.2d 233 (5th Cir. 1988)........................................................................................... 8

*Malpiede v. Townson,* 780 A.2d 1075, 1091-93 (Del.2001) ................................................. 9

*North American Catholic Educational Programming Foundation, Inc. v. Gheewalla,*
   930 A.2d 92, ( Del.2007) ............................................................................................. 10

**Statutes**

11 U.S.C. §363............................................................................................................... 11

11 U.S.C. §506(b)........................................................................................................... 11

6 Delaware Code §18-305 ............................................................................................... 5

Section 18-1101 of the DLLCA ....................................................................................... 9

**Other Authorities**

Mark M. Maloney and Michelle L. Carter, *Asserting Breach-of-fiduciary-duty Claims in the Context of Delaware LLCs,* Am. Bankr.Inst. J., Vol. XXVIII,
No. 7, September 2009................................................................................................... 9

Washington Technology Associates, LLC ("WTA") and iEntertainment, Inc. ("iEntertainment") submit this memorandum of points and authorities in response to the brief filed by Nuthin' But Net ("NBN") in support of its Objection to the Distribution of Proceeds to the Secured Lenders,[1] and its Motion to Pursue Estate Causes of Action.

## I. INTRODUCTION

NBN's Objection to the Distribution of Proceeds must be overruled and its Motion to Pursue Estate Causes of Action must be denied because the true facts, as reflected in the documents submitted to the Court, establish that the Secured Lenders are secured, and that the Managers of the Company, including WTA and DOM Partners LLC ("DOM"), fully complied with the Operating Agreement in effect at the time of the disputed transactions. As a matter of law, the Company's managers did not violate any fiduciary duty or cause corporate waste and NBN should not be authorized to pursue such baseless claims.

## II. THE MANAGERS FULLY COMPLIED WITH ALL CORPORATE GOVERNANCE AND THE SECURITY INTERESTS GRANTED TO WTA, DOM AND iENTERTAINMENT ARE VALID AND SHOULD BE ENFORCED

At the time that the Company entered into the Web Site Linking Agreement and subsequently the Option Agreement with iEntertainment, only DOM, DNAG, and WTA were members of the Company. In addition, they were its sole managers. While iEntertainment was an acknowledged affiliate of WTA, the Web Site Linking Agreement

---

[1] All capitalized terms unless otherwise defined have the same meaning as used in WTA's brief filed on November 29, 2010 and the Statement of Undisputed Facts filed on the same date.

[2] All versions of the Operating Agreement contain the same language in ¶¶ 5.05 and 5.10. *See* Exhibits, 3, 4, 11 and 16.

[3] NBN asserts that Michael Mann, the owner of WTA and iEntertainment controls Escom. That statement is untrue and not supported by any evidence. While Michael Mann controls WTA and iEntertainment, WTA is only one of three managers who advises and consents to Escom matters requiring the approval of its managers. At the deposition of Del Anthony Polikretis, the CEO/President of Escom, taken by NBN, Mr. Polikretis testified that he reports to the managers collectively and to representatives at each of the managers – DNAG, DOM, and WTA. Decisions regarding the operations of Escom and approvals as required are made in accordance with the operating agreement which requires the approval of all of the managers. (Exhibit 22, pp. 11-12, 15-16). Moreover, every agreement between Escom and iEntertainment was approved by the

1

1    was part of the original consideration that caused WTA and its member Michael Mann to
2    make a $1,000,000 capital contribution to Escom and make a $5 million secured loan to the
3    Company.  Without the Web Site Linking Agreement, WTA's capital contribution and
4    secured loan would not have been made.  *See* Exhibit 4, page 283.  100% of the
5    managers/founders and members of the Company approved the Web Site Linking
6    Agreement and the Option Agreement.  NBN was not a member of the Company at the time
7    and cannot attempt to unwind the completed transactions, which were a fundamental part of
8    the Company's foundation.  Moreover, NBN cannot claim that the Managers breached their
9    fiduciary duty to NBN by approving the Linking Agreement when NBN was not even a
10   member at the time it was entered into.

11        The first sentence of ¶5.05 of the Operating Agreement establishes for going forward
12   purposes a general standard for the Company to enter into related party transactions.  NBN
13   contends that this sentence somehow constituted a representation to NBN (who was not
14   even a party to the Operating Agreement at the time it was executed) that the Web Site
15   Linking Agreement and the Option Agreement were approved because they met the criteria
16   for that general standard (i.e. that the terms of the agreements were reasonably comparable
17   to agreements entered into with non-affiliated persons).  NBN contends this merely because
18   the express approval of those agreements came in the sentence following the general
19   standard.  However, there is nothing in the Operating Agreement to suggest that the Web
20   Site Linking Agreement or the Option Agreement were intended to be comparable to
21   agreements with unrelated parties. In fact, the very existence of the Option Agreement as an
22   element of the consideration granted by iEntertainment to Escom indicates that the opposite
23   is true; i.e. that these agreements were specially negotiated deals between two parties who
24   intended to intertwine their interests.  This is not a scenario where one of the Company's
25   managers secured a service contract for another company owned by him on terms that were
26   less favorable to the Company than the Company might have obtained had it been free to
27   obtain those services from a competing unaffiliated service provider. In this case, the Web
28   Site Linking Agreement was a vehicle for providing consideration to Mr. Mann in order to

secure his investment, and the Option Agreement (along with the revenue share to which Escom was entitled under the Web Site Linking Agreement) was consideration back to Escom to complete the deal. Finally, NBN ignores ¶5.10 of the Operating Agreement entirely, which provides that the Company may enter into an arrangement or incur a liability that is "not done at arm's length (e.g. with an Affiliate where the terms are not in accordance with Section 5.05)" with the consent of the Members holding a majority of the voting Interests in the Company.[2]  Since <u>all</u> of the members consented to the Company entering into the Web Site Linking and Option Agreement with iEntertainment, those agreements were properly approved under the Operating Agreement and enforceable.[3] NBN's attempt to have an "expert" evaluate the terms and fairness of the agreements in retrospect four years later is inappropriate and the "expert's" opinions are irrelevant.

### A. **NBN Ratified the Second Operating Agreement Upon Admission as a Member of the Company and Cannot Now Complain About the Terms of that Agreement**

NBN improperly claims that it did not ratify and accept the Web Site Linking Agreement and Option Agreement because it relied on representations that the Agreements were commercially reasonably and NBN did not have sufficient knowledge of the terms of the Agreements or other relevant facts to provide an informed consent.  NBN Objection,

---

[2] All versions of the Operating Agreement contain the same language in ¶¶ 5.05 and 5.10. *See* Exhibits, 3, 4, 11 and 16.

[3] NBN asserts that Michael Mann, the owner of WTA and iEntertainment controls Escom.  That statement is untrue and not supported by any evidence.  While Michael Mann controls WTA and iEntertainment, WTA is only one of three managers who advises and consents to Escom matters requiring the approval of its managers.  At the deposition of Del Anthony Polikretis, the CEO/President of Escom, taken by NBN, Mr. Polikretis testified that he reports to the managers collectively and to representatives at each of the managers – DNAG, DOM, and WTA.  Decisions regarding the operations of Escom and approvals as required are made in accordance with the operating agreement which requires the approval of all of the managers. (Exhibit 22, pp. 11-12, 15-16).  Moreover, every agreement between Escom and iEntertainment was approved by the disinterested Managers (i.e. DOM and DNAG), not just by WTA. The fact that WTA, DOM and DNAG ultimately reached agreement in the context of the bankruptcy case on how to address the secured claims and the debtor's estate does not erase the fact that they were independent parties at all relevant times.

3

¶¶ 54-57. First, no such representations were made by the Company in any relevant document or communication to NBN. Second, in signing the Admission Agreement (Exhibit 5), NBN expressly acknowledged and agreed as follows:

> NBN hereby agrees to be bound by the Operating Agreement as a Class A Member and Interest Holder. NBN represents that it has been afforded the opportunity to seek legal, tax and other appropriate counsel with respect to the terms, rights and obligations set forth in the Operating Agreement [which included the Web Site Linking Agreement and Option Agreement] and this Admission Agreement, and that it is executing this Admission Agreement with full knowledge of the same.

Whether NBN in fact conducted a thorough analysis of the company in which it was investing is of no relevance as NBN, a sophisticated investor, expressly agreed to be bound by the terms of the Second Operating Agreement, wherein the Web Site Linking Agreement and Option Agreement had been expressly approved, and expressly represented that its consent was in fact informed. NBN also argues that the contracts with iEntertainment were not sufficiently protective of Escom. It is completely disingenuous for NBN to claim they didn't have enough information on which to base a decision in one breath and then cite to information they clearly did have as a key basis for their claim in the next (information which they obviously knew and decided to ignore in proceeding with their investment). The reality is that NBN was made aware of all relevant facts and had every opportunity to review the iEntertainment website to help inform its decision as to whether its investment in Escom was a good business decision given the existence of the Linking Agreement and Option Agreement.

Third, the Operating Agreement includes an integration/merger clause stating that the Operating Agreement embodies the entire agreement of the parties (¶10.09 of the Operating Agreement and each amendment thereto – Exhibits 2, 3, 4, 11, 16); and that the Members of Escom are entitled to rely on the provisions of the Operating Agreement (¶10.10 of the Operating Agreement and each amendment thereto – Exhibits 2, 3, 4, 11, 16). NBN cannot come into Court four years after executing the Admission Agreement and agreeing to be

bound by the Second Operating Agreement and now claim that it was misled. As set forth in WTA's initial brief, such statements and attempts to supplement the record violate the parol evidence rule and the clams themselves are barred by the doctrines of estoppel and laches. *See* WTA Brief, sections III.B and C.

Fourth, with respect to the subsequent Waiver Agreement, NBN (at that time an equity holder in Escom) had an even greater opportunity to ensure that its decision to approve the Waiver Agreement was informed as Delaware statutory and common law provide LLC members the right to inspect confidential information and records of limited liability companies. 6 Delaware Code §18-305 provides that:

> (a) Each member of a limited liability company has the right, subject to such reasonable standards . . . as may be set forth in a limited liability company agreement or otherwise established by the manager . . . to obtain from the limited liability company from time to time upon reasonable demand for any purpose reasonably related to the member's interest as a member of the limited liability company:
>
> (1) True and full information regarding the status of the business and financial condition of the limited liability company;
>
> \* \* \*
>
> (6) Other information regarding the affairs of the limited liability company as is just and reasonable.

The Operating Agreement also provided NBN with similar inspection rights (See Article VI of all versions of the Company's Operating Agreement). Thus, NBN had the ability to inspect pertinent records relating to Escom's relationship with iEntertainment prior to expressly approving the Waiver Agreement. Yet, even after voicing initial concern over the Agreement (*see* Baldauf e-mail – Exhibit 10), NBN opted not to exercise these rights and instead opted to approve the Waiver Agreement. NBN claims that it had no choice in the matter. But, in fact, this is not the case at all. NBN could have refused to approve it, noted in writing their objection, and/or expressly reserved its right to seek redress if the Managers proceeded with the Wavier Agreement. Moreover, NBN could have refused to sign the Amendment to Interest Payment Extension Agreement (which was

5

executed contemporaneously with the Waiver Agreement and the Third Restated Agreement) (Exhibit 13) and instead call their note. They did none of these things. It would be inequitable for the Court to "save" NBN from its decisions and from the bargain it struck with Escom merely because NBN has now determined those decisions were unprofitable.

### B. NBN's Claim That iEntertainment Did Not Perform Under the Agreements for Four Years is Specious

NBN claims that iEntertainment did absolutely nothing to maximize the value of the Web Site Linking Agreement and therefore the Agreement should be annulled. *See* NBN Brief, ¶¶ 25-27. This claim is both wrong and irrelevant. As the documents reflect, iEntertainment entered into the Web Site Linking Agreement with Escom in or about February 2006. At the time both Escom and iEntertainment were new companies and their business plans were being developed. By September 2006, barely seven months later (and only four months after NBN joined the company), Escom entered into the Playboy.com License and Services Agreement (Exhibit 8) and iEntertainment agreed to suspend the Web Site Linking Agreement. When the Playboy.com agreement expired, iEntertainment agreed to continue the suspension of its rights, until August 2007 when the members entered into the Third Operating Agreement and expressly approved the Waiver Agreement permanently ending iEntertainment's linking rights. Accordingly, iEntertainment's rights under the Linking Agreement were in place for only seven months. Given the small amount of time and the fact that both iEntertainment and Escom were startups, the amount of revenue Escom derived from the Linking Agreement is a wholly inappropriate measure of whether iEntertainment performed under the agreement. The fact is that the short period of time notwithstanding, iEntertainment expended significant resources in building a live video chat website and otherwise developing its business. NBN also points to the fact that Escom's 2007 and 2008 financials reflect that Escom did not receive any revenue from iEntertainment as evidence of iEntertainment's failure to provide any value to Escom. Yet, this too is a baseless claim as iEntertainment had suspended and/or waived its linking rights

to during that entire period of time. Moreover, the extent of iEntertainment's performance under the Web Site Linking Agreement is irrelevant because the subsequent Waiver Agreement was duly authorized and approved by all of Escom's independent managers and members (including NBN) several months after iEntertainment's rights under the Web Site Linking Agreement had been suspended (i.e. well after any issues related to iEntertainment's performance would have been moot).

**III.    THE WAIVER AGREEMENT WAS NEVER SUBJECT TO THE "REASONABLY COMPARABLE" STANDARD SET FORTH IN PARA. 5.05 OF THE OPERATING AGREEMENTS AND NBN'S ATTEMPT TO HAVE THE AGREEMENT EVALUATED UNDER THAT STANDARD MUST BE REJECTED**

The Waiver Agreement (Exhibit 14) was a settlement of the Company's obligation to iEntertainment.  NBN erroneously contends that ¶ 5.05 of the Operating Agreement required the Waiver to be reasonably comparable to an agreement entered into with non-affiliates.  However, the express terms of ¶5.05 do not apply.  The language of ¶5.05 relied upon by NBN states:

> With the Approval of the Managers (excluding any interested Manager or any Manager appointed by an interested Member), the Company may enter into one or more agreements, leases, or contracts, or other arrangements *for the furnishing to or by the Company of goods, services or space* with any Member, Manager or Affiliated Person, and may pay compensation thereunder for such goods, services or space, provided in each case the amounts payable thereunder are reasonably comparable to those which would be payable to unaffiliated Persons under similar agreements . . . . (Emphasis added.)

Clearly the Waiver Agreement is not an agreement to furnish goods, services or space.  Accordingly, the provision cited by NBN is inapplicable.  Instead, the Waiver Agreement is a settlement of an obligation or liability and, as such, any approval of such a settlement is within the express authority of the Managers pursuant to ¶5.03(l).  Pursuant to the Third Operating Agreement, which was signed by all Managers and by all members, including NBN, the Company was expressly authorized to enter into the Wavier Agreement.

7

*See* Exhibit 11 (Third Operating Agreement, ¶5.05) ("The Members hereby authorize the Company to enter into the Agreement to Waive Linking Rights (including the promissory note and security agreement referenced therein) . . . in order to modify the parties' respective rights and obligations under the Linking and Option Agreements"). Having signed the Third Operating Agreement and expressly approved the Waiver Agreement, NBN cannot challenge the Waiver Agreement three years later when, in hindsight, it determines that the deal was not in its best interest.

## IV. THE COMPANY'S MANAGERS, INCLUDING WTA AND DOM, DID NOT VIOLATE ANY FIDUCIARY DUTY AND THERE IS NO COLORABLE CLAIM THAT CAN AND SHOULD BE PURSUED BY NBN

NBN seeks to assert state law claims for breach of fiduciary duty and corporate waste against the Company's managers. In *Louisiana World Exposition v. Federal Insurance Company*, 858 F.2d 233 (5th Cir. 1988), repeatedly cited by NBN, the Fifth Circuit was asked to determine whether a creditors' committee could assert causes of action against the debtor's officers and directors based on state law claims under Louisiana law. Citing the Supreme Court's decision in *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979), the Fifth Circuit held that where "no cause of action is asserted arising under the Bankruptcy Code and thereby implicating 'some federal interest,' the viability of the claim asserted . . . must be evaluated under [state] law. The *Louisiana World* court further held that a creditors' committee should not be permitted to bring an action on behalf of the estate unless it can establish a colorable claim that would benefit the estate and which the Debtor had declined to pursue.

The Operating Agreement provides that Delaware law governs (¶10.04 of the Operating Agreement and each amendment thereto – Exhibits 2, 3, 4, 11, 16); accordingly, the Court must determine whether colorable claims for breach of fiduciary duty exist under Delaware law. For the reasons set forth below, no colorable claim exists.

In *In re BH S & B Holdings LLC*, 420 BR 112 (Bankr. S.D.N.Y. 2009), the bankruptcy court applying Delaware law held that Delaware General Corporation law

8

permits an LLC and its managers to exculpate the company's directors and officers from liability arising from breach of fiduciary duty. Moreover, if the operating agreement contains an exculpatory provision, then the court may determine at the motion to dismiss stage that no colorable claim exists that could or should be pursued by a creditor or committee. Citing the applicable Delaware statutory and case law, the *BH S& B* Holdings court explained:

> Under § 102(b)(7) of the Delaware General Corporation Law, shareholders may exculpate directors and officers for liability arising from a breach of fiduciary duty of care.

420 B.R. at 145. The *BH S&B* court, citing numerous Delaware authorities and treatises, held that the courts may take judicial notice of exculpatory provisions and dismiss a complaint for breach of fiduciary duty at the pleading stage.[4]

Section 18-1101 of the Delaware Limited Liability Company Act similarly permits the members or managers to limit or eliminate liability for breaches of a manager's fiduciary duties.[5] *See In re The Heritage Organization, LLC*, 2008 WL 5215688, 15 (Bankr. N.D. Tex. 2008) ("Under Delaware law, a limited liability company may restrict or wholly eliminate any duties that might otherwise be owed to that company, including fiduciary duties."). Furthermore, the Delaware courts have held that creditors may be bound by an LLC agreement that expressly waives liability for breaches of fiduciary duty.[6]

---

[4] Cases cited by the *BH S&B* court include: *Malpiede v. Townson,* 780 A.2d 1075, 1091-93 (Del.2001) (holding that chancery court properly considered exculpatory provision on motion to dismiss under *Del. Ch.* Ct. R. *12(b)(6),* because "[w]hen the issue is confined to the legal effect of a Section 102(b)(7) charter provision, it is difficult to envision what discovery would be implicated"); *Hokanson v. Petty,* 2008 WL 5169633, at *5 (Del.Ch. Dec.10, 2008) (taking judicial notice of exculpation clause, granting motion to dismiss breach of fiduciary duty of care claim under Del. Ch. Ct. R. 12(b)(1)); *IT Litig. Trust v. D'Aniello (In re IT Group),* 2005 WL 3050611, at *11-12 (D.Del. Nov.15, 2005) (considering exculpatory provision on appeal of motion to dismiss and noting that Del. Stat. Ann. § 102(b)(7) bar can be raised on a Fed.R.Civ.P. 12(b)(6) motion to dismiss, a motion for judgment on the pleadings, or in a motion for summary judgment).

[5] Section 18-1101 of the DLLCA provides that "any and all liabilities for breach of contract and breach of duties (including fiduciary duties) of a member, manager or other person to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement" with the exception of liability for "any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing." DEL.CODE ANN. *tit. 6, § 18-1101(e).*

[6] *See North American Catholic Educational Programming Foundation, Inc. v. Gheewalla,* 930 A.2d (Footnote Continued)

9

Here, ¶5.06 of the Operating Agreement expressly provides that managers shall not be held liable for damages for breach of duty unless there is a final adjudication that the Manager acted in bad faith or was involved in intentional misconduct or a knowing violation of law:

> 5.06  Limited Liability for Certain Acts.  A Manager shall not be personally liable to the Company or its Members for damages for any breach of duty as a Manager, except for any matter in respect to which such Manager shall be liable by reason that, in addition to any and all other requirements for such liability, there shall have been a judgment or other final adjudication adverse to such Manager that establishes that such Manager's acts or omissions were in bad faith or involved intentional misconduct or a knowing violation of law or that such Manager personally gained in fact a financial profit or other advantage to which such Manager was not legally entitled or that with respect to a distribution such Manager's acts were not performed in accordance with the Act or this Agreement. Neither the amendment or the repeal of this Section 5.06 shall eliminate or reduce the effect of this Section 5.06 in respect to any matter occurring, or any cause of action, suit or claim that, but for this Section 5.06, would accrue or arise, prior to such amendment, repeal or adoption of an inconsistent provision.

There has been no adjudication and no allegations by NBN that any of the managers took actions in bad faith or that their actions involved intentional misconduct or knowing violations of the law (nor would there be a basis for any such allegation).  Accordingly, any claim that NBN might wish to assert against the managers would be limited to claims of breaches of fiduciary duty.  Paragraph 5.06 of the Operating Agreement insulates the managers from any such claims or liability.  Furthermore, NBN has failed to make any

---

92, 100-02 ( Del.2007) ("[w]hen a corporation is insolvent ... its creditors take the place of the shareholders as the residual beneficiaries;" and creditors have many opportunities to protect their rights, "among which are the protections afforded by their negotiated agreements, their security instruments, the implied covenant of good faith and fair dealing, fraudulent conveyance law, and bankruptcy law"); Mark M. Maloney and Michelle L. Carter, *Asserting Breach-of-fiduciary-duty Claims in the Context of Delaware LLCs,* Am. Bankr.Inst. J., Vol. XXVIII, No. 7, September 2009, at 36, 86, 86 n. 2 ("By stepping into equityholders' shoes, creditors would be bound by the LLC agreement's provisions governing fiduciary duties, subject to the implied covenant of good faith and fair dealing, tit. 6 § 18-1101(c)," and, "the authors agree that a Delaware LLC can probably accept, adjust or deny fiduciary duties to creditors through its LLC agreement.").

demand on the Debtor to bring an action against its managers. Because no claim exists pursuant to Delaware law and the Operating Agreement, and because NBN failed to request that the Debtor pursue such action, NBN must be denied permission to pursue what would otherwise be estate causes of action.

## V. NEITHER WTA NOR DOM ENGAGED IN ANY INEQUITABLE CONDUCT THAT WOULD JUSTIFY DENIAL OF THEIR RIGHTS UNDER THEIR SECURED NOTES

NBN improperly suggests that the Secured Lenders' default interest, collection costs and late fees should be equitably subordinated. Without any factual basis or legal authority, NBN argues that WTA and DOM caused the defaults and have improperly colluded to pay each other and that as insiders the equities require the Court to deny them their interest and collection costs which were expressly contracted for in their secured notes. First, WTA and DOM did not "cause" the Company to default; the Company had insufficient liquidity to pay the secured liens, and WTA and DOM had no obligation to extend the maturity of their obligations. The secured notes of WTA and DOM were negotiated among and approved by the members/managers at the time the Company was formed. In addition to the secured notes, both WTA and DOM made $1 million capital contributions to fund the Company. In approving the form of the notes, all of the Managers and Members approved the terms. WTA and DOM tried for a year to reach an agreement for the restructuring of the Company's debt and/or sale of the Company's assets to raise sufficient capital to pay off the secured notes. As this Court is well aware, DOM and WTA did not see eye to eye on the management of the Debtor. It was not until the bankruptcy case was filed and the Court threatened to appoint a trustee if the managers could not agree on how to proceed with the bankruptcy and sell the assets that DOM, WTA and DNAG all agreed to the amounts and priorities of the Secured Lenders' claims. There is nothing improper in the Agreement that was ultimately reached among the Secured Lenders.

As detailed in WTA's brief, 11 U.S.C. §506(b) provides that oversecured creditors, such as WTA and DOM, are entitled to be paid the additional costs and fees provided in

their Notes, including default interest and late fees. The sale of assets was completed pursuant to 11 U.S.C. §363 with the approval of the Bankruptcy Court. Even NBN did not object to the form of the sale. Under the Ninth Circuit's holding in *General Electric Capital Corp v. Future Media Productions Inc.*, 536 F.3d 969 (9th Cir. 2008), default interest and late fees should be awarded.

## VI.    CONCLUSION

For the reasons set forth above, the Court should find that (1) the iEntertainment Note is a valid secured note, (2) WTA and DOM should be paid in full, (3) NBN's objection to the distribution should be overruled, and (4) NBN's motion to pursue estate causes of action should be denied.

Dated: December 8, 2010

Respectfully submitted,

LAW OFFICE OF SUSAN I. MONTGOMERY

By    /s/ Susan I. Montgomery
       Susan I. Montgomery
Attorneys for Washington Technology Associates, LLC and iEntertainment, Inc.

| In re: ESCOM, LLC | CHAPTER 11 |
|---|---|
| Debtor(s). | CASE NUMBER 1:10-bk-13001-GM |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 1925 Century Park East, Suite 2000, Los Angeles, CA 90067

A true and correct copy of the foregoing document described **RESPONSE AND OPPOSITION OF WASHINGTON TECHNOLOGY ASSOCIATES, LLC AND iENTERTAINMENT, INC. TO NUTHIN' BUT NET'S OBJECTION TO DISTRIBUTION OF SALE PROCEEDS AND TO ITS MOTION FOR AUTHORITY TO PURSE ESTATE CAUSES OF ACTION** be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **December 8, 2010** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

- Jeffrey W Dulberg   jdulberg@pszjlaw.com
- Michael I Gottfried   mgottfried@lgbfirm.com, msaldana@lgbfirm.com
- Peter J Gurfein   pgurfein@lgbfirm.com
- John W Kim   jkim@nossaman.com
- Susan I Montgomery   susan@simontgomerylaw.com
- S Margaux Ross   margaux.ross@usdoj.gov
- United States Trustee (SV)   ustpregion16.wh.ecf@usdoj.gov

**II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On December 8, 2010, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be</u> completed no later than 24 hours after the document is filed.

The Honorable Geraldine Mund       [BY OVERNIGHT MAIL]
United States Bankruptcy Court
Central District of California
21041 Burbank Boulevard, Suite 342
Woodland Hills, CA 91367

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **December 8, 2010** I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge <u>will be</u> completed no later than 24 hours after the document is filed.

- Alan Nisselson and Scott Matthews – anisselson@windelsmarx.com; smatthews@windelsmarx.com
- Daniel G. Gurfein   dgurfein@ssbb.com James Regan   jregan@ssbb.com
- Brian Leventhal   brian@leventhallegal.com

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| 12/8/2010 | Jennifer Montgomery | /s/ Jennifer Montgomery |
|---|---|---|
| *Date* | *Type Name* | *Signature* |